Jennifer Yu Sacro, SBN: 208988
E-Mail: jsacro@sacrowalker.com
Ilya A. Kosten, SBN: 173663
E-Mail: ikosten@sacrowalker.com
Lisa M. Burnett, SBN: 324293
E-Mail: lburnett@sacrowalker.com
SACRO & WALKER LLP
700 North Brand Boulevard, Suite 610
Glendale, California 91203
Tel.: (818) 721-9597; Fax: (818) 721-9670

Attorneys for Defendant
RADNOR SPECIALTY INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA ENDOWMENT,<br><br>Plaintiff,<br><br>v.<br><br>RADNOR SPECIALTY INSURANCE COMPANY,<br><br>Defendant. | ) Case No. 2:25-cv-06891 ODW (MARx)<br>) Hon. Otis D. Wright, II<br>)<br>) **EVIDENCE PACKET IN SUPPORT**<br>) **OF DEFENDANT RADNOR**<br>) **SPECIALTY INSURANCE**<br>) **COMPANY'S**<br>) **MOTION FOR SUMMARY**<br>) **JUDGMENT**<br>)<br>) *[Concurrently filed with: 1) Notice of*<br>) *Motion and Motion for Summary*<br>) *Judgment; 2) Statement of Uncontroverted*<br>) *Facts; 3) Proposed Judgment]*<br>)<br>) Date:          December 29, 2025<br>) Time:           1:30 P.M.<br>) Courtroom:  10C<br>)<br>) Complaint filed: July 28, 2025<br>) Pre-Trial Conference: February 22, 2027<br>) Trial: March 9, 2027 |

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

- 1 -
**EVIDENCE PACKET IN SUPPORT OF DEFENDANT RADNOR SPECIALTY
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

## EVIDENCE PACKET

## Table of Contents

| Document Type | Description |
|---|---|
| Declaration | Declaration of James B. Shrimp in Support of Defendant Radnor Specialty Insurance Company's Motion for Summary Judgment[1] |
| Exhibit 1 | Radnor Specialty Insurance Company policy no. DPS5000364C |
| Exhibit 2 | Complaint in action entitled *Gina Durham v. The California Endowment, et al.*, Los Angeles County Superior Court Case No. 23STCV19120D (the "Durham Action") |
| Exhibit 3 | May 25, 2022, reservation of rights letter |
| Exhibit 4 | September 1, 2023, reservation of rights letter |
| Exhibit 5 | June 11, 2024, letter from C. Counts to J. Shrimp and enclosed Statement of Worl of June 7, 2024 |
| Exhibit 6 | July 12, 2024, letter from C. Counts to J. Shrimp and enclosed Integreon invoice no. 111137369 in the amount of $7,946.65 |

---

[1] The instant Evidence Packet containing Exhibits 1-10 in support of Radnor's Motion for Summary Judgment is referred to in the Declaration of James B. Shrimp as the "Volume of Exhibits".

- 2 -

**EVIDENCE PACKET IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

| Document Type | Description |
|---|---|
| Exhibit 7 | July 31, 2024, emails between C. Counts and James Shrimp |
| Exhibit 8 | October 28, 2024, letter from K. Brown to L. Davis |
| Exhibit 9 | August 16, 2024, invoice no. 111137717 of Integreon in the amount of $409,399.94 |
| Exhibit 10 | August 16, 2024, invoice no. 111137718 of Integreon in the amount of $3,219.00 |
| Declaration | Declaration of Ilya A. Kosten in Support of Defendant Radnor Specialty Insurance Company's Motion for Summary Judgment |

DATED:  November 21, 2025          SACRO & WALKER LLP

By  */s/ Ilya A. Kosten*
       JENNIFER YU SACRO
       ILYA A. KOSTEN
       LISA M. BURNETT
       Attorneys for Defendant RADNOR
       SPECIALTY INSURANCE
       COMPANY

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

- 3 -

Declaration of James B. Shrimp

Jennifer Yu Sacro, SBN: 208988
E-Mail: jsacro@sacrowalker.com
Ilya A. Kosten, SBN: 173663
E-Mail: ikosten@sacrowalker.com
Lisa M. Burnett, SBN: 324293
E-Mail: lburnett@sacrowalker.com
SACRO & WALKER LLP
700 North Brand Boulevard, Suite 610
Glendale, California 91203
Tel.: (818) 721-9597; Fax: (818) 721-9670

Attorneys for Defendant
RADNOR SPECIALTY
INSURANCE COMPANY

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA ENDOWMENT, | ) Case No. 2:25-cv-06891 ODW (MARx) |
| | ) Hon. Otis D. Wright, II |
| Plaintiff, | ) |
| | ) **DECLARATION OF JAMES B.** |
| v. | ) **SHRIMP IN SUPPORT OF** |
| | ) **DEFENDANT RADNOR SPECIALTY** |
| RADNOR SPECIALTY | ) **INSURANCE COMPANY'S MOTION** |
| INSURANCE COMPANY, | ) **FOR SUMMARY JUDGMENT** |
| | ) |
| Defendant. | ) |
| | ) |

DATE:          December 29, 2025
TIME:          1:30 p.m.
COURTROOM:   10C

- 5 -

DECLARATION OF JAMES B. SHRIMP IN SUPPORT OF DEFENDANT
RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY
JUDGMENT

I, James B. Shrimp, declare as follows:

1.    I am over the age of 18 and am employed as a Claims Examiner, Professional Claims for Defendant Radnor Specialty Insurance Company ("Radnor"). The following facts are within my personal knowledge.  If called upon as a witness, I could and would testify competently to those facts, under oath.

2.    I am familiar with Radnor's practices and policies of document preparation and retention. The documents attached hereto were either prepared on behalf of Radnor at or near the time of the events they concern by someone with knowledge and authority as part of Radnor's regular business practice and maintained as business records of Radnor in its ordinary course of business or received by Radnor during its ordinary course of business and so maintained in its business records for this matter.

3.    Attached as **Exhibit 1** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of the Radnor Specialty Insurance Company policy no. DPS5000364C that was issued to The California Endowment with effective dates of September 1, 2021, to September 1, 2022 (the "Policy").

4.    On or about August 10, 2023, Gina Durham, a former employee of TCE, sued TCE in an action titled *Gina Durham v. The California Endowment, et al*., Los Angeles County Superior Court Case No. 23STCV19120D (the "Durham Action"). Before filing the Durham Action, back in about April-May, 2022, Ms. Durham's counsel had provided a copy of the draft Complaint to TCE. TCE tendered Ms. Durham's claims and lawsuit to Radnor demanding a defense under the Policy. Attached as **Exhibit 2** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of Ms. Durham's Complaint in the Durham Action that she filed with the Superior Court of California for the County of Los Angeles.

DECLARATION OF JAMES B. SHRIMP IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

5. Because the Durham Action alleged claims potentially covered under the EPL coverage part of the Policy issued by Radnor to TCE, Radnor immediately agreed to provide its insured a defense under a reservation of rights. Attached as **Exhibits 3 and 4** to the Volume of Exhibits concurrently filed herewith, respectively, are Radnor's reservation of rights letters dated May 25, 2022 and September 1, 2023 sent to TCE. As set forth in the September 1, 2023 reservation of rights letter, Radnor retained attorneys from the Wesierski & Zurek law firm to defend TCE.

6. After several months of ongoing negotiations, the Durham Action was settled in October 2024 for a confidential amount that was fully funded by Radnor pursuant to the Policy.

7. While Radnor has its own e-discovery consultants that it employs to assist in the defense of lawsuits such as the Durham Action, TCE unilaterally, and without Radnor's prior written consent, engaged and hired a company named Integreon as an e-discovery consultant in the defense of the Durham Action.

8. Attached as **Exhibit 5** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of a letter dated June 11, 2024, from Christian C. Counts of Wesierski & Zurek that he sent to me with a copy of the Statement of Work ("SOW") between TCE and Integreon referenced in his letter, which is the letter by which Radnor was first informed that TCE had hired Integreon. Radnor did not consent to TCE entering into the SOW with Integreon. The SOW referenced an earlier May 14, 2024, Services Agreement entered into between Integreon and TCE, for which no one sought prior consent from Radnor. Radnor did not consent to TCE entering into a Services Agreement with Integreon.

9. Attached **Exhibit 6** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of a July 12, 2024, letter from Christian C. Counts

- 7 -

DECLARATION OF JAMES B. SHRIMP IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

of Wesierski & Zurek to me, together with Integreon invoice no. 111137369 dated July 8, 2024, for services rendered to TCE in the amount of $7,946.65.

10.    Not only did TCE hire Integreon without the prior consent of Radnor, but also without the input of defense counsel Christian C. Counts of the Wesierski & Zurek law firm that Radnor had appointed to defend TCE. In such respect, attached as **Exhibit 7** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of a July 31, 2024, email chain between Christian C. Counts of Wesierski & Zurek and me, among others, including Mr. Counts's email stating that TCE had hired Integreon without his input.

11.    Attached as **Exhibit 8** to the Volume of Exhibits concurrently filed herewith is a true and correct copy of an October 28, 2024, letter from Kevin Brown, Coverage Specialist for Radnor, to Ms. Lynell Davis, of TCE in response to TCE's August 16, 2024, ex post facto request that Radnor pay $412,618.94 for additional e-discovery services apparently rendered by Integreon for TCE and which Radnor had not authorized. Attached as **Exhibits 9 and 10** to the Volume of Exhibits concurrently filed herewith**,** respectively, are true and correct copies of Integreon's August 16, 2024 invoices nos. 111137717 in the amount of $409,399.94 and 111137718 in the amount of $3,219.00 (totaling $412,618.94) for Phase 2 related work, which were the subject of TCE's request to Radnor for payment and to which services Radnor never consented.

12.    As was reiterated in the October 28, 2024, letter to TCE, and based on the July 12, 2024, letter from Mr. Counts and on the previous $9,976 estimate for Phase 1 work, Radnor paid the $7,496 invoice from Integreon in full on behalf of TCE, as a special accommodation to TCE and its defense counsel. However, Radnor disclaimed, and continues to disclaim, any obligation to pay for the additional

DECLARATION OF JAMES B. SHRIMP IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

unauthorized services allegedly rendered by Integreon in the amount of $412,618.94 for a Phase 2, which Radnor contends are not covered under the provisions of the Policy and to which Radnor never consented. Radnor never received any estimates regarding the Phase 2 work. After several months of ongoing negotiation, the Underlying Action was in the process of being settled and Radnor had no expectation whatsoever that any additional discovery work would be necessary or performed by Integreon, let alone the hundreds of thousands of dollars of work at issue here. And in fact, the Underlying Action was nearing settlement in the summer and fall of 2024, and Radnor fully funded the settlement shortly thereafter. Regardless, neither TCE nor its defense counsel asked for Radnor's consent for Integreon, nor did Radnor provide prior written consent to any additional work by Integreon. Radnor never provided written consent to the initial retention of Integreon either, or to any of the work performed by Integreon as stated above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true correct. This declaration was signed on November 17, 2025, at Wayne, Pennsylvania.

James B. Shrimp

DECLARATION OF JAMES B. SHRIMP IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 1

Exhibit 1
Page 10

DPS5000364B
Renewal of Number

**Radnor Specialty Insurance Company**

Home Office Copy

POLICY DECLARATIONS

1170 Devon Park Drive, Wayne, Pennsylvania 19087
A Member Company of Devon Park Specialty Insurance

No. DPS5000364C

NAMED INSURED AND ADDRESS:
THE CALIFORNIA ENDOWMENT

POLICY PERIOD: (MO. DAY YR.)   From:  09/01/2021  To:  09/01/2022

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

FORM OF BUSINESS:        Non-Profit Corporation

BUSINESS DESCRIPTION: Executive View Point

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

|  | PREMIUM |
|---|---|
| Executive ViewPoint - Management Liability | $ |
| Directors & Officers Liability | Purchased |
| Employment Practices Liability | Purchased |
| Fiduciary Liability | Not Purchased |
| Surplus Lines Tax | $ |
| Stamping Fee | $ |
| TOTAL: | $ |

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue
See Endorsement EOD (1/95)

Agent:   AMWINS INSURANCE BROKERAGE OF LOS ANGELES, CA (1280)
         444 South Flower Street, Suite 4500
         Los Angeles, CA  90017

Issued:  08/25/2021 11:32 AM

Broker:  Bolton & Co

By: _Thomas P. Nerney_
Authorized Representative

UPD (08-07)   THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Exhibit 1
Page 11

## EXTENSION OF DECLARATIONS

Policy No. DPS5000364C

Effective Date:    09/01/2021

12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

FORMS AND ENDORSEMENTS

The following forms apply to the Directors And Officers Liability coverage part

| Endt# | Revised | Description of Endorsements |
|-------|---------|----------------------------|
| 2110 | 04/15 | Service Of Suit |
| EVP 100 GTC | 11/19 | Executive ViewPoint - EVP -  General Terms and Conditions |
| EVP 102 EPL | 11/19 | Executive ViewPoint - EVP - Employment Practices Liability Coverage Part |
| EVP 104 NP | 11/19 | Executive ViewPoint - EVP - Directors & Officers Liability Coverage Part |
| EVP 211 | 11/15 | Amend Other Insurance - Act As Primary |
| EVP 239 | 12/19 | Identity Theft Expense Endorsement |
| EVP 257 NP | 12/19 | Privacy Breach Expense Endorsement |
| EVP 264 | 11/15 | Separate Retention For Mass Or Class Action Claims |
| EVP 272 | 12/19 | Workplace Violence and Kidnap Expense Endorsement |
| EVP 273 | 11/15 | Extended Reporting Period Percentage Endorsement |
| EVP 300 NP | 12/16 | Nonprofit General Terms and Conditions Endorsement |
| EVP 317 | 12/18 | Defense Costs Sublimit for Wrongful Immigration Acts |
| EVP 323 | 02/21 | Biometric Information Exclusion |
| EVP 324 NP | 03/21 | Side A Additiional Limit Exclusion |
| Jacket RAD | 06/20 | Policy Jacket |

EOD (01/95)    All other terms and conditions remain unchanged.    Page    1    of    1

Exhibit 1
Page 12

## EXECUTIVE VIEWPOINT MANAGEMENT LIABILITY POLICY DECLARATIONS

PLEASE READ YOUR POLICY CAREFULLY.

THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.

No.  DPS5000364C

Effective Date:  09/01/2021

12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

THE CALIFORNIA ENDOWMENT

███████████████

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  09/01/2021  To:  09/01/2022

ITEM III: LIMITS OF LIABILITY

The Coverage Part(s) designated below are issued with the Limits of Liability option shown below:

LIMIT OPTION SELECTED:    Dedicated Limits of Liability

## Directors & Officers Liability Coverage Part

1. LIMITS OF LIABILITY:

| | | |
|---|---|---|
| Directors & Officers Liability Coverage Part | $5,000,000 | EACH CLAIM AND IN THE AGGREGATE |
| 2. RETENTION: | $100,000 | EACH CLAIM |
| 3. PRIOR AND PENDING DATE: | 09/01/2013 | |

## Employment Practices Liability Coverage Part

1. LIMITS OF LIABILITY

| | | |
|---|---|---|
| Employment Practices Liability Coverage Part | $5,000,000 | EACH CLAIM AND IN THE AGGREGATE |
| 2. RETENTION | $25,000 | EACH CLAIM |
| 3. PRIOR AND PENDING DATE: | 09/01/2013 | |

## Fiduciary Liability Coverage Part

1. LIMITS OF LIABILITY

| | | |
|---|---|---|
| Fiduciary Liability Coverage Part | Not Covered | EACH CLAIM AND IN THE AGGREGATE |
| 2. RETENTION | N/A | EACH CLAIM |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

EVP 150 (11-15)

This page has been intentionally left blank.

Exhibit 1
Page 14

## Service Of Suit

Pursuant to any statute of any state, territory or district of the United States which makes provisions therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the Statute, or his successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured(s) or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the below named as the person to whom the said officer is authorized to mail process or a true copy thereof.

It is further agreed that service of process in such suit may be made upon the General Counsel of the Company, or his nominee, at 1190 Devon Park Drive, Wayne, Pennsylvania 19087 and that in any suit instituted against any one of them upon this policy, the Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.

2110 (04-15)                                                                                          Page 1 of 1

Exhibit 1
Page 15

# Executive ViewPoint - EVP
Management Liability Policy

General Terms and Conditions

---

*In consideration of payment of the premium and subject to the Policy Declarations and the limitations, conditions, provisions and all other terms of this **Policy**, the **Insurer** and the **Insureds** agree as follows:*

I.    HEADINGS, BOLDED TERMS
    A.   The descriptions in the headings and subheadings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage, and do not serve to express, confirm or provide coverage.
    B.   Words in bold have special meaning and are defined in Section III. DEFINITIONS. Any bolded term in a **Coverage Part** that is defined in these General Terms and Conditions shall have the meaning set forth in these General Terms and Conditions. Any bolded term in a **Coverage Part** that is defined in that **Coverage Part** shall have the meaning set forth in such **Coverage Part**.

II.   TERMS AND CONDITIONS
    A.   The General Terms and Conditions of this **Policy** shall apply to all **Coverage Parts** except for terms and conditions that are specific to a **Coverage Part.** In the event of a conflict between these General Terms and Conditions and the terms and conditions of a **Coverage Part**, the terms and conditions of that **Coverage Part** shall control.

III.  DEFINITIONS
    A.   **Application** means:
        1.   an application and attachments thereto, and materials submitted or required to be submitted therewith for this **Policy**; and
        2.   an application and attachments thereto, and materials submitted or required to be submitted therewith for any previous **Policies** issued by the **Insurer** providing uninterrupted coverage; provided, however, such application, attachments and submitted materials were provided to the **Insurer** within the last twelve (12) months.
        All such applications, attachments and materials as described in paragraphs 1. and 2. above are deemed attached and incorporated into this **Policy** as if physically attached.
    B.   **Claim** shall have the meaning as defined in the applicable **Coverage Part**.
    C.   **Coverage Part** means only those coverage parts designated as set forth in the Policy Declarations as included and attached to and made a part of this **Policy**.
    D.   **Defense Costs** shall have the meaning as defined in the applicable **Coverage Part**.
    E.   **Domestic Partner** means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local laws.
    F.   **Financial Impairment** means:
        1.   the appointment by any federal or state official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator, creditors committee or similar official to take control of, supervise, manage or liquidate such **Organization** and provided that the court or other judicial or administrative body overseeing the receivership, conservatorship, liquidation, rehabilitation, bankruptcy or equivalent proceeding has denied a request by the **Organization** to indemnify an **Insured Person** for a **Loss**;
        2.   such **Organization** becoming a debtor in possession under the United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country: or
        3.   the inability of such **Organization** to indemnify an **Insured Person** for a **Loss** solely on the basis of the **Organization's** financial condition.
    G.   **Insured** means any **Organization** and any **Insured Person**.
    H.   **Insured Person** shall have the meaning as defined in the applicable **Coverage Part**.
    I.   **Insurer** means the insurance company identified in the Policy Declarations.

EVP 100 GTC (11-19)

Page 1 of 9

Exhibit 1
Page 16

J.  **Interrelated Wrongful Acts** means any **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or are logically or causally connected by reason of any common or related series of facts, circumstances, situations, transactions or events.

K.  **Loss** shall have the meaning as defined in the applicable **Coverage Part.**

L.  **Management Control** means:
1. ownership of more than fifty percent (50%) of the outstanding securities representing the right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers, or management committee members; or
2. ownership of exactly fifty percent (50%) of the voting rights representing the right to elect, appoint, or designate the majority of the directors, trustees, managers, members of the Board of Managers, or management committee members; and pursuant to a written contract solely controls the management and operations of such entity.

M.  **Named Insured** means the entity named on the Policy Declarations.

N.  **Organization** means:
1.  the **Named Insured** and any **Subsidiary**; and
2. any such entity as a debtor in possession under United States bankruptcy law or equivalent status under the law of any other jurisdiction

O.  **Outside Entity** shall have the meaning as defined in the applicable **Coverage Part.**

P.  **Outside Executive Capacity** shall have the meaning as defined in the applicable **Coverage Part.**

Q.  **Plan** shall have the meaning as defined in the applicable **Coverage Part**.

R.  **Policy** means collectively the Policy Declarations, General Terms and Conditions, applicable **Coverage Parts**, applicable endorsements, and the **Application**.

S.  **Policy Period** means the period of time from the effective date and time of this **Policy** to the date and time of expiration as shown in the Policy Declarations, or its earlier cancellation or termination date. If the length of the **Policy Period** is the same as the **Policy Year**, the terms **Policy Period** and **Policy Year** are used interchangeably herein.

T.  **Policy Year** means the period of one (1) year following the effective date of the **Policy Period** or any subsequent one-year anniversary thereof.

U.  **Shareholder Derivative Demand** means a written demand by one or more shareholders of the **Organization** in their capacity(ies) as such, upon the board of directors of any **Organization** to bring a civil proceeding in a court of law on behalf of, or in the name or right of, the **Organization** against any **Insured Person** for a **Wrongful Act** by an **Insured Person**, but only if such demand is asserted without the assistance, participation or solicitation of any member of the board of directors, officer, member of the board of managers or management committee, or a functional equivalent thereof.

V.  **Shareholder Derivative Demand Investigation Costs** means reasonable costs, fees and expenses (other than regular or overtime wages, salaries, fees, or benefits of the directors, officers or employees of the **Organization**) incurred by the **Organization** (including its Board of Directors or any committee thereof), with the prior written consent of the **Insurer**, solely with respect to an investigation required to determine whether it is in the best interest of the **Organization** to prosecute the claims alleged in a **Shareholder Derivative Demand** and prior to any **Claim** first made in connection with such **Shareholder Derivative Demand**.

W.  **Subsidiary** means:
1. any entity, whose securities are not publicly traded, in which the **Named Insured** has **Management Control** directly or indirectly through one or more **Subsidiaries** on or before the effective date of this **Policy**; and
2. any not-for-profit entity under section 26 U.S.C. §501(c) (3), (4), (6), (7) and (10), as amended, or any Political Action Committee, sponsored exclusively by the **Named Insured** on or before the effective date of this **Policy** and during the term of this **Policy** and any renewal thereof.

X.  **Takeover** means:
1. The acquisition by another entity or person or group of entities or persons acting in concert of:
    a.  the **Management Control** of the **Named Insured**; or

EVP 100 GTC (11-19)                                                                                          Page 2 of 9

Exhibit 1
Page 17

      b.  the acquisition of more than fifty percent ( 50%) of the total consolidated assets of the **Named Insured** as of the date of the **Named Insured's** most recent audited consolidated financial statement prior to such acquisition;

2. the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;

3. the consolidation of the **Named Insured** with another entity; or

4. the **Named Insured** emerging from bankruptcy as of the effective date stated in the plan of reorganization as approved or ordered by the court.

Y. **Wrongful Act** shall have the meaning as defined in each applicable **Coverage Part.**

IV.     <u>EXTENDED REPORTING PERIOD</u>

    A. Optional Extended Reporting Period

       1. If this **Policy** expires, is cancelled by the **Named Insured**, or non-renewed by the **Named Insured** or **Insurer** or the **Named Insured** undergoes a **Takeover**, then an **Insured** shall have the right to purchase, upon payment of an additional premium, an Extended Reporting Period of one (1) year, two (2) years, three (3), or six (6) years after the effective date of such expiration, non-renewal or cancellation of this **Policy** to report to the **Insurer** as soon as practicable prior to the expiration date of the purchased Extended Reporting Period any **Claim** against an **Insured.** An Extended Reporting Period shall only apply to **Claims** arising from a **Wrongful Act** which was actually or allegedly committed before the date of expiration, cancellation or non-renewal of this **Policy,** or prior to the effective date of any **Takeover**.

       2. The offer of renewal terms and conditions or premiums by the **Insurer** different from those in effect prior to renewal shall not constitute refusal to renew.

       3. An Optional Extended Reporting Period is not available if a **Policy** is cancelled for non-payment of premium.

    B. Extended Reporting Period Premium

       1. The additional premium for the Extended Reporting Period will be equal to the applicable percentage of the annualized policy premium set forth in Item IV.  EXTENDED REPORTING PERIOD of the Policy Declarations as applicable to the Extended Reporting Period term selected.

       2. As a condition precedent to the right to purchase an Extended Reporting Period, the total premium for this **Policy** must have been paid. The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium as set forth above, is received by the **Insurer** within sixty (60) days of the effective date of the expiration, termination, or cancellation of this **Policy**; or any **Takeover**.

       3. If the Extended Reporting Period is purchased, the entire premium shall be deemed fully earned at its inception without any obligation by the **Insurer** to return any portion thereof.

    C. Extended Reporting Period Limit

       1. The Extended Reporting Period will not provide a new, separate or additional Limit of Liability. The remainder of the Limit of Liability applicable to the **Policy Year** in effect as of the effective date of the expiration, cancellation, non-renewal, or **Takeover** is the maximum Limit of Liability for all **Claims** reported during the Extended Reporting Period.

V.     <u>DEFENSE AND SETTLEMENT</u>

    A. Defense

The **Insurer** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent. The **Insurer** shall have the right to appoint counsel of its choice with respect to such **Claim**. The **Insurer's** obligation to defend any **Claim** or pay any **Loss**, including **Defense Costs**, shall be completely fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

       1. The **Insurer** may make any investigation it deems necessary and may, with the consent of an **Insured**, which shall not be unreasonably withheld, make any settlement of any **Claim** it deems appropriate.

EVP 100 GTC (11-19)                              Page 3 of 9

Exhibit 1
Page 18

2. No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

3. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agrees to do nothing that may prejudice the **Insurer's** position or its potential or actual rights of recovery.

VI.    ALLOCATION

A. If a **Claim** consists of both **Loss** that is covered by this **Policy** and loss that is not covered by this **Policy** because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:

1. **Defense Costs**: one hundred percent (100%) of **Defense Costs** on account of such **Claim** shall be covered **Loss**; and

2. loss other than **Defense Costs**: all remaining loss from such **Claim** shall be apportioned between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters. In making such a determination, the **Named Insured**, **Insured Persons**, and the **Insurer** agree to use best efforts to determine a fair and proper allocation of all such amounts.

3. Paragraphs  1. and 2., above, of this Section VI., shall not apply to any **Insured** for whom coverage is excluded pursuant to Section X. REPRESENTATIONS AND SEVERABILITY, subsection C.

VII.    REPORTING OF CLAIMS/POTENTIAL CLAIMS

A. Notice of Claim

1. The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this **Policy**, give written notice to the **Insurer** of a **Claim** as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, risk manager, fiduciary of any **Plan**, any human resources manager, or person in an equivalent position of any **Organization** becomes aware of such **Claim**. Provided that such notice must be given to the **Insurer** in no event later than:

   a. ninety (90) days after termination or expiration of the **Policy Period** or any subsequent renewal **Policy Period** in an uninterrupted series of renewals; or

   b. the expiration of the Extended Reporting Period, if applicable,

It is further understood that if the **Insurer** sends written notice to the **Named Insured** stating that the **Policy** is being cancelled for nonpayment of premium, an **Insured** shall give to the **Insurer** written notice of such **Claim** prior to the effective date of such cancellation.

B. Notice of Potential Claim

1. If during the **Policy Period**, or any applicable Extended Reporting Period, an **Insured** becomes aware of circumstances which could give rise to a **Claim** and gives written notice of such circumstances to the **Insurer** as soon as practicable during the **Policy Period**, or Extended Reporting Period if applicable, in which an **Insured** first becomes aware of such circumstances, then any **Claim** subsequently arising from such circumstances shall be deemed made against the **Insured** during the **Policy Year** in which such circumstances were first reported to the **Insurer**. Such subsequent **Claim** must be reported to the **Insurer** in accordance with this Section VII., subsection A. above.

2. When reporting a circumstance to the **Insurer**, an **Insured** shall give the names of any potential claimant; a description of the specific circumstances that could give rise to a **Claim**; the identity of the specific **Insureds** allegedly involved in such circumstance; the nature of the potential damages (monetary and non-monetary); and the specifics as to how the **Insureds** first became aware of such circumstance.

C. To Whom Notice of Claim or Potential Claim Should Be Sent

1. The **Insureds** shall give written notice of **Claims** or circumstances to the **Insurer** under this **Policy** as specified in the Policy Declarations, which notice shall be effective upon receipt.

VIII.    INTERRELATED CLAIMS

A. More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of:

EVP 100 GTC (11-19)                                                                                            Page 4 of 9

Exhibit 1
Page 19

1. the date on which the earliest such **Claim** was first made; or
2. the first date valid notice was given by the **Insureds** to the **Insurer**, in accordance with applicable reporting provisions, under this **Policy** or under any prior policy, of any **Wrongful Act** or any fact, circumstance, situation, transaction or event which underlies such **Claim**.

IX.    CANCELLATION OR NON-RENEWAL

A. This **Policy** shall not be cancelled by the **Insurer** except for non-payment of any premium when due. The **Insurer** shall provide to the **Named Insured** written notice of such cancellation stating when, not less than twenty (20) days thereafter, such cancellation shall be effective. Notwithstanding the foregoing, non-payment of premium due at inception of this **Policy** will result in the **Policy** being cancelled from inception.

B. In the event the **Insurer** decides to non-renew this **Policy**, the **Insurer** shall provide written notice to the **Named Insured** not less than sixty (60) days prior to expiration of the **Policy Period**. Such notice shall be binding on all **Insureds**. Should the state of domicile of the **Named Insured** as listed in Item I. NAMED INSURED AND PRINCIPAL ADDRESS of the Policy Declarations require written notice of nonrenewal greater than sixty (60) days, the **Insurer** shall provide such notice in accordance with such state's requirement at the time such notice is mailed.

C. The **Insureds** grant exclusive authority to cancel this **Policy** to the **Named Insured**. The **Named Insured** may cancel this **Policy** by providing the **Insurer** written notice stating when thereafter such cancellation shall be effective. The unearned premium shall be computed on a pro-rata basis and premium adjustment may be made at the time cancellation is effected or as soon as practicable.

X.    REPRESENTATIONS AND SEVERABILITY

A. The **Insureds** represent and acknowledge that the declarations and statements contained in the **Application** are true and agree that:
1. those declarations and statements are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of the **Policy**; and
2. this **Policy** is issued in reliance upon the truth of such declarations and statements.

B. The **Application** for coverage shall be construed as a separate **Application** for coverage by each **Insured Person**.  With respect to the declarations and statements contained in such **Application**, no fact pertaining to or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person**.

C. In the event that such **Application** contains any misrepresentations, which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, then no coverage shall be afforded for any **Claim** based upon, arising out of, related to, directly or indirectly resulting from,  in consequence of, or in any way involving any such misrepresentation with respect to:
1. any **Insured Person** who made such misrepresentations, knew of such misrepresentations, or knew of the facts or circumstances relating to such misrepresentations (whether or not such **Insured Person** knew such **Application** contained such misrepresentations), or any **Organization** to the extent it indemnifies any such **Insured Person.** Such knowledge possessed by such **Insured Person** shall not be imputed to any other **Insured Person**; or
2. any **Organization** if any past or present chief executive officer, chief financial officer, in-house general counsel, **Plan** fiduciary, or human resources manager, or any equivalent position of the **Named Insured**, or the signer of the **Application**, made such misrepresentations, knew of such misrepresentations, or knew of the facts or circumstances relating to such misrepresentations (whether or not such **Insured Person** knew such **Application** contained such misrepresentations).
3. The **Insurer** shall not seek to rescind this **Policy** with respect to any **Insured**.

XI.    LIMITS OF LIABILITY

A. This **Policy** is offered with one of two options as set forth and selected on the Policy Declarations:
1. Single Limit of Liability
Where the Single Limit of Liability option has been selected, as set forth in the Policy Declarations, the Limit of Liability set forth in the Policy Declarations shall be the maximum aggregate Limit of

Exhibit 1
Page 20

Liability of the **Insurer** for all **Loss** under this **Policy** for each **Policy Year**, regardless of the number of **Coverage Parts** purchased or **Claims** made. Notwithstanding the foregoing, the additional limit provided by Section III. INSURED PERSON NON-INDEMNIFIED COVERAGE (SIDE A) ADDITIONAL LIMIT of the Directors & Officers Liability Coverage Part shall be in addition to and not a part of the Single Limit of Liability set forth in the Policy Declarations.

    2.   Dedicated Limits of Liability

Where the Dedicated Limits of Liability option as set forth on the Policy Declarations has been selected, the Dedicated Limit of Liability for each **Coverage Part** purchased shall apply as separate Limits of Liability for each such **Coverage Part** and shall be the maximum aggregate Limit of Liability of the **Insurer** for all **Loss** under the respective **Coverage Part** for each **Policy Year** regardless of the number of **Claims** made.

Regardless of the option selected, the **Policy Year** Limits of Liability may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage with respect to **Claims** first made or deemed made, as provided in Section VII. REPORTING OF CLAIMS/POTENTIAL CLAIMS, during any other **Policy Year**. If the applicable Limits of Liability for any **Policy Year** are exhausted, the **Insurer's** obligation for that **Policy Year** shall be deemed completely fulfilled and extinguished.

B.   The Limit of Liability available to pay damages or settlements will be reduced and may be exhausted by amounts paid by the **Insurer** as **Defense Costs.**

XII.    <u>RETENTIONS AND PRESUMPTIVE INDEMNIFICATION</u>

A.   Retentions set forth in the Policy Declarations for each **Coverage Part** shall apply per **Claim** per **Policy Year** under each respective **Coverage Part**. The **Insurer's** liability under this **Policy** shall apply to that part of **Loss** which is in excess of the applicable Retention and such Retention shall be borne by the **Insureds** uninsured and at their own risk. The **Insurer** shall have no obligation to pay any part or all of any applicable Retention for any **Claim** on behalf of an **Insured**. If the **Insurer**, at its sole discretion, elects to pay any part or all of any applicable Retention, the **Insureds** agree to repay such amounts to the **Insurer** upon demand.

B.   If more than one Retention applies to any single **Claim** then each applicable Retention shall be applied to each part of such **Claim**, but the sum of such Retentions shall not exceed the highest of such applicable Retentions.

C.   **Claims** shall be subject to the Retention(s) applicable to the **Policy Year** during which the **Claims** are first made or first deemed to have been made as provided in Section VII. REPORTING OF CLAIMS/POTENTIAL CLAIMS.

D.   **Defense Costs** shall be applied against the Retention(s).

E.   An **Organization** is presumed to indemnify **Insured Persons** for **Loss** to the fullest extent permitted by statutory or common law. Notwithstanding the foregoing, no Retention shall apply to any **Loss** under this **Policy** incurred by an **Insured Person** if such **Loss** cannot be indemnified by an **Organization** by reason of:

    1.   **Financial Impairment**; or

    2.   a good faith determination by an **Organization** that such indemnification is not permitted by common or statutory law.

If an **Organization** fails or refuses to indemnify an **Insured Person**, for a reason other than paragraphs 1. and 2. above of this subsection E., then any payment by the **Insurer** of such **Loss** shall be in excess of the applicable retention, as set forth in the Policy Declarations, pursuant to the **Coverage Part** applicable to the **Claim**. Furthermore, if an **Organization** refuses in writing, or fails within ninety (90) days of an **Insured Person's** written request for indemnification, to advance, pay or indemnify an **Insured Person** for **Loss** on account of a **Claim**, then upon the reporting of the **Claim** pursuant to Section VII. REPORTING OF CLAIMS/POTENTIAL CLAIMS of these General Terms and Conditions, the **Insurer** shall advance covered **Defense Costs** in excess of any applicable Retention(s) until such time that the **Organization** accepts the **Insured Person's** request for indemnification or the applicable Limit of Liability set forth in the Policy Declarations has been exhausted, whichever occurs first.

F.  For purposes of determining an **Organization's** indemnification obligation to any Advisory Board Member, each Advisory Board Member shall be deemed a duly elected or appointed director or officer of such **Organization**. Accordingly, the **Organization** shall be deemed to have granted indemnification to each Advisory Board Member to the fullest extent permitted by statutory or common law to the same extent as any duly elected or appointed director or officer of the **Organization**.

XIII.  CHANGES IN EXPOSURE
A.  Creation, Acquisition of or Merger With Another Entity
1.  If, after the effective date of this **Policy**, any **Organization** creates or acquires another entity or merges with another entity incorporated under the laws of a jurisdiction within the territorial United States, (hereafter referred to as "other entity") such that the **Organization** (in the case of an acquisition or merger) is the surviving entity, and if as a result of such creation, acquisition or merger, such other entity becomes a **Subsidiary** of the **Organization**, then coverage shall be provided for such entity as an **Insured** solely for **Wrongful Acts** committed or allegedly committed after the effective date of such creation, acquisition or merger.
2.  If, after the effective date of this **Policy**, any **Organization** creates, acquires or merges with a "foreign entity" such that the **Organization** (in the case of an acquisition or merger) is the surviving entity and if as a result of such creation, acquisition or merger such foreign entity becomes a **Subsidiary** of the **Organization**, coverage shall not be provided for such foreign entity unless, within thirty (30) days of the effective date of such creation, acquisition or merger, the **Organization** has provided the **Insurer** with written notice of the creation, acquisition or merger, and the **Insurer** has agreed to make such foreign entity an **Insured** in which case coverage shall be provided for such foreign entity solely for **Wrongful Acts** committed or allegedly committed after the effective date of such creation, acquisition or merger.  As used herein, "foreign entity" means an entity incorporated or formed under the laws of a jurisdiction outside of the territorial United States.
B.  Cessation of Subsidiaries
1.  If before or during the **Policy Period** any **Subsidiary** ceases to be a **Subsidiary**, then coverage under this **Policy** shall continue for such **Subsidiary** and its **Insureds** until the expiration of this **Policy** or the last **Policy** in an uninterrupted series of policies issued by the **Insurer**, but solely for **Claims** for **Wrongful Acts** committed or allegedly committed by such **Subsidiary** or its **Insureds** while such **Subsidiary** was a **Subsidiary** and prior to the effective date of such cessation. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the effective date of cessation.
C.  Takeover of the Named Insured
1.  In the event of a **Takeover** of the **Named Insured**, coverage under this **Policy** shall continue until expiration of the **Policy Period** or until this **Policy** is otherwise terminated, but only with respect to **Claims** arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the effective date of the **Takeover**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date of **Takeover**.
D.  Merger, Sale, Transfer or Termination of a Plan
If after the inception date of the Fiduciary Liability **Coverage Part**:
1.  the sponsorship of a **Plan** is transferred so that an **Organization** is no longer the sole employer sponsor of such **Plan**;
2.  a **Plan** is merged with another plan for which coverage is not afforded under the Fiduciary Liability **Coverage Part**;
3.  a **Plan** is terminated or sold; or
4.  the Pension Benefit Guaranty Corporation (PBGC) becomes the Trustee of a **Plan**;
then:
a.  in the case of paragraphs 1., 2. and 3. above, the Fiduciary Liability **Coverage Part** shall continue to apply to such transferred, merged, terminated or sold **Plan**, but solely  for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date of such transfer, merger, termination or sale. There shall be no coverage for **Claims** arising out of actual

Exhibit 1
Page 22

or alleged **Wrongful Acts** occurring on or after the date of merger, transfer, termination or sale of any **Plan** as described in paragraphs 1., 2. and 3. above; or

    b. in the case of paragraph 4. above, the Fiduciary Liability **Coverage Part** shall continue to apply to such **Plan** for those who were **Insureds** at the time the PBGC became the Trustee of such **Plan** but solely for **Claims** based upon or arising out of **Wrongful Acts** that occurred or allegedly occurred prior to the date the PBGC became the Trustee of such **Plan**. There shall be no coverage for **Claims** arising out of actual or alleged **Wrongful Acts** occurring on or after the date the PBGC becomes the Trustee of any **Plan**.

XIV.    <u>SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES EXTENSION</u>

    A. Subject to the terms, conditions and exclusions of this **Policy**, coverage shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

        1. the lawful spouse or **Domestic Partner** of such **Insured Person** solely by reason of such spouse or **Domestic Partner's** status as such, or such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts** of such **Insured Person** ; or

        2. the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, legally incompetent, insolvent or bankrupt.

    B. Any **Loss**, which such spouse, **Domestic Partner**, estate, heirs, legal representatives, or assigns becomes legally obligated to pay on account of such **Claim**, shall be deemed **Loss**, which the **Insured Person** becomes legally obligated to pay as a result of the **Claim**.

    C. No coverage afforded by this Section XIV. shall apply to any **Loss** arising from an act, error, omission, misstatement, misleading statement, neglect, breach of duty, or other act by such spouse, **Domestic Partner**, estate, heirs, legal representatives, or assigns.

XV.    <u>OTHER INSURANCE</u>

    A. If any **Loss** resulting from any **Claim** is insured under any other valid and collectible insurance policy, other than a policy that is issued specifically excess of the insurance provided by this **Policy**, this **Policy** shall be excess of and shall not contribute with such other insurance.

    B. Any coverage afforded under this **Policy** for a **Claim** in connection with an **Insured Person** serving in an **Outside Executive Capacity** for an **Outside Entity** shall be specifically excess of any valid and collectible insurance and any indemnification available to such **Insured Person** by reason of serving in such **Outside Executive Capacity**.

XVI.    <u>SUBROGATION</u>

    A. In the event of any payment under this **Policy**, the **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery, including without limitation an **Insured Person's** right to indemnification or advancement from an **Organization**. As a condition precedent to the **Insurer's** payment under this **Policy**, the **Insureds** agree to execute all papers required and shall take all reasonable actions to preserve such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

XVII.    <u>BANKRUPTCY</u>

    A. Bankruptcy or insolvency of an **Insured** shall not relieve the **Insurer** of its obligations nor deprive the **Insurer** of its rights or defenses under this **Policy**, including but not limited to the right to cancel this **Policy** for non-payment of premium.

XVIII.    <u>CHANGES</u>

    A. Notice to any agent or knowledge by any agent shall not effect a waiver or change in any part of this **Policy** or stop the **Insurer** from asserting any right under the terms of this **Policy**, nor shall the terms of this **Policy** be waived or changed except by an endorsement issued by the **Insurer** to form a part of this **Policy**.

Exhibit 1
Page 23

XIX.    AUTHORIZATION CLAUSE AND NOTICES
A.  By acceptance of this **Policy**, the **Insureds** agree that the **Named Insured** shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to:
1.  the payment of premiums and the receiving of any return premiums that may become due under this **Policy**;
2.  effecting changes in the **Policy**;
3.  the negotiation, agreement to and acceptance of endorsements; and
4.  the giving or receiving of any notice provided for in this **Policy**, including but not limited to notice of **Claim** or potential **Claim**; and notice of cancellation or non-renewal.
B.  Any notice given to the **Named Insured** by the **Insurer** pursuant to Section IX. CANCELLATION OR NON-RENEWAL at the address as set forth in the Policy Declarations shall be deemed to be notice to all **Insureds**.

XX.    ASSIGNMENT
A.  Assignment of interest under this **Policy** shall not bind the **Insurer** unless its consent is endorsed hereon.

XXI.    ACTION AGAINST THE COMPANY
A.  No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of the **Policy**, and until the amount of an **Insured's** obligation to pay shall have been finally determined either by judgment against an **Insured** after actual trial or by written agreement of an **Insured**, the claimant or the claimant's legal representative, and the **Insurer**.
B.  No person or entity shall have any right under this **Policy** to join the **Insurer** as a party to any action against an **Insured** to determine an **Insured's** liability, nor shall the **Insurer** be impleaded by an **Insured** or their legal representatives.

XXII.    COORDINATION OF COVERAGE
A.  Subject always to the applicable Limit of Liability, should two or more **Coverage Parts** apply to the same **Claim**, the **Insurer** will not pay more than the actual **Loss** incurred by the **Insureds**.

XXIII.    TRADE AND ECONOMIC SANCTIONS
A.  This **Policy** does not apply to the extent any laws or regulations of the United States concerning trade or economic sanctions or any other similar laws or regulations prohibit insurability.

XXIV.    TERRITORY
A.  Coverage shall apply worldwide.

Exhibit 1
Page 24

Executive ViewPoint - EVP
Management Liability Policy

Employment Practices Liability Coverage Part

---

Words that are in bold have special meaning and are defined in Section II. DEFINITIONS of this **Coverage Part**, or in Section III. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

*In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this Coverage Part, the Insurer and the Insureds agree as follows:*

I.   INSURING AGREEMENT

The **Insurer** shall, pay on behalf of an **Insured**, **Loss** on account of a **Claim** first made against an **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, by or on behalf of:

Employment Practices Liability
A.  an **Employee** or an applicant for employment for a **Wrongful Employment Act**;

Third Party Liability
B.  any natural person, other than an **Employee**, for a **Wrongful Third Party Act**.

II.  DEFINITIONS
A.  **Claim**
1.  means any:
a.  written demand for monetary or non-monetary relief, including injunctive relief;
b.  civil proceeding commenced by the service of a complaint or similar pleading;
c.  an arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document;
d.  formal civil administrative or regulatory proceeding  or formal, civil, administrative or regulatory investigation, including any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any similar federal, state or local agency with jurisdiction over an **Organization's** employment practices; or
e.  Notice of Violation or Order to Show Cause or written demand for monetary relief or injunctive relief, commenced by the receipt by an **Insured** of such Notice, Order or written demand, issued by the Office of Federal Contract Compliance Programs;

brought against an **Insured**, alleging a **Wrongful Employment Act** or **Wrongful Third Party Act**, including any appeal therefrom. Such **Claim** shall be deemed made on the earliest of the date of service upon, or other receipt by, any **Insured** of a written demand, complaint, formal order of investigation, target letter, Notice of Violation or Order to Show Cause or similar document in such proceeding, arbitration or investigation.

2.  **Claim** also means a written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1.a. through 1.e. above.

Notwithstanding the foregoing, **Claim** shall not include any labor dispute or grievance proceeding, arbitration or other proceeding brought against any **Insured** pursuant to a collective bargaining agreement.

B.  **Confidential Employee Information** means any non-public, personally identifiable information regarding an **Employee**, collected, stored or transmitted by an **Organization**, for the purpose of establishing or maintaining an employment relationship.

Exhibit 1
Page 25

C. **Defense Costs** means that part of **Loss** constituting reasonable and necessary costs, charges, fees (including attorneys' fees and experts' fees) and expenses incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds; however, **Defense Costs** do not include any fees, costs or expenses incurred by any **Insured** without the **Insurer's** prior written consent, nor does **Defense Costs** include salaries, wages, fees, overhead or benefit expenses associated with any **Insured Person**.

D. **Employee** means any past, present or future, natural person whose labor or service was, is or will be engaged and directed by an **Organization**, including full-time, part-time, temporary, seasonal, leased or loaned employees, interns or volunteers. **Employee** also includes an independent contractor working for an **Organization**, but only while acting in his or her capacity as such and only if the **Organization** has agreed to indemnify such independent contractor in writing and in the same manner as provided to the **Organization's** other **Employees** for liability arising out of a **Claim**.

E. **Employee Benefits** means perquisites, fringe benefits, deferred compensation or payments (including insurance premiums) in connection with an employee benefit plan, **Stock Benefits** and any other payment to or for the benefit of an **Employee** arising out of the employment relationship. **Employee Benefits** shall not include salary, wages, commissions, or non-deferred cash incentive compensation.

F. **ERISA or any Similar Act** means the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law of the United States, Canada or their states, territories or provinces or any other jurisdiction anywhere in the world.

G. **Executive** means any past, present or future natural person:
   1. duly elected or appointed director, officer, member of the advisory board, in-house general counsel, trustee, or governor;
   2. duly elected or appointed managers or members of a management committee or equivalent position, member of the advisory board, or in-house general counsel of an **Organization** formed as a limited liability company in the United States of America; or
   3. an official holding an equivalent position to those described in paragraphs G.1. and G.2. above in an **Organization** incorporated, formed or organized outside the United States.

H. **Insured Person** means any **Executive** or **Employee** of an **Organization**.

I. **Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:
   1. **Defense Costs**;
   2. settlements, judgments (including pre-judgment and post-judgment interest); compensatory damages;
   3. punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the **Insurer**, or the **Wrongful Act** giving rise to such damages;
   4. liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family and Medical Leave Act, or Equal Pay Act;
   5. back pay and front pay; and
   6. attorney's fees awarded by a court against an **Insured** to a person or entity bringing a **Claim** or agreed to by the **Insurer,** in writing, in connection with a settlement

   However, **Loss** does not include:
   1. the cost of compliance with any order for, grant of, or agreement to provide non-monetary or injunctive relief;
   2. costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state or local statutory or common law, including but

EVP 102 EPL (11-19)                                                                 Page 2 of 7

Exhibit 1
Page 26

not limited to the Americans with Disabilities Act, the Civil Rights Act of 1964, or any amendments to or rules or regulations promulgated thereunder;

3. any amounts uninsurable under the law pursuant to which this **Coverage Part** is construed;

4. civil or criminal fines, penalties, taxes, sanctions or forfeitures imposed on an **Insured** whether pursuant to law, statute, regulation or court rule;

5. future salary, wages, commissions or **Employee Benefits** of a person bringing a **Claim** who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order, or other resolution of a **Claim**;

6. compensation (other than back pay or front pay) earned by a claimant in the course of employment but unpaid by an **Organization** including salary, wages, commissions, severance, bonus or incentive compensation, or **Employee Benefits**;

7. **Employee Benefits** due or to become due or the equivalent value of such **Employee Benefits**, except with respect to any **Claim** for wrongful termination; or

8. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order.

J. **Pollutants** means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides, insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or

2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or

3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.

2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus or other microorganism of any type, including but not limited to their byproduct such as spores, mycotoxin, mildew, or biogenic aerosol.

3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.

4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

K. **Stock Benefits** means any:

1. offering, plan or agreement between an **Organization** and any **Employee** which grants stock, warrants, shares or stock options of the **Organization** to such **Employee**, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other compensation or incentive granted in the form of securities of the **Organization**; or

2. payment or instrument granted by the **Organization** in the amount or value of which is derived from the value of securities of the **Organization**, including but not limited to stock appreciation rights or phantom stock plans or arrangements;

provided that **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans in which the consideration for the purchase of stock is not paid by the **Organization**.

Exhibit 1
Page 27

L. **Wrongful Act** means a **Wrongful Employment Act** and **Wrongful Third Party Act**.

M. **Wrongful Employment Act** means any actual or alleged:
1. violation of any federal, state or local laws (whether statutory or common) prohibiting discrimination in employment based on a person's race, color, religion, creed, genetic information, age, gender or gender identity, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, Vietnam Era Veteran status or other protected military status, or any other status that is protected pursuant to any such laws;
2. sexual harassment or other harassment including workplace bullying;
3. wrongful retaliation against an **Employee** for: the exercise of any legally protected right or for engaging in any legally protected activity; refusing to violate any law or opposing any unlawful practice; having cooperated in a proceeding or investigation (including an internal investigation by an **Organization's** human resources department or legal department) into alleged unlawful activity by an **Insured;** disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law by an **Insured** and/or the **Organization**; or filing any claim against the **Organization** under any federal, state or local whistleblower law including Federal False Claims Act, or Sarbanes-Oxley;
4. wrongful: termination; dismissal or discharge of employment, whether actual or constructive;
5. wrongful: demotion; denial of tenure; failure or refusal to hire or promote; failure to grant partnership or other equity status; denial of seniority; failure to employ; or wrongful or negligent employee reference;
6. wrongful employment-related: misrepresentation; defamation, libel or slander; negligent evaluation; wrongful discipline; wrongful deprivation of career opportunity;
7. employment-related invasion of privacy, including the unauthorized use or disclosure of **Confidential Employee Information**;
8. hostile workplace or working environment caused by any of the above **Wrongful Employment Acts** in paragraphs 1. through 7. Above
9. breach of any oral, written or implied contract, including any contract arising out of any personnel manual, employee handbook, policy statement or other representation;

committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such by any means including the internet, social media or email; or employment-related:
a. negligent retention, supervision, hiring, or training;
b. false imprisonment;
c. wrongful infliction of emotional distress, mental anguish, or humiliation; or
d. wrongful failure to adopt or enforce consistent employment-related corporate workplace policies and procedures;

committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such but only when alleged as part of a **Claim** for any **Wrongful Employment Act** as described in paragraphs 1. through 9. above.

N. **Wrongful Third Party Act** means any actual or alleged:
1. discrimination based on race, color, religion, creed, genetic information, age, gender or gender identity, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, Vietnam Era Veteran status or other protected military status, or any other status that is protected pursuant to any federal, state or local statutory or common law;
2. harassment of either a sexual nature or other unwelcome conduct; or
3. violation of civil rights relating to such discrimination or harassment;

against any natural person, other than an **Employee** or applicant for employment, committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such, by any means including the internet, social media or email.

Exhibit 1
Page 28

III.    EXCLUSIONS

A.  The **Insurer** shall not be liable to pay any **Loss** under this **Coverage Part** in connection with any **Claim** made against any **Insured** as follows:

1.  Bodily Injury/Property Damage

    for any actual or alleged bodily injury, sickness, disease, or death, from any cause, of any persons, or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed; except that this exclusion shall not apply to any actual or alleged emotional distress, mental anguish or humiliation asserted in an otherwise covered **Claim** alleging a **Wrongful Employment Act** or **Wrongful Third Party Act**;

2.  Prior Notice

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

    a.  any fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the inception date of this **Policy**, was the subject of any notice given under any policy of which this **Policy** is a direct or indirect renewal or replacement; or

    b.  any other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph a. above, would constitute **Interrelated Wrongful Acts**;

3.  Prior or Pending

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any written demand, suit, proceeding, notice or investigation against any **Insured**, which was pending on or prior to the applicable Prior or Pending Date set forth on the Policy Declarations, or based upon or arising out of the same or essentially the same facts, circumstances, matters, situations, transactions or events underlying or alleged therein;

4.  Prior Wrongful Acts of Subsidiaries

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

    a.  any **Wrongful Act** by an **Insured Person** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or

    b.  any other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph a. above, would constitute **Interrelated Wrongful Acts**;

5.  Pollution

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any actual or alleged:

    a.  discharge, emission, seepage, migration, release, dispersal, existence or escape of **Pollutants** or any threat thereof, including but not limited to nuclear reaction, radiation or contamination;

    b.  treatment, removal, testing, storage or disposal of any **Pollutants**;

    c.  regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants** or any voluntary decision to do so; or

    d.  actual or alleged property damage including but not limited to loss of use, devaluation, interference with the rights of others, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization**, its security holders, creditors or others resulting from any of the aforementioned matters in subparagraphs a., b., c. and d. of this Exclusion A.5.;

    however, this exclusion shall not apply to any **Claim** alleging retaliation or wrongful termination of employment whether actual or constructive, because of an **Employee's** actual or threatened disclosure of the matters described in this Exclusion A.5., or because of such **Employee's** refusal to participate in the wrongful discharge, emission, release, dispersal, escape, treatment, removal, storage or disposal of **Pollutants** or refusal to violate any law regarding **Pollutants**;

Exhibit 1
Page 29

6. <u>Breach of Employment Contract</u>
based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any breach of an employment contract, provided that this exclusion shall not apply to:
  a. **Loss** to the extent an **Insured** would have been liable for such **Loss** in the absence of such employment contract; or
  b. **Defense Costs** for breach of employment contract;

7. <u>Violation of Law</u>
for any actual or alleged violation of:
  a. **ERISA or any similar act** (except Section 510 of ERISA), or any other federal, state or local statutory or common law anywhere in the world governing any employee benefit program, policy, plan or arrangement of any type, including but not limited to laws governing retirement or pension benefit programs, welfare plans, insurance plans, employee stock options, employee stock ownership plans, employee stock purchase plans or deferred compensation programs;
  b. the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended or any other similar federal, state or local statutory or regulatory law or common law anywhere in the world;
  c. any law governing workers' compensation, unemployment insurance, social security, disability benefits or any other similar federal, state or local statutory or regulatory law or common law anywhere in the world;
  d. the Occupational Safety and Health Act of 1970 (OSHA), as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing workplace safety and health;
  e. the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988), as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing an employer's obligation to notify or bargain with others in advance of any facility closing or mass layoff; or
  f. the National Labor Relations Act, as amended, or any other federal, state or local statutory or regulatory law or common law anywhere in the world governing employees' rights and employers' duties with respect to unions, bargaining, strikes, boycotts, picketing, lockouts or collective activities;
however, the foregoing shall not apply to any **Claim** alleging retaliation (including any **Claim** alleging retaliation in violation of Section 510 of ERISA) or wrongful termination of employment whether actual or constructive, because of an **Employee's** exercise of a right pursuant to any such laws;

8. <u>Fair Labor Standards Act</u>
based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any actual or alleged violation of the Fair Labor Standards Act, as amended, or any other federal, state or local statutory law or common law anywhere in the world governing wage, hour and payroll policies, provided that this exclusion shall not apply to any **Claim** alleging violation of the Equal Pay Act or an equivalent state or local law, or retaliation or wrongful termination of employment whether actual or constructive, because of an **Employee's** exercise of a right pursuant to any such laws.

IV.    <u>TIMELY NOTICE AND RESOLUTION INCENTIVE</u>
  A. The **Insurer** shall reduce the **Insured's** applicable retention for a **Claim** covered under this **Coverage Part** by a maximum of fifty percent (50%), up to $10,000, whichever is less, subject to the following conditions:
    1. the **Claim** is reported to the **Insurer** within thirty (30) days of the first receipt by an **Insured**; and
    2. the **Insurer** successfully negotiates a settlement of the **Claim** within the Limit of Liability of this **Coverage Part**; and

Exhibit 1
Page 30

3. the **Insured** consents to such settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Insurer**; and

4. settlement of the **Claim** is finalized by the **Insurer** within sixty (60) days of the **Claim** being first reported to the **Insurer**.

Exhibit 1
Page 31

# Executive ViewPoint - EVP
Management Liability Policy

Directors & Officers Liability Coverage Part

---

Words that are in bold have special meaning and are defined in Section IV. DEFINITIONS of this **Coverage Part**, or in Section III. DEFINITIONS of the General Terms and Conditions, incorporated in or attached to this **Coverage Part**, as applicable.

*In consideration of payment of the premium and subject to the Policy Declarations, General Terms and Conditions, and the limitations, conditions, provisions and all other terms of this **Coverage Part**, the **Insurer** and the **Insureds** agree as follows:*

I.    INSURING AGREEMENT

Insured Person Non-Indemnified Coverage (Side A)

A.   The **Insurer** shall, pay on behalf of an **Insured Person**, **Loss** on account of a **Claim** first made against the **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Act**, but only to the extent that such **Loss** is not indemnified by an **Organization**.

Insured Person Indemnified Coverage (Side B)

B.   The **Insurer** shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against an **Insured Person** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Act** to the extent the **Organization** indemnifies the **Insured Person** for such **Loss** as permitted or required by law.

Insured Organization Coverage (Side C)

C.   The **Insurer** shall pay on behalf of an **Organization**, **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period**, or Extended Reporting Period if applicable, for a **Wrongful Act**.

II.   INSURED PERSON NON-INDEMNIFIED COVERAGE (SIDE A) ADDITIONAL LIMIT

The **Insurer** shall pay an additional limit of liability, not to exceed an aggregate of $1,000,000 per **Policy Period,** solely for **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A).This additional limit of liability shall be paid only after the applicable Limits of Liability for the Directors & Officers Liability Coverage Part shown in the Policy Declarations are completely exhausted by payment of **Loss**.

III.   DEFINITIONS

A.   **Claim** means:

1.   For this Directors & Officers Liability Coverage Part, any:

a.   written demand for monetary or non-monetary relief, including injunctive relief;

b.   civil proceeding commenced by the service of a complaint or similar pleading;

c.   criminal proceeding commenced by a return of an indictment or other formal charges;

d.   a formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

e.   an arbitration or mediation proceeding commenced by receipt of a demand for arbitration, demand for mediation or similar document; or

f.   a formal request for **Extradition**;

against an **Insured** alleging a **Wrongful Act**, including any appeal therefrom, which **Claim** shall be deemed made on the date of the **Insured's** receipt of such written demand, service upon, or other receipt by any **Insured** of a complaint, indictment, notice of charge or similar document in such proceeding or arbitration;

Exhibit 1
Page 32

g. a written request first received by an **Insured** to toll or waive a statute of limitations relating to a potential **Claim** as described in subparagraphs 1.a. through 1.f. above, which **Claim** shall be deemed made on the date of the **Insured's** receipt of such request;

2. For purposes of coverage under Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A) and Subsection B. Insured Person Indemnified Coverage (Side B), any:

   a. civil, criminal, administrative or regulatory investigation of an **Insured Person** for a **Wrongful Act** if such **Insured Person** is served with or receives a formal order of investigation or target letter by any investigating authority identifying such **Insured Person** as a target of such investigation, which **Claim** shall be deemed made upon such **Insured Person** being identified in such order or letter or when served with such letter or similar document;

3. For purposes of coverage under Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A), any:

   a. subpoena issued to an **Insured Person** for testimony or documents regarding any of the matters defined as a **Claim** above, but solely for **Defense Costs** incurred by such **Insured Person** in responding to such subpoena, which **Claim** shall be deemed made upon receipt by an **Insured Person** of such subpoena; or

4. For purposes of coverage under Section I. INSURING AGREEMENT, Subsection C. Insured Organization Coverage (Side C), a **Claim** brought by or maintained derivatively on behalf of an **Organization**, or by any securityholder or member of an **Organization**, or persons who are not **Insured Persons**, whether directly or derivatively, independent of and without the solicitation, participation, intervention or assistance of any **Organization** or **Executive**, which **Claim** shall be deemed made on the date of any **Insured's** receipt of a written demand.

B. **Defense Costs** means:

1. that part of **Loss** constituting reasonable and necessary costs, charges, fees (including attorneys' fees and experts' fees) and expenses incurred in investigating, defending, opposing or appealing any **Claim** and the premium for appeal, attachment or similar bonds; and

2. **Extradition Costs**;

however, **Defense Costs** do not include any fees, costs or expenses incurred by an **Insured** without the **Insurer's** prior written consent, nor does **Defense Costs** include salaries, wages, fees, overhead or benefit expenses associated with any **Insured Person**.

C. **Employee** means any natural person whose labor or service is, was or will be engaged and directed by an **Organization** while performing duties related to the conduct of the **Organization's** business and includes full-time, part-time, leased, seasonal and temporary workers, volunteers, interns, and independent contractors.

D. **ERISA or any Similar Act** means the Employee Retirement Income Security Act of 1974, as amended, or any similar common or statutory law of the United States, Canada or their states, territories or provinces or any other jurisdiction anywhere in the world.

E. **Excess Benefit Transaction** means an "excess benefit transaction" as that term is defined in Section 4958(c) of the Internal Revenue Code, 26 U.S.C. § 4958(c).

F. **Excess Benefit Transaction Excise Tax** means any excise tax imposed by the Internal Revenue Service, pursuant to Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C. § 4958(a)(2), on an **Insured Person** who is an **Organization Manager** as a result of such **Insured Person's** participation in an **Excess Benefit Transaction.**

G.  **Executive** means any past, present or future natural person:

1.  duly elected or appointed director, officer, executive director, member of the advisory board, in-house general counsel, trustee, or governor;

2.  duly elected or appointed managers or members of a management committee  or equivalent position, member of the advisory board, or in-house general counsel of an **Organization** formed as a limited liability company in the United States of America; or

3.  an official holding an equivalent position to those described in paragraphs G.1. and G.2. above in an **Organization** incorporated, formed or organized outside the United States.

H.  **Extradition** means any formal process by which an **Insured Person** located in any country is surrendered or is sought to be surrendered to any other country for trial or otherwise to answer any criminal charge, or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

I.  **Extradition Costs** means reasonable and necessary fees, costs and expenses incurred by an **Insured** to defend or challenge any request for or order of **Extradition**, or any appeal thereof in connection with a **Claim** against an **Insured Person** for a **Wrongful Act**.

J.  **Insured Person** means any **Executive** or **Employee** of an **Organization** acting either in his or her capacity as such or in an **Outside Executive Capacity.**

K.  **Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any covered **Claim**, including:

1.  compensatory damages, settlements, and judgments (including an award of pre-judgment and post-judgment interest);

2.  **Defense Costs**;

3.  punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the **Insurer**, or to the **Wrongful Act** giving rise to such damages; and

4.  civil or criminal fines or penalties assessed against an **Insured Person**, but solely pursuant to:

   a.  15 U.S.C. §78dd-2(g)(2)(B) or 78ff(c)(2)(B) of the Foreign Corrupt Practices Act, subject to a $100,000 maximum sublimit of liability for all such fines or penalties per **Policy Period.** This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations;

   b.  42 U.S.C. 1320d-5(a) of the Health Insurance Portability and Accountability Act of 1996, subject to a $100,000 maximum sublimit of liability for all such fines or penalties  per **Policy Period.** This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations; or

   c.  Section 4958(a)(2) of the Internal Revenue Code, 26 U.S.C § 4958(a)(2), on an **Insured Person** as a result of such **Insured Person's** participation in an any **Excess Benefit Transaction,** subject to a $100,000 maximum sublimit of liability for all such fines or penalties  per **Policy Period,** provided, however that indemnification by the **Organization** for such taxes is not expressly prohibited in the bylaws, certificate of incorporation or other organizational documents of the **Organization.** This sublimit of liability is part of and not in addition to the applicable Directors and Officers Limit of Liability as set forth on the Policy Declarations**.**

However, **Loss** does not include:

1.  civil or criminal fines, penalties, sanctions or forfeitures, except for those fines or penalties enumerated in subparagraphs 4.a., b. and c. above of this definition K., imposed on an **Insured** whether pursuant to law, statute, regulation or court rule;

2.  taxes, except solely for the purposes of Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A), any tax imposed on an **Insured Person** in his or her

Exhibit 1
Page 34

capacity as such in connection with any bankruptcy, receivership, conservatorship, or liquidation of an **Organization** to the extent that such tax is insurable under the law pursuant to which this **Coverage Part** is construed;

3. cost of compliance with any order for, grant of or agreement to provide non-monetary or injunctive relief;

4. any amount uninsurable under the law pursuant to which this **Policy** shall be construed;

5. an amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by an **Organization** in connection with its purchase of any securities or assets;

6. any amounts for which an **Insured Person** is liable due to an actual or alleged breach of any written or oral contract or agreement or due to an **Insured Person's** assumption of liability under any oral or written contract or agreement;

7. any unpaid salary, wages, commissions, severance, bonus or incentive compensation that is due or alleged to be due to any person; or

8. any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order.

L. **Organization Manager** means an "organization manager" as that term is defined in Section 4958(f) of the Internal Revenue Code, 26 U.S.C. § 4958(f).

M. **Outside Entity** means any non-profit organization approved by the Internal Revenue Service as exempt from federal taxation  under Section 501(c)(3), (4), (6), (7) and (10) of the Internal Revenue Code of 1986, as amended, that is not an **Organization**.

N. **Outside Executive Capacity** means the service of an **Insured Person** in an **Outside Entity** as any:
1. director, executive director or officer;
2. manager or managing member;
3. trustee, regent, governor; or
4. any equivalent position;

but only if such service is provided on behalf of the **Outside Entity** with the specific knowledge, request, consent or direction of an **Organization.**

O. **Personal Injury Act** means any:
1. false arrest, wrongful detention or imprisonment or malicious prosecution;
2. libel, slander, defamation of character, or disparagement of a person's or organization's name, goods, product or services;
3. oral or written publication, in any manner, of material in violation of a person's right of privacy; or
4. wrongful entry or eviction or other invasion of the right of private occupancy.

P. **Proprietary Injury Act** means any:
1. plagiarism, misappropriation of ideas (including advertising ideas), or breach of confidentiality rights or non-disclosure agreement(s) whether written or oral;
2. invasion, infringement or interference with the another's proprietary rights or rights of privacy or publicity; or
3. infringement of copyright, title, slogan, logo, trademark, trade name, trade dress, service mark, or service name.

Q. **Pollutants** means any solid, liquid, gaseous, bacterial, fungal, electromagnetic, thermal or other substance, smoke, vapor, soot, fumes, acids, alkalis, chemicals, toxic materials, 'Volatile Organic Compound', 'Organic Pathogen', 'Silica', asbestos, lead and gases therefrom, radon, combustion byproducts, noise and 'Waste'. Specific examples include, but are not limited to diesel, kerosene, and other fuel oils, carbon monoxide, and other exhaust gases, mineral spirits and other solvents, tetrachloroethylene, perchloroethylene (PERC), trichloroethylene (TCE), methylene chloroform, and other dry cleaning chemicals, chlorofluorocarbons, chlorinated hydrocarbons, adhesives, pesticides,

Exhibit 1
Page 35

insecticides, and all substances specifically listed, identified, or described by one or more of the following references:

1. Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Priority List Hazardous Substances (1997 and all subsequent editions); or
2. Agency for Toxic Substances And Disease Registry ToxFAQs™; or
3. U.S. Environmental Protection Agency EMCI Chemical References Complete Index.

For the purposes of this definition;

1. 'Volatile Organic Compound' means any compound which discharges organic gases as it decomposes or evaporates, examples of which include but are not limited to formaldehyde, pesticides, adhesives, construction materials made with organic chemicals, solvents, paint varnish and cleaning products.
2. 'Organic Pathogen' means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus or other microorganism of any type, including but not limited to their byproduct such as spores, mycotoxin, mildew, or biogenic aerosol.
3. 'Silica' means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide, crystalline silica, quartz, or non-crystalline (amorphous) silica.
4. 'Waste' means any property intended to be disposed, recycled, reused or reclaimed by the owner or user thereof.

R. **Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty or **Personal Injury Act** or **Proprietary Injury Act,** actually or allegedly committed or attempted by:

1. any **Insured Person** while acting in his or her capacity as such, or if claimed against any **Insured Person** solely by reason of his or her status as such;
2. any **Insured Person** while acting in an **Outside Executive Capacity**; or
3. any **Organization.**

IV.  EXCLUSIONS

A. Exclusions applicable to Section I. INSURING AGREEMENT, Subsections A., B., and C.

The **Insurer** shall not be liable for **Loss** on account of any **Claim**:

1. Bodily Injury/Property Damage

for any actual or alleged bodily injury, sickness, disease or death, mental anguish, humiliation, or emotional distress, from any cause, of any persons, or damage to or destruction of any tangible property including loss of use thereof whether or not it is damaged or destroyed; except that this exclusion shall not apply to any actual or alleged emotional distress, mental anguish or humiliation asserted in a **Claim** for a **Personal Injury Act** or a **Proprietary Injury Act**;

2. Prior Notice

based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

a. any fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** that, before the inception date of this **Policy**, was the subject of any notice given under any policy of which this **Policy** is a direct or indirect renewal or replacement; or

b. any other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph a. above, would constitute **Interrelated Wrongful Acts**;

3. Prior or Pending

based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving or constituting any written demand, suit, proceeding, or investigation against any **Insured**, which was pending on or prior to the applicable Prior or Pending Date set forth on the Policy Declarations, or the same or essentially the same fact, circumstance, matter, situation, transaction or event underlying or alleged therein;

Exhibit 1
Page 36

4.  Prior Wrongful Acts of Subsidiaries

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

    a.   any **Wrongful Act** by an **Insured Person** of any **Subsidiary**, or by such **Subsidiary**, occurring before the date such entity became a **Subsidiary**; or

    b.  any other fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, or **Wrongful Act** described in subparagraph a. above, would constitute **Interrelated Wrongful Acts**;

5.  Organization versus Insured

    by or on behalf of, or in the name or right of, any **Organization**; provided, however, that this exclusion shall not apply to:

    a.  any **Claim** broughtby or maintained derivatively on behalf of an **Organization,** or by any securityholder or member of an **Organization,** or persons who are not **Insured Persons**, whether directly or derivatively, independent of and without the solicitation, participation, intervention or assistance of any **Organization** or **Executive** (unless such solicitation, participation, intervention or assistance is considered whistleblower activity pursuant to any federal, state, local or foreign law);

    b.  any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly or indirectly from a **Claim** which is not otherwise excluded under this **Policy**; or

    c.  any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Organization**;

6.  Pollution

    based upon, arising out of, relating to,  directly or indirectly resulting from, or in any way involving actual or alleged:

    a.  discharge, emission, seepage, migration, release, dispersal or escape of **Pollutants** or any threat thereof, including nuclear reaction, radiation or contamination;

    b.  treatment, removal or disposal of any **Pollutants**;

    c.  regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any **Pollutants** or any voluntary decision to do so; or

    d.  actual or alleged property damage including loss of use, bodily injury, sickness, disease or death of any person, or financial loss to an **Organization** or **Outside Entity**, their security holders, or their creditors resulting from any of the aforementioned matters in subparagraphs a., b. and c. of this Exclusion A.6.;

    However, this exclusion shall not apply to the extent:

    i.  an **Organization** or **Outside Entity** is unable to indemnify an **Insured Person** for **Loss** resulting from a **Claim** either because such **Organization** or **Outside Entity** is not permitted by common or statutory law to grant such indemnification or because of the **Financial Impairment** of such **Organization** or **Outside Entity**;

7.  ERISA or any Similar Act

    for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA or any Similar Act**;

8.  Conduct

    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

    a.  any deliberately fraudulent act or omission, or criminal act, by an **Insured**, if a final, non-appealable adjudication in an underlying action establishes such act, omission or criminal act; or

b. an **Insured** having gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled, if a final, non-appealable adjudication in an underlying action establishes the gaining of such profit, remuneration or advantage; provided that:
   i. no conduct pertaining to any **Insured Person** shall be imputed to any other **Insured Person**; and
   ii. any conduct pertaining to any past, present, or future chief executive officer, chief financial officer, chief operating officer, executive director or chairperson (or equivalent position) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries**;

9. Outside Entity versus Insured
   made by or on behalf of an **Outside Entity** or one or more of the **Outside Entity's** directors, officers, trustees, governors or equivalent executives against an **Insured Person** acting in an **Outside Executive Capacity**, provided, however that this exclusion shall not apply to:
   a. any **Claim** brought derivatively on behalf of the **Outside Entity,** independently and without the direct solicitation, participation, intervention or assistance of the **Outside Entity** or any **Insured Person** in an **Outside Executive Capacity** (unless such solicitation, participation, intervention or assistance constitutes protected "whistleblower" activity pursuant to any federal, state, local or foreign law);
   b. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Insured Person** acting in an **Outside Executive Capacity** and which is part of or results directly from a **Claim** which is not otherwise excluded under this **Policy**; or
   c. any **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, liquidator, receiver, rehabilitator, or creditors committee for an **Outside Entity** against an **Insured Person** acting in an **Outside Executive Capacity** for such **Outside Entity**;

10. Third Party
    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any actual or alleged discrimination against or sexual harassment of any third party;

11. Employment Practices
    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any employment-related **Wrongful Act**.

B. Exclusions applicable to Section I. INSURING AGREEMENT, Subsection C. Insured Organization Coverage (Side C):
   The **Insurer** shall not be liable for **Loss** on account of any **Claim** against an **Organization**:
   1. Contract
      based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving an actual or alleged breach of any written or oral contract or agreement to which an **Organization** is a party, provided that this exclusion shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement.

V.    ORDER OF PAYMENTS
   A. If a **Claim** is covered under Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A), and another insuring agreement in this **Coverage Part,** the **Insurer** shall:
      1. Pay all **Loss** covered under Section I. INSURING AGREEMENT, Subsection A. Insured Person Non-Indemnified Coverage (Side A), first.
      2. After all payments are made under paragraph 1. above, the **Insurer** shall pay any remaining **Loss** covered under another insuring agreement of this **Coverage Part** up to the remaining limit of liability, if any.
   Except as otherwise provided in Subsection A. above, the **Insurer** in its sole discretion, may pay covered **Loss** on any **Claim** when due under this **Coverage Part** without regard to the potential for other, future **Loss** that may be covered under this **Coverage Part**.

EVP 104 NP (11-19)                                                      Page 7 of 8

Exhibit 1
Page 38

VI.   COORDINATION WITH EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
    A.   If a **Claim** is covered under this **Coverage Part** and the Employment Practices Liability Coverage Part the **Insurer** shall:
        1.   Pay all **Loss** under the Employment Practices Liability Coverage Part first, subject to the applicable limit of liability and retention.
        2.   After all payments are made under paragraph 1., above, the **Insurer** shall pay any remaining **Loss** covered under this **Coverage Part**, which is not paid under the Employment Practices Liability Coverage Part, subject to the applicable limit of liability. Solely with respect to this Section VI, the Directors & Officers Liability retention shall not apply to such **Claim**.

VII.   TIMELY NOTICE AND RESOLUTION INCENTIVE
    A.   The **Insurer** shall reduce the applicable retention for a **Claim** covered under this **Coverage Part** by a maximum of  fifty percent (50%) up to $10,000, whichever is less, subject to the following conditions:
        1.   The **Claim** is reported to the **Insurer** within thirty (30) days of first receipt by an **Insured**; and
        2.   The **Insurer** successfully negotiates a settlement of the **Claim** within the limits of liability of this **Coverage Part**; and
        3.   The **Insured** consents to the settlement of the **Claim** without condition within thirty (30) days after notice of the settlement is provided to the **Insured** by the **Insurer**; and
        4.    Settlement of the **Claim** is finalized by the **Insurer** within ninety (90) days of the **Claim** being first reported to the **Insurer**.

VIII.   LIFETIME OCCURRENCE REPORTING PROVISION
    A.   If the **Named Insured** cancels or non-renews this **Policy** for reasons other than being sold, acquired, declaring bankruptcy, or being financially insolvent, each **Executive,** who did not serve as such at the time of the cancellation or non-renewal, shall be provided an unlimited extension of time to report any **Claim** first made against such **Executive** after the effective date of such cancellation or non-renewal, subject to the following conditions:
        1.   the **Wrongful Act** was actually or allegedly committed before the effective date of cancellation or non-renewal; and
        2.   the **Wrongful Act** was actually or allegedly committed during a **Policy Period** of a **Policy** issued by the **Insurer**; and
        3.   such **Executive** was serving in such capacity during the **Policy Period** of a **Policy** issued by the **Insurer**, provided the **Insurer** has written continuous coverage for the **Named Insured** from the effective date of the first **Policy** issued to the **Named Insured** by the **Insurer** to the effective date of cancellation or non-renewal of this **Policy**; and
        4.   no Directors & Officers Liability policy, or similar policy providing essentially the same type of coverage, or extended reporting period, is in effect at the time the **Claim** is first made against such **Executive**; and
        5.   The **Claim** is not otherwise excluded by the **Policy** issued by the **Insurer** in effect at the time the **Wrongful Act** actually or allegedly occurred; such **Policy** shall be the **Policy** under which coverage is applicable including all terms, conditions, limits, retentions, and endorsements therein.
    B.   The LIFETIME OCCURRENCE REPORTING PROVISION described herein shall not apply to any **Claim** made against any **Executive** caused by, arising or resulting, directly or indirectly from or in consequence of the **Executive's** serving in an **Outside Executive Capacity** for an **Outside Entity**.
    C.   The INSURED PERSON NON-INDEMNIFIED COVERAGE (SIDE A) ADDITIONAL LIMIT as provided in Section III. of this **Coverage Part** shall not apply to any **Claim** covered under this LIFETIME OCCURRENCE REPORTING PROVISION.

Exhibit 1
Page 39

---

This endorsement modifies insurance provided under the following:

**MANAGEMENT LIABILITY POLICY**

---

**AMEND OTHER INSURANCE - ACT AS PRIMARY**

In consideration of the premium paid for this **Policy**, it is agreed that this endorsement amends the General Terms and Conditions, Section XV. OTHER INSURANCE by adding the following:

Solely in regard to coverage provided by the Directors & Officers Liability Coverage Part, if any **Loss** resulting from a covered **Claim** against an **Insured Person** is covered under this **Policy** and under any outside executive liability provision of another policy due to such **Insured Person's** affiliation with The California Endowment, then coverage under this **Policy** shall be specifically primary of such outside executive liability coverage.

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

EVP 211  (11-15)                                                                 Page    1  of    1

Exhibit 1
Page 40

| This endorsement modifies insurance provided under the following: |
| :---: |
| **MANAGEMENT LIABILITY POLICY** |

## IDENTITY THEFT EXPENSE ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement.  This endorsement is part of and subject to the provisions of the Policy to which it is attached.

I.   IDENTITY THEFT COVERAGE AND LIMIT

The following is a summary of Coverage and Limit of Liability provided by this endorsement:

| COVERAGE | LIMIT OF LIABILITY |
| --- | --- |
| Identity Theft Expense | $50,000 each claim |
| | $50,000 in the aggregate |

In no event shall the **Insurer** pay more than $50,000 in any one **Policy Period** for **Identity Theft** regardless of the number of **Identity Thefts** that may occur.  No retention applies to the coverage provided by this endorsement.

II.  COVERAGE

Words shown in bold shall have the meaning set forth in Section III. DEFINITIONS of this endorsement, or as set forth in the Directors & Officers Liability Coverage Part Section IV. DEFINITIONS, or as set forth in the General Terms and Conditions Section III. DEFINITIONS, as applicable.

Identity Theft Expense

The **Insurer** will pay on behalf of an **Executive** of an **Organization** up to the **Identity Theft** Expense Limit of Liability stated in Section I. above, for expenses, services or fees set forth in 1. through 3. below, incurred by such **Executive** after he or she has become a victim of **Identity Theft.** The **Identity Theft** must be first discovered by an **Insured** during the **Policy Period** and reported to the **Insurer** during the **Policy Period**, but in no event later than sixty (60) days after the **Identity Theft** is first discovered by an **Insured.**  There shall be no coverage for **Identity Theft**, which occurred prior to the first policy issued by the **Insurer**, regardless of when such **Identity Theft** was discovered. The expenses below must be incurred within one (1) year of the reporting of such **Identity Theft**:

1.  Credit monitoring services provided by a vendor of the **Insurer's** choice for the affected **Executive** for up to one year following an **Identity Theft;**

2.  Additional application fees paid by an **Executive** whose loan(s) were rejected based on incorrect credit information resulting from an **Identity Theft**;

3.  Notary fees, certified and overnight mail expenses paid by an **Executive** in connection with reporting an **Identity Theft** to financial institutions, credit bureaus and agencies and law enforcement authorities.

Any **Executive** of the **Organization** who is a victim of **Identity Theft** must first report the **Identity Theft** to the **Insurer** and use a service provider of the **Insurer's** choice prior to incurring any of the above expenses, services or fees. The **Identity Theft** must first occur during the **Policy Period**. In no event shall the **Insurer's** total **Policy Period** payment under this coverage be more than the per claim or aggregate limit shown in Section I. of this endorsement.

EVP 239 (12-19)                                                        Page 1 of 3

Exhibit 1
Page 41

There is no coverage for any **Identity Theft** Expense unless **Personally Identifiable Information** that is obtained without authorization, consent or permission is used to make or attempt to make transactions or purchases by fraudulently assuming the identity of an **Executive** of an **Organization**.

III. DEFINITIONS

For purpose of this endorsement, the following bolded terms have the following meanings:

1. **Identity Theft** means
   a. the act of obtaining **Personally Identifiable Information** belonging to an **Executive** of an **Organization** without that person's authorization, consent or permission; and
   b. the use of **Personally Identifiable Information** so obtained to make or attempt to make transactions or purchases by fraudulently assuming that person's identity.

   **Identity Theft** does not mean any of the above committed directly or indirectly by an **Executive** of an **Organization** or a family member of an **Executive**.

2. **Personally Identifiable Information** means
   a. information concerning an individual(s) that would be considered "non-public information" within the meaning of Title V. of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to Social Security numbers or account numbers correlated with names and addresses which is in an **Insured's** care, custody and control; and
   b. personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and
   c. protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPPA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111- 5), as amended, and any regulations promulgated thereto.

   **Personally Identifiable Information** does not mean information that is available to the public, which does not include otherwise protected personal information.

IV. LIMITS OF LIABILITY AND RETENTION

The Limit of Liability specified in Section I. above as in the aggregate shall be the maximum liability for all **Identity Theft Expense** to which the coverage applies.

The Limit of Liability specified in Section I. above as the Limit for each claim shall be the maximum liability for all **Identity Theft Expense** for each claim to which the coverage applies.

The maximum Limit of Liability for all **Identity Theft Expense** provided by this endorsement shall be in addition to the Limit of Liability specified in the Policy Declarations in the aggregate for the Directors & Officers Liability Coverage Part.

No Retention shown on the Policy Declarations shall apply to **Identity Theft Expense** coverage provided by this endorsement.

Regardless of the amount of covered **Identity Theft Expense** incurred by the **Organization** under this endorsement, the maximum Limit of Liability for any one **Identity Theft** shall be $50,000 each claim and in the aggregate. Any one incident, interrelated incidents or series of similar or related incidents for which coverage is provided under this endorsement shall be treated as one incident subject to the maximum Limit of Liability available under this endorsement at the time the incident(s) is first reported to the **Insurer** regardless of whether the incident(s) continues and expenses are incurred by the **Organization** in any subsequent **Policy Period**(s).

V. ADDITIONAL EXCLUSIONS

The insurance provided by this endorsement does not apply to:

EVP 239 (12-19)                                                    Page 2 of 3

Exhibit 1
Page 42

1.  **Identity Theft Expense** reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled.

2.  **Identity Theft** Expense(s) arising from or in any way involving any incident(s) of which any **Insured** had notice before the inception date of this **Policy**; or arising from or in any way involving any fact, circumstance, event, situation or incident which before the inception date of this **Policy** was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this **Policy** based upon such pending or prior notice.

3.  **Identity Theft** Expenses incurred by any **Executive** of a **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**.

4.  The portion of any **Identity Theft Expenses** covered under this endorsement that is also covered under any other coverage part of this **Policy**.

VI. COVERAGE LIMITATIONS

A.  The following sections of the General Terms and Conditions of this **Policy** do not apply to the coverage provided by this endorsement:
    1.  Section IV. EXTENDED REPORTING PERIOD
    2.  Section XIV. SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES EXTENSION

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

This endorsement modifies insurance provided under the following:

MANAGEMENT LIABILITY POLICY

# PRIVACY BREACH EXPENSE ENDORSEMENT

In consideration of the premium charged it is agreed that this endorsement amends the Directors & Officers Liability Coverage Part and the General Terms and Conditions of this Policy as follows:

The Directors & Officers Liability Coverage Part, Section I. INSURING AGREEMENT is amended with the addition of the following:

The Insurer shall pay on behalf of an Organization for Privacy Breach Expense incurred by the Organization which results from a Privacy Breach that firsts occurs on or after the Retroactive Date of 8/1/2018 and is first discovered by or reported to Key Personnel during the Policy Period. However, there is no coverage for any Interrelated Privacy Breach that first occurred before the Retroactive Date.

The Insurer's maximum limit of liability for all Privacy Breach Expense for this Policy Period shall be 100,000. This limit shall be in addition to the Limit of Liability specified in the Policy Declarations for the Directors & Officers Coverage Part.

An Insured shall give written notice to the Insurer of a Privacy Breach within the Notice Period.

The Directors & Officers Liability Coverage Part, Section IV. EXCLUSIONS, subsection B. is amended by the addition of the following new exclusion:

Network Security and Privacy
based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving any actual or alleged Network Security and Privacy Wrongful Act;

The Directors & Officers Liability Coverage Part, Section III. DEFINITIONS is amended by the addition of the following definitions for purposes of coverage provided by this endorsement:

Breach Notice Law means any United States federal, state, or territory statute or regulation that requires an Insured to give timely notice to persons whose Personally Identifiable Information was accessed or reasonably may have been accessed by an unauthorized person.

Interrelated Privacy Breaches means any Privacy Breach based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events, or are logically or causally connected by reason of any common or related series

EVP 257 NP  (12-19)                                                        Page    1  of    5

Exhibit 1
Page 44

of facts, circumstances, situations, transactions or events. Interrelated Privacy Breaches shall be deemed to be one Privacy Breach which occurred at the time of the earliest Privacy Breach.

Key Personnel means the individuals holding the following positions in the Organization: President; owner, partner, members of the Board of Directors; executive officers, including the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer; General Counsel, staff attorneys employed by an Organization; Executive Director; Chief Information Officer; Chief Security Officer; Chief Privacy Officer; managing member of a limited liability company; and any individual in a substantially similar position as those referenced above, or with substantially similar responsibilities as those referenced above, irrespective of the exact title of such individual, and any individual who previously held any of the above referenced positions.

Notice Period means the sixty (60) day period of time that the Organization has to notify the Insurer that a Privacy Breach has occurred commencing when the Privacy Breach is first reported to or discovered by Key Personnel.

Network Security and Privacy Wrongful Act means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty committed by or on behalf of an Insured that results in:
  (1) a Privacy Breach; or
  (2) the transmission of malicious code; or
  (3) unauthorized access to any computer system; or
  (4) use of the Organization's computer system in a denial of service attack against a third party's computer system; or
  (5) a denial of authorized electronic access to any computer system; or
  (6) the disclosure or misappropriation of Third Party Corporate Information;  or
  (7) violation of Privacy Law; or
  (8) a Privacy Policy Violation; or
  (9) violation of any Breach Notice Law resulting from a Privacy Breach.

Personally Identifiable Information means the following non-public information in the care, custody and control of the Insured, or those acting on behalf of the Insured:
  (1) information, both in electronic and non-electronic form, concerning an individual(s) that would be considered "non-public information" within the meaning of Title V of the Gramm-Leach Bliley Act of 1999 (as amended) and its implementing regulations including but not limited to social security numbers or account numbers correlated with names and addresses; and
  (2) personal information as defined in any U.S. federal, state or local privacy protection law governing the control and use of an individual's personal and confidential information, including any regulations promulgated thereunder; and
  (3) protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA") or the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH") (Public Law 111-5), as amended, and any regulations promulgated thereto.

Privacy Breach means the misappropriation, theft, loss, unauthorized access, inadvertent disclosure or public exposure of Personally Identifiable Information.

Privacy Breach Expense means the reasonable and necessary expenses listed below

EVP 257 NP  (12-19)                                                    Page    2  of    5

Exhibit 1
Page 45

in (1) through (9) resulting from a Privacy Breach and incurred by the Organization or assumed under a written contract or agreement within one (1) year of the reporting of such Privacy Breach to the Insurer.

    (1) Development of a plan to assist the Organization in responding to a Privacy Breach; and

    (2) Development, printing, and mailing of legally required notification letters to those affected by a Privacy Breach; and

    (3) Development, printing and mailing of non-legally required notification letters at the Insurer's discretion, to those affected by a Privacy Breach when such Privacy Breach poses a significant risk of financial, reputational or other harm to the individual(s); and

    (4) Public relations or crisis management services retained for the Organization after notification letters are sent to mitigate any adverse effect on the Organization's reputation with customers, investors and employees resulting from a Privacy Breach that becomes public; and

    (5) Data analysis or forensic investigation to assess the scope of a Privacy Breach; and

    (6) Development of a website link for use by the Organization in communicating with persons affected by a Privacy Breach after notification letters are sent; and

    (7) Development and support of a Customer Relationship Management (CRM) system and call center for use by the Organization in communicating with persons affected by a Privacy Breach after notification letters are sent; and

    (8) Credit monitoring services that are reasonable and necessary to those persons affected by a Privacy Breach;

Privacy Law means a federal or state statute or regulation governing the confidentiality access, control, and use of Personally Identifiable Information.

Privacy Policy Violation means the Organization's actual or alleged:

    (1) failure to have or appropriately display a privacy policy; or

    (2) failure to comply with any federal, state, or local statutes, ordinances, regulations or other laws regarding the Organization's privacy policy; or

    (3) breach of the Organization's privacy policy; or

    (4) changing of the terms of the Organization's privacy policy.

Third Party Corporate Information means information held by any Insured on behalf of an organization other than an Insured:

    (1) that is subject to any form of confidentiality agreement or confidentiality provision in a contract or agreement between the organization and any Insured; or

    (2) which the Insured is legally required to maintain in confidence.

The Directors & Officers Liability Coverage Part, Section IV. EXCLUSIONS, subsection A. 4. Prior Wrongful Acts of Subsidiaries is deleted in its entirety and replaced with the following for purposes of this endorsement:

    <u>Prior Wrongful Acts of Subsidiaries</u>
    based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving:

EVP 257 NP  (12-19)

Exhibit 1
Page 46

a. of any Wrongful Act or Privacy Breach by an Insured Person of any Subsidiary, or by such Subsidiary, occurring before the date such entity became a Subsidiary; or

b. any other fact, circumstance, matter, situation, transaction, event, Privacy Breach, or Wrongful Act whenever occurring, which together with a fact, circumstance, matter, situation, transaction, event, Privacy Breach, or Wrongful Act described in a. above, would constitute Interrelated Wrongful Acts or Interrelated Privacy Breaches;

The General Terms and Conditions, Section XIII. CHANGES IN EXPOSURE, Item B. Cessation of Subsidiaries and Item C. Takeover of the Named Insured, are deleted in their entirety and replaced with the following for purposes of this endorsement

B. Cessation of Subsidiaries

1. If before or during the Policy Period any Subsidiary ceases to be a Subsidiary, then coverage under this Policy shall continue for such Subsidiary and its Insureds until the expiration of this Policy or the last Policy in an uninterrupted series of policies issued by the Insurer, but solely for Claims for Wrongful Acts committed or allegedly committed by such Subsidiary or its Insureds while such Subsidiary was a Subsidiary and prior to the effective date of such cessation. There shall be no coverage for Claims arising out of actual or alleged Wrongful Acts occurring on or after the effective date of cessation. In addition, for any Subsidiary that ceases to be a Subsidiary, there shall be no coverage for any Privacy Breach that occurs on or after the effective date of cessation.

C. Takeover of the Named Insured

1. In the event of a Takeover of the Named Insured, coverage under this Policy shall continue until expiration of the Policy Period or until this Policy is otherwise terminated, but only with respect to Claims arising out of Wrongful Acts that occurred or allegedly occurred prior to the effective date of the Takeover. There shall be no coverage for Claims arising out of actual or alleged Wrongful Acts occurring on or after the date of Takeover. In addition, there shall be no coverage for any Privacy Breach that occurs after the date of Takeover.

The General Terms and Conditions, Section XV. OTHER INSURANCE is amended with the addition of the following:

If any Privacy Breach Expense is insured under any other valid and collectible insurance policy, other than a policy that is issued specifically excess of the insurance provided by this Policy, this Policy shall be excess of and shall not contribute with such other insurance.

The following terms, conditions, and exclusions in the General Terms and Conditions do not apply to this endorsement:

1. General Terms and Conditions, Section IV. EXTENDED REPORTING PERIOD
2. The General Terms and Conditions, Section V. DEFENSE AND SETTLEMENT

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of this Policy and takes effect on the effective date of this Policy unless another effective date is shown.

Exhibit 1
Page 48

This endorsement modifies insurance provided under the following:

**MANAGEMENT LIABILITY POLICY**

## SEPARATE RETENTION FOR MASS OR CLASS ACTION CLAIMS

In consideration of the premium paid for this **Policy** it is agreed that the General Terms and Conditions is amended as follows:

Section XII. RETENTIONS AND PRESUMPTIVE INDEMNIFICATION, subsection A. is amended by the addition of the following:

Solely with respect to the Employment Practices Liability Coverage Part, each **Mass or Class Action Claim** brought against any **Insured** shall be subject to a separate retention in the amount of $500,000, payment of which shall be the sole responsibility of the **Insureds**.

The separate retention referred to above shall apply even if such **Mass or Class Action Claim** ceases to qualify as such after it is brought. No amount of a separate retention paid by any **Insured** while such **Claim** qualified as a **Mass or Class Action Claim** will be reimbursed by the **Insurer**.

For the purposes of this endorsement, **Mass or Class Action Claim** means a **Claim**:
1. brought by or on behalf of five or more **Employees** or natural persons, whether or not such **Employees** or natural persons are represented by one or more legal counsel; or
2. brought by or on behalf of four or more **Employees** or natural persons alleging a pattern, practice or systemic **Wrongful Employment Act** or **Wrongful Third Party Act**, who are seeking relief as a class or group of complainants, whether or not such **Employees** or natural persons are represented by one or more legal counsel; or
3. brought by a governmental entity, department or agency alleging a pattern, practice or systemic **Wrongful Employment Act** or **Wrongful Third Party Act**, which is seeking relief on behalf of a class or group of complainants.

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

Exhibit 1
Page 49

> This endorsement modifies insurance provided under the following:
>
> **PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

**WORKPLACE VIOLENCE AND KIDNAP EXPENSE ENDORSEMENT**

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement. This endorsement is part of and subject to the provisions of the **Policy** to which it is attached.

I.   SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Coverages and Limits of Liability provided by this endorsement.

| COVERAGE | LIMIT OF LIABILITY |
|---|---|
| A. Workplace Violence Expense | $50,000 each claim <br> $50,000 in the aggregate |
| B. Kidnap Expense | $50,000 each claim <br> $50,000 in the aggregate |

In no event shall the **Insurer** pay more than $100,000 in any one **Policy Period** for any combination of **Claims** for covered expenses shown above.  No retention applies to the above coverage.

II.  COVERAGES:

Words shown in bold shall have the meaning provided in Section III. DEFINITIONS of this endorsement or as provided in the General Terms and Conditions, Section III. DEFINITIONS, as applicable.

A.  Workplace Violence Expense

The **Insurer** will reimburse the **Organization,** up to the Workplace Violence Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** for a period of thirty (30) days following, and as a result of, a covered **Workplace Violence Act**:

1.  Counseling services rendered to **Employees** and persons who were on the **Organization's Premises** at the time of and directly affected by a **Workplace Violence Act**.  The counseling services must be rendered by a licensed, professional counselor of the **Organization's** choice.

2.  Services rendered by an independent public relations consultant of the **Organization's** choice for the purpose of mitigating the adverse effect of a **Workplace Violence Act** on the **Organization**.

To be covered, the **Workplace Violence Act** must occur during the **Policy Period** and be reported to the **Company** during the **Policy Period** but in no event later than sixty (60) days after the occurrence of such **Workplace Violence Act**.

B.  Kidnap Expense

The **Insurer** will reimburse the **Organization,** up to the Kidnap Expense Limit of Liability stated in the schedule above**,** for the following reasonable costs paid by the **Organization** as a result of a **Kidnapping** occurring during the **Policy Period** and reported to the **Insurer** during the **Policy Period** but in no event later than sixty (60) days after the occurrence of such **Kidnapping**.

1.  Retaining an independent negotiator or consultant to facilitate the release of a **Kidnapping** victim. Nothing herein shall obligate the **Insurer** to recommend, select, retain or arrange for the retention of such independent negotiator or consultant;

EVP 272 (12-19)                                                                   Page 1 of 3

Exhibit 1 <br> Page 50

2.  Interest on a loan obtained by the **Organization** to pay expenses covered under this endorsement that is incurred as a result of a **Kidnapping.**  However, there is no coverage for interest accruing prior to thirty (30) days preceding the date of such payment or subsequent to the date the **Insurer** pays any portion of a Kidnap Expense or for expenses not covered under this endorsement;

3.  Travel and accommodations incurred by the **Organization** in direct response to the **Kidnapping.**  Nothing herein shall obligate the **Insurer** to recommend, select, or arrange for such travel and accommodations;

4.  A reward up to $10,000 paid by the **Organization** to an informant for information which leads to the arrest and conviction of the person(s) responsible for the **Kidnapping**;

5.  The current base salary paid to an **Executive** of the **Organization** for such **Executive's** work on behalf of the **Organization**, who is a victim of a **Kidnapping** subject to the following:

    (a)  salary reimbursement shall commence on the thirty-first (31st) consecutive day after a **Kidnapping**;

    (b)  salary reimbursement shall end when the **Executive** is released; or is confirmed dead; or one hundred and twenty (120) days after the **Executive** is last confirmed to be alive; or twelve (12) months after the date of the **Kidnapping**, or when the Kidnap Expense Limit of Liability has been exhausted by payments made by the **Insurer**, whichever occurs first.

There is no coverage for Kidnap Expense resulting from a **Kidnapping** planned, carried out or participated in, directly or indirectly, by any person who is or was a member of the victim's family or the **Organization**.

III.  DEFINITIONS

A.  **Employee** means any past, present or future, natural person whose labor or service is or will be engaged and directed by an **Organization**, including full-time, part-time, temporary, seasonal, leased or loaned employees, independent contractors, interns or volunteers.

B.  **Executive** means any past, present or future natural person:
1.  duly elected or appointed director, officer, member of the advisory board, in-house general counsel, trustee, or governor;
2.  duly elected or appointed manager or member of the management committee or equivalent position; member of the advisory board; or in-house general counsel, of an **Organization** formed as a limited liability company in the United States of America; or
3.  an official holding an equivalent position to those described in paragraphs 1. and 2. above in an **Organization** incorporated, formed or organized outside the United States;

C.  **Kidnapping** means an actual or alleged wrongful abduction and involuntary restraint of an **Executive** of the **Organization**, by one or more persons acting individually or collectively in which monetary or non-monetary demands are made to the **Organization** to obtain the **Executive's** release.

D.  **Premises** means buildings, facilities or properties leased or owned by the **Organization** for the purpose of conducting its operations.

E.  **Workplace Violence Act** means:
1.  an actual use of unlawful deadly force; or
2.  the threatened use of unlawful deadly force involving the display of a lethal weapon, occurring on the **Organization's Premises** and directed at an **Employee** or **Executive,** or other persons on the **Premises** of the **Organization**.

IV. LIMITS OF LIABILITY AND RETENTION

The aggregate Limit of Liability for each coverage specified in section I. above shall be the maximum liability of the **Insurer** per **Policy Period** for all expenses to which coverage applies. The maximum limit of liability of the **Insurer** for all such coverages combined shall be $100,000 per **Policy Period**.

EVP 272 (12-19)                                                            Page 2 of 3

Exhibit 1
Page 51

The maximum Limit of Liability for any expenses provided by this endorsement shall be in addition to the LIMIT OF LIABILITY specified in the Policy Declarations.

Any RETENTION shown on the Policy Declarations shall not apply to the expense coverage provided by this endorsement.

Regardless of the number of **Executives** who are victims of a **Kidnapping** or persons who are affected by a **Workplace Violence Act** or the amount of covered expenses incurred by the **Organization** under this endorsement, the maximum Limit of Liability of the **Insurer** for any one **Kidnapping** or **Workplace Violence Act** shall be $50,000 each claim and in the aggregate. Any one **Kidnapping** or **Workplace Violence Act**, interrelated incidents or series of similar or related **Kidnappings** or **Workplace Violence Acts** for which coverage is provided under this endorsement shall be treated as **Kidnapping** or **Workplace Violence Act** subject to the maximum Limit of Liability available under this endorsement at the time the **Kidnapping** or **Workplace Violence Act** is first reported to the **Insurer** regardless of whether either or both continues and expenses are incurred by the **Organization** in any subsequent **Policy Period(s).**

V. ADDITIONAL EXCLUSIONS

The above notwithstanding, the **Insurer** shall not be liable to pay:

1. Expense reimbursement resulting in any **Insured** gaining any profit, remuneration or advantage to which the **Insured** is not legally entitled.

2. Expense(s) arising from or in any way involving any incident(s) of which any **Insured** had notice before the inception date of this **Policy**; or arising from or in any way involving any fact, circumstance, event, situation or incident which before the inception date of this **Policy** was the subject of any notice under any other similar policy of insurance or any future claims for expenses under this **Policy** based upon such pending or prior notice.

3. Expenses incurred by any **Subsidiary** of an **Organization** occurring prior to the date that such entity became a **Subsidiary** or incurred at any time that such entity is not a **Subsidiary**.

4. The portion of any expense(s) covered under this endorsement that is also covered under any other **Coverage Part** of this **Policy**.

VI. COVERAGE LIMITATIONS

A. The following sections of the General Terms and Conditions of this **Policy** do not apply to the coverage provided by this endorsement:
   1. Section IV. EXTENDED REPORTING PERIOD
   2. Section XIV. SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES EXTENSION
B. The following sections and exclusions of the Directors and Officers Liability Coverage Part of this **Policy**, if purchased, do not apply to the coverage provided by this endorsement:
   1. Section V. EXCLUSIONS, subsection A.1. Bodily Injury/Property Damage

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

EVP 272 (12-19)                                                                 Page 3 of 3

Exhibit 1
Page 52

> This endorsement modifies insurance provided under the following:
>
> ## MANAGEMENT LIABILITY POLICY

## EXTENDED REPORTING PERIOD PERCENTAGE ENDORSEMENT

In consideration of the premium paid for this **Policy**, it is agreed that this endorsement amends the **Policy** as follows:

Item IV. EXTENDED REPORTING PERIOD of the Policy Declarations is deleted in its entirety and replaced with the following:

Item IV. EXTENDED REPORTING PERIOD

| Extended Reporting Period Term | Percentage of Annual Premium |
| --- | --- |
| 1 year | 75% |
| 2 years | 125% |
| 3 years | 150% |
| 6 years | 200% |

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

EVP 273  (11-15)                                                                 Page    1  of    1

Exhibit 1
Page 53

---

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

---

# NONPROFIT GENERAL TERMS AND CONDITIONS ENDORSEMENT

In consideration of the premium paid for this **Policy**, it is agreed that the **Policy** is amended as follows:

A.  General Terms and Conditions, Section III. DEFINITIONS, L. **Management Control** is deleted in its entirety and replaced with the following:

L.  **Management Control** means:

1.  the right to elect, appoint, or designate the majority of the directors, trustees, managers, members of the board of managers, or management committee members; or

2.  the right to elect, appoint, or designate exactly fifty percent (50%) of the directors, trustees, managers, members of the Board of Managers, or management committee members; and pursuant to a written contract solely controls the management and operations of such entity.

B.  General Terms and Conditions, Section III. DEFINITIONS, U. **Shareholder Derivative Demand**, and V. **Shareholder Derivative Demand Investigation Costs** are deleted in their entirety.

C.  General Terms and Conditions, Section III. DEFINITIONS, W. **Subsidiary** is deleted in its entirety and replaced with the following:

W.  **Subsidiary** means:

1.  any entity  which qualifies as a not-for-profit organization under the Internal Revenue Code, for which the **Named Insured** has **Management Control** on or before the effective date of this **Policy** and during the term of this **Policy** and any renewal thereof; and

2.  any Political Action Committee to which the **Named Insured** has **Management Control** on or before the effective date of this **Policy** and during the term of this **Policy** and any renewal thereof; and

3.  any for-profit entity specifically endorsed to this **Policy**.

D.  General Terms and Conditions, Section III. DEFINITIONS, X. **Takeover** is amended by  the addition of the following:

**Takeover** also means:

5.  the acquisition or taking over the control of the operations of the **Named Insured** by any federal or state government agency, department or division; or

6.  the loss, forfeiture or suspension of the **Named Insured's** tax-exempt status.

E.  General Terms and Conditions, Section X. REPRESENTATIONS AND SEVERABILITY, Subsection C. paragraph 2. is deleted in its entirety and replaced with the following:

2.  any **Organization** if any past or present chief executive officer, chief financial officer, executive director, in-house general counsel, Plan fiduciary, or human

EVP 300 NP (12-16)                                                                                   Page 1 of 2

Exhibit 1
Page 54

resources manager, or any equivalent position of the **Named Insured**, or the signer of the **Application**, knew of such misrepresentations or knew of the facts or circumstances relating to such misrepresentations.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is a part of the **Policy** and takes effect on the effective date of the **Policy** unless another effective date is shown.

Exhibit 1
Page 55

| This endorsement modifies insurance provided under the following: |
|---|
| **MANAGEMENT LIABILITY POLICY** |

## DEFENSE COSTS SUBLIMIT FOR WRONGFUL IMMIGRATION ACTS

In consideration of the premium paid for this **Policy**, it is agreed that this endorsement amends the Employment Practices Liability Coverage Part as follows:

Section I. INSURING AGREEMENT, is amended with the addition of the following:

Defense Cost for Wrongful Immigration Act
The **Insurer** shall, pay on behalf of an **Insured**, **Defense Costs** on account of an **Immigration Claim** first made against an **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, for a **Wrongful Immigration Act**, subject to the sublimit and retention set forth below.

Section II. DEFINITIONS, is amended with the addition of the following:

**Immigration Claim** means any formal criminal investigation of an **Insured** by a governmental agency for **Wrongful Immigration Act** and such **Insured** is served with or receives a formal order of investigation or target letter by an investigating governmental authority identifying such **Insured** as a target of such investigation. The **Immigration Claim** shall be deemed made upon such **Insured** being identified in such order or letter when served with such letter or similar document.

**Wrongful Immigration Act** means any actual or alleged violation of the Immigration Reform and Control Act (IRCA), any rule or regulations promulgated under IRCA, or any similar provisions of any federal, state, or local laws governing immigration.

For the purposes of this endorsement, and notwithstanding anything in this **Policy** to the contrary, the **Insurer's** maximum aggregate sublimit of liability for all **Defense Costs** directly related to an **Immigration Claim** shall be $50,000, which amount is part of and not in addition to the Employment Practices Liability Coverage Part Limit of Liability as set forth in the Policy Declarations. Notwithstanding anything to the contrary, the **Insurer's** liability for all **Defense Costs** directly related to an **Immigration Claim** shall be excess of a per **Claim** retention of $10,000 or 50% of the retention set forth in the Policy Declarations for the Employment Practices Liability Coverage Part whichever is greater, but not to exceed $25,000. Payment of such retention shall be the sole responsibility of the **Insured(s)**.

All other terms and conditions of this **Policy** remain unchanged.  This endorsement is a part of this **Policy** and takes effect on the effective date of this **Policy** unless another effective date is shown.

EVP 317 (12-18)                                                                                          Page 1 of 1

Exhibit 1
Page 56

---

This endorsement modifies insurance provided under the following:

**MANAGEMENT LIABILITY POLICY**

---

**BIOMETRIC INFORMATION EXCLUSION**

The **Policy** is amended as follows:

EVP 102 EPL Employment Practices Liability Coverage Part, Section II. DEFINITIONS
EVP 103 FID Fiduciary Liability Coverage Part, Section II. DEFINITIONS

The above referenced coverage part(s), if purchased, are amended to add the following definitions:

**Biometric Identifiers** means a retina or iris scan, fingerprint, voiceprint**,** deoxyribonucleic acid (DNA), scan of hand or face geometry, or any physical, physiological, biological or behavioral characteristic of an individual, or anything else that could be perceived as biologically unique to an individual.

**Biometric Information** means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's **Biometric Identifiers** used to identify an individual.

EVP 102 EPL Employment Practices Liability Coverage Part, Section III. EXCLUSIONS, Subsection A.
EVP 103 FID Fiduciary Liability Coverage Part, Section III. EXCLUSIONS, Subsection A.

The above referenced coverage part(s), if purchased, are amended to add the following exclusion:

Biometric Information
based upon, arising out of, relating to, directly or indirectly resulting from, or in any way involving, in whole or in part, any actual or alleged violation of any law that regulates or restricts the collection, maintenance, storage, use, safeguarding, handling, retention, disposal, notifications, disclosures or authorizations related to **Biometric Information**; or any actual or alleged unauthorized collection, maintenance, storage, use, safeguarding, handling, retention, disposal, notifications, disclosures or authorizations of **Biometric Information**, or any other improper use thereof.

All other terms and conditions of this **Policy** remain unchanged. This endorsement is a part of the **Policy** and takes effect on the effective date of the **Policy**, unless another effective date is shown.

EVP 323 (02-21)                                                                                     Page 1 of 1

Exhibit 1
Page 57

| This endorsement modifies insurance provided under the following: |
| :---: |
| **MANAGEMENT LIABILITY POLICY** |

**SIDE A ADDITIONAL LIMIT EXCLUSION**

EVP 104 NP Directors & Officers Liability Coverage Part, is amended as follows:

Section II. INSURED PERSON NON-INDEMNIFIED COVERAGE (SIDE A) ADDITIONAL LIMIT is deleted.

Section VIII. LIFETIME OCCURRENCE REPORTING PROVISION, C. is deleted.

EVP 100 General Terms and Conditions Section XI. LIMITS OF LIABILITY, A., 1 is amended to delete the following:

Notwithstanding the foregoing, the additional limit provided by Section III. INSURED PERSON NON-INDEMNIFIED COVERAGE (SIDE A) ADDITIONAL LIMIT of the Directors & Officers Liability Coverage Part shall be in addition to and not a part of the Single Limit of Liability set forth in the Policy Declarations.

All other terms and conditions of this policy remain unchanged. This endorsement is a part of your policy. It takes effect on the effective date of your policy unless there is another effective date that is shown.

EVP 324 NP (03-21)                                                    Page 1 of 1

Exhibit 1
Page 58

# INSURANCE

# POLICY



## RADNOR SPECIALTY INSURANCE COMPANY

A STOCK COMPANY

1170 Devon Park Drive
Wayne, PA 19087-2191
CUSTOMER SERVICE:  (844) 438-6775
DEVONPARKSPECIALTY.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

Jacket RAD (06-20)

## INSURANCE POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.  Where required by law, this Policy shall not be valid unless countersigned by a duly authorized representative of the company.

Treasurer

Chief Executive Officer

Exhibit 1
Page 60

# EXHIBIT 2

Exhibit 2
Page 61

SEAN M. NOVAK, ESQ. (Bar No. 198307)
**THE NOVAK LAW FIRM, P.C.**
2609 N. Sepulveda Blvd.
Manhattan Beach, CA 90266
Tel: (310) 921-8712
Fax: (310) 921-8732
service@novaklawfirm.com

Attorney for Plaintiff
GINA DURHAM

Electronically FILED by
Superior Court of California,
County of Los Angeles
8/10/2023 4:40 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT

GINA DURHAM,

    Plaintiff,

    v.

THE CALIFORNIA ENDOWMENT;
DOES 1 through 20, inclusive; ROES 1 to
20, inclusive,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.:** 23STCV19120

**COMPLAINT FOR DAMAGES FOR:**

**(1)** **Discrimination-(Violation of California Gov. Code §12941 et seq**
**(2)** **Retaliation in Violation of FEHA**
**(3)** **Retaliation in Violation of Labor Code § 1102.5 et seq.**
**(4)** **Harassment-Violation of Gov. Code §12940(k) et seq.;**
**(5)** **Failure to Take All Reasonable Steps Necessary to Prevent Discrimination from Occurring (California Government Code §12940(k))**
**(6)** **Wrongful Termination/ Constructive Termination in violation of Public Policy and FEHA**
**(7)** **Age Discrimination (Gov. Code §12940)**
**(8)** **Violation of Business & Professions Code §17200 et seq.**

**[DEMAND FOR JURY TRIAL]**

-1-

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

COMES NOW Plaintiff GINA DURHAM and alleges as follows:

1.    At all relevant times Plaintiff GINA DURHAM (hereinafter referred to as "Plaintiff") was and is an individual who is a resident of the State of California, living in the County of Los Angeles, in the State of California.

2.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times defendants THE CALIFORNIA ENDOWMENT(hereinafter referred to as "CALIFORNIA ENDOWMENT" )was and is a California corporation, authorized to conduct business, and conducting business, in the State of California, with principal places of business located in the County of Los Angeles, in the State of California.

3.  Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned defendants CALIFORNIA ENDOWMENT, DOES 1 to 20, inclusive, and ROES 1 to 20, inclusive, and each of them, were the agents, representatives and/or employees of each other and were acting within the purpose and scope of their agency.  The acts and conduct alleged herein of each such defendant were known to, authorized and ratified by each such defendant.

4.  Plaintiff alleges the following claims against Defendants inclusive for harassment, discrimination, retaliation and wrongful termination.  Furthermore, at all relevant times Plaintiff was acting as a loyal and honest employee, who acting out of integrity and values, "blew the whistle" on defendants' discrimination and harassment of employees, wage and hour violations, fraudulent misconduct, fraud on consumers, fraud on the public, safety violations and violations of California Labor law.   Defendants retaliated against Plaintiff based upon Plaintiff's lawful actions, and further discriminated against Plaintiff based upon Plaintiff's race, gender, and age.

-2-

*Complaint For Damages*

Exhibit 2
Page 63

## GENERAL ALLEGATIONS

5. The true names, identities, or capacities whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, are unknown to the Plaintiff, who therefore sues said defendants by such fictitious names. When the true names, identities or capacities of such fictitiously designated defendants are ascertained, Plaintiff will ask leave of this court to amend this Complaint and to insert said true names, identities, and capacities, together with the proper charging allegations.

6. Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein as a DOE is responsible in some manner and liable herein for negligent, wanton, reckless and tortious conduct, and by such wrongful conduct, proximately caused the Plaintiff's injuries and damages.

7. Plaintiff identifies as an African American female, aged 54.

8. Plaintiff began her employment with defendants in or about February, 2018. She was hired in a position as Deputy General Counsel and Director of Compliance.

9. As further alleged herein, between February, 2018 and November 24, 2021, Plaintiff's manager and supervisor Martha Jimenez, in her capacity as Executive Vice President and Chief General Counsel for defendants, routinely harassed Plaintiff and discriminated against Plaintiff, and retaliated against Plaintiff, based upon Plaintiff's race and gender based characteristics, and based upon Plaintiff's age and physical disability.

10. Furthermore, between February, 2018 and November 24, 2021, in her capacity as Director of Compliance, Plaintiff repeatedly raised concerns about unlawful and/or unethical actions engaged in by Defendants, including but not limited to:

    A. Unlawful wage/hour practices;

    B. Financial Fraud;

    C. Accounting Fraud;

    D. Misappropriation of corporate funds by Senior Executives;

-3-

E.     Incidents of racial discrimination directed at Plaintiff and other African American employees.

11.     Each time Plaintiff raised complaints or concerns regarding Defendant's unlawful and/or unethical actions, Plaintiff was reprimanded by Defendant and suffered from retaliation.

12.     Furthermore, each time Plaintiff raised complaints about discrimination and harassment being directed at her, and other African American employees, she was reprimanded by Defendant and suffered from retaliation.

13.     As alleged herein, in November, 2021, Plaintiff's managers and supervisors, in their capacity as managing agents of defendants, escalated the routine harassment and discrimination against Plaintiff based upon Plaintiff's race, gender and age.

14. In or about August, 2020 through November 24, 2021, the Plaintiff specifically complained to corporate agents and officers, including but not limited to corporate officers and executives, concerning the retaliation, unlawful harassment and discrimination directed at Plaintiff by defendants, by and through their managing agents and Plaintiff's supervisors.  Defendants intentionally ignored Plaintiff's complaints, and undertook no efforts to prevent further and continuing discrimination and harassment directed at Plaintiff in the workplace.

15.     Ultimately, on November 24, 2021, defendants wrongfully terminated Plaintiff's employment without cause or justification in retaliation for Plaintiff's complaints about harassment, discrimination, illegal misconduct, unethical misconduct and unlawful pay practices in the workplace.

16.     At all relevant times herein, defendants were the employer of Plaintiff and were listed as such on Plaintiff's W-2 forms and pay stubs pursuant to Government Code §12968 and Labor Code §226.

-4-

*Complaint For Damages*

Exhibit 2
Page 65

17. Defendants DOES 1 through 10, were individuals or other entities that were the agents, employees, members, volunteers, servants, partners, representatives, independent contractors, joint venturers or other participants with or of Defendants and DOES 11 through 20, inclusive, and DOES 1 through 20, in doing the things hereinafter mentioned, were acting within the course and scope of said agency, employment, membership or other relationship with each of the other Defendants.  At all times herein mentioned, Defendants DOES 11 through 20 were employees of Defendants and DOES 1 through 10, inclusive, who held supervisory positions within the company (hereinafter referred to collectively as Defendants.)

18. At all times herein mentioned, defendants, whether or not specifically identified or designated herein as a DOE, and each of them, were the agents, employees, servants, partners, independent contractors, joint venturers and participants with all other defendants, and with each other, and in doing the things hereinafter mentioned, were agents, employees, servants, partners, joint venturers, and with the consent and permission of the co-defendants, and each of them.  **Specifically, Plaintiff alleges that at all relevant times the COURTESY defendants, DOES 1 to 20, inclusive, and ROES 1 to 20, inclusive, and each of them were acting in a <u>JOINT VENTURE</u> and were engaged in the capacity of JOINT EMPLOYERS of Plaintiff.  This included, but is not limited to (1)  JOINTLY exercising control over Plaintiff's wages, hours AND working conditions, (2) suffering and permitting Plaintiff to work on their JOINT behalf at all relevant times and (3) JOINTLY engaging Plaintiff in an employment relationship.  Defendants further JOINTLY participated in the hiring, direction, supervision,  relevant day-to-day aspects of workplace behavior relating to Plaintiff and the  discipline and wrongful discharge of Plaintiff.**

19. At all times herein, COURTESY defendants, DOES 1 to 20, inclusive and ROES 1 to 20, inclusive were, and still are, vicariously liable for the conduct of its employees, supervisors and administrators and employees all of whom are employed by defendants and each of them.  Each defendant and employee, supervisor and administrator,

-5-

*Complaint For Damages*

Exhibit 2
Page 66

were the agents, servants, and employees of the remaining co-defendants, and was acting within the scope and course of said agency and employment.  Reference made in this complaint to "defendants", shall be deemed to mean the acts of defendants acting individually, jointly, and/or severally.

20.    Defendants' managing agents, officers or directors approved, ratified and authorized the conduct of its mangers, administrators, supervisors, employees, and agents leading up to Plaintiff's ultimate termination.

21.    Plaintiff names said defendants herein, and each of them, because Plaintiff is in doubt and does not know exactly from which of the said defendants Plaintiff is entitled to redress in light of the fact that the injuries and damages to Plaintiff herein alleged were caused by the combined conduct of defendants, or one or more of them.  For that reason, Plaintiff names all of the said defendants, and asks that the Court determine the liability of each and all of the said defendants in this action and to what extent and what responsibility falls upon each of said defendants, and that the Court award judgment to Plaintiff as against such or all defendants, either jointly or separately, as may be found liable.

22.    There exists, and at all times herein mentioned there existed, a unity of interest and ownership between the defendants CALIFORNIA ENDOWMENT, DOES 1 to 20, inclusive and ROES 1 to 20 such that any individuality and separateness between defendants is a fiction as each is the alter ego of each other.

23.    This action seeks all legal and equitable remedies for damages against defendants, and each of them, for pursuing specific discriminatory policies and practices that have damaged Plaintiff as set forth hereinafter.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.    As alleged herein, Plaintiff was wrongfully terminated by defendants on or about November 24, 2021.

25.    On or about October 3, 2022, Plaintiff filed a timely claim with the Department of Fair Employment and Housing (hereinafter "DFEH") properly naming

-6-

Defendants concerning the unfair employment practices complained of herein. Plaintiff filed a further timely claim with the Department of Fair Employment and Housing on June 30, 2023.

26. On or about October 3, 2022 DFEH notified Plaintiff by way of letter that Plaintiff's case against defendants was concluded, and that Plaintiff was entitled to file suit. A copy of the Complaint and Right to Sue letters were timely served on defendants.

27. All conditions precedent to jurisdiction under California Labor Code § 2699 et seq. and FEHA have occurred because Plaintiff has timely filed this pending action within the statutory requirements for doing so under applicable state law.

### VENUE

28. The court is the proper court because the hiring, termination and retaliation suffered by Plaintiff occurred within this jurisdiction. The unlawful employment practices and other acts alleged herein were committed within the County of Los Angeles, and the State of California.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

29. Plaintiff is an African American female, current age 54, who began working for Defendants in or about February, 2018.

30. As further alleged herein, during Plaintiff's employment term, defendants began engaging in unlawful and illegal misconduct, including but not limited to discriminating against Plaintiff as an African American female, discriminating against African American employees, harassing African American employees, discriminating against Plaintiff due to Plaintiff's age and gender, and defendants engaging in fraudulent concealment of wage and hour violations; mis-classification of workers; failure and refusal to pay overtime wages to employees and other discriminatory employment practices and misconduct.

31. Commencing in or about August, 2020, upon discovering the nature and extent of defendants' intentional misconduct, Plaintiff began complaining to defendants

-7-

*Complaint For Damages*

Exhibit 2
Page 68

concerning their unlawful actions, and made repeated requests that defendants cease and desist in such misconduct.

32.  Defendants ignored Plaintiff's repeated requests that they cease and desist in their unlawful misconduct.

33.  Defendants further sought to enlist Plaintiff's aid in furthering their unlawful misconduct.  Plaintiff refused to assist defendants in their unlawful misconduct, and following their refusal to cease and desist in their unlawful misconduct, Plaintiff duly notified defendants that Plaintiff could no longer tolerate their violations.  As a result, Plaintiff advised defendants that Plaintiff would be required to file complaints with the appropriate governmental agencies concerning defendants' misconduct, including but not limited to, wage and hour violations, and other legal violations.

34.    In addition to harassing Plaintiff based on Plaintiff's race, and age, between February, 2018 and November 24, 2021, defendants, and each of them, began intentionally harassing Plaintiff, taking adverse employment actions against Plaintiff, and otherwise abusing Plaintiff at the workplace in retaliation for Plaintiff's refusal to participate in defendants' unlawful misconduct, and to punish Plaintiff for Plaintiff's intent on reporting of defendants' misconduct to appropriate government agencies and Defendant's internal whistleblowing hotline.

35.  During this same time period, defendants began regularly harassing Plaintiff, and discriminating against Plaintiff due to Plaintiff's gender, race, ethnicity, and age.  Plaintiff protested this harassment and discriminatory mistreatment. Plaintiff is informed and believes, and thereupon alleges, that Plaintiff's termination was in retaliation for Plaintiff's complaints about defendants' engagement in unlawful misconduct.  Plaintiff is further informed and believes that Plaintiff's race, ethnicity, gender and age were substantial motivating factor in the wrongful termination by defendants.

-8-

*Complaint For Damages*

Exhibit 2
Page 69

36.     On or about November 24, 2021 Plaintiff's employment was wrongfully terminated by defendants as the ultimate retaliation by defendants against Plaintiff.

## FIRST CAUSE OF ACTION

## DISCRIMINATION-(Violation of

## California

## Gov. Code §12941 et seq.)

## (As Against All Defendants)

37.     Plaintiff incorporates herein by reference paragraphs 1 through 36, inclusive, as if fully set forth herein and with the same force and effect.

38.     Plaintiff identifies as African American female, age 54, and defendants were aware at all relevant times that Plaintiff identifies as an African American female.

39.     Commencing in or about August, 2020, Plaintiff began being subjected to discrimination in the workplace by managers and direct supervisors, including but not limited to Martha Jimenez, directed at Plaintiff's race, gender and age.  Incidents of discriminatory misconduct directed at Plaintiff by managers and direct supervisors, included but was not limited to:

A.     Derogatory comments directed at Plaintiff related to Plaintiff's characteristics as an African American female;

B.     Repeatedly making derogatory comments about African American persons, that were objectively offensive;

C.     Treating Plaintiff in a manner different and less favorable than other employees.

40.     Plaintiff repeatedly complained to supervisors and executive officers on multiple occasions regarding the discriminatory mistreatment directed at Plaintiff and other employees, and repeatedly requested that supervisors including Martha Jimenez be made to cease and desist in their offensive and discriminatory behavior.  Defendants

-9-

ignored all such requests by Plaintiff and permitted Ms. Jimenez to persist in harassing and discriminating against Plaintiff.

41.    Plaintiff repeatedly advised defendants that Plaintiff found the misconduct directed at Plaintiff was offensive and discriminatory, and requested that defendants cease and desist in permitting the offensive and discriminatory behavior to continue.  Defendants ignored all such requests by Plaintiff and permitted the misconduct to persist.

42.    Plaintiff is informed and believes that Plaintiff was ultimately wrongfully terminated on November 24, 2021, in part, due to discrimination by defendants based upon Plaintiff's race and/or race related characteristics, gender and age.

43.    Plaintiff is informed and believes and based thereon alleges that at all times mentioned in this Complaint the defendants, and each of them, regularly employed 5 or more persons, bringing defendants within the provisions of the Government Code Sections 12900 et. seq., which prohibits employers or their agents from various forms of discrimination.

44.    In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated public policy and the guarantees and provisions of law embodied in California Government Code, §§12940, 12945 et seq.; California Labor Code §233; California Constitution, Article I, §8; relevant provisions of the California Fair Employment and Housing Act; and relevant provisions of the California Family Rights Act in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's gender, age, race and/or race related characteristics.

45.    The actions of defendants in discriminating against Plaintiff based upon Plaintiff's gender, age, race and/or race related characteristics were ratified and approved by defendants at all times.  Furthermore, Plaintiff was ultimately wrongfully and unlawfully terminated based, in part, upon such complaints concerning defendants' misconduct. The acts and omissions of the defendants, and each of them, in engaging in

-10-

wrongful termination of Plaintiff were not based upon any legitimate employment reason or rationale.

46.    In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated California public policy and the guarantees and provisions of law embodied in California Government Code, §12940 et seq., and other relevant law, in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's age, **race**, **ethnicity**, **age**, **national origin**, sexual orientation and/or **physical disability**.

47.    As a direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff was caused to suffer, and continues to suffer severe emotional distress, embarrassment, shame, emotional pain and suffering, equal work conditions, equal employment privileges and/or job advancement, thereby causing Plaintiff to sustain general damage in an amount as yet unascertained but subject to proof.

48.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff suffered loss of earnings and earning capacity, all in an amount as yet unascertained but subject to proof.

49.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has become emotionally distressed and physically ill, all to Plaintiff's damage in an amount as yet unascertained but subject to proof.

50.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has been denied interest on the principal amounts of earnings to which Plaintiff is due.

-11-

*Complaint For Damages*

Exhibit 2
Page 72

51.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has incurred and will incur reasonable attorney fees in prosecuting this action.  Plaintiff is entitled to recovery of all said attorney fees pursuant to Sections 12940 and 12965 of the California Government Code.

52.    Plaintiff is informed and believes, and thereupon alleges, that defendants acted against Plaintiff with intent to harm Plaintiff.  Plaintiff is further informed and believes, and thereupon alleges, that the misconduct of defendants was approved and ratified by defendants and their corporate officers/managing agents.  The unlawful and discriminatory acts and omissions undertaken by the defendants, and each of them, as alleged hereinabove, were done willfully, oppressively and maliciously and with the intent to injure and oppress Plaintiff and, by reason thereof, Plaintiff is entitled to punitive and exemplary damages in an amount as yet unascertained but sufficient to punish and make an example of defendants, and each of them.

## SECOND CAUSE OF ACTION

### (RETALIATION IN VIOLATION OF FEHA-GOVERNMENT CODE §12940(h) et seq.)

(Alleged Against All Defendants)

53.  Plaintiff restates and incorporates by reference each and every allegation contained in Paragraphs 1 through 52, inclusive, as though fully set forth herein.

54.  Between February, 2018 and November 24, 2021, Plaintiff repeatedly complained to defendants about the following unlawful harassment, discrimination and retaliatory misconduct the Plaintiff and other similarly situated employees were being subjected to in the workplace.

55.    Plaintiff further complained in August, 2020 and November 24, 2021 about unlawful and discriminatory pay practices being employed by defendants.

-12-

56.     On or about November 24, 2021 defendants unlawfully terminated Plaintiff in retaliation for Plaintiff's complaints about this harassment, discrimination, unlawful misconduct and illegal pay practices by defendants.

57.     Plaintiff is informed and believes, and thereupon alleges, that Plaintiff's complaints concerning unlawful pay practices, the harassment, discrimination and unlawful misconduct by defendants was a substantial motivating reason for defendants' wrongful termination of Plaintiff's employment.

58.     The misconduct by defendants in wrongfully terminating Plaintiff in retaliation for Plaintiff's complaints concerning the unlawful pay practices, harassment, discrimination and unlawful misconduct by defendants is a direct violation by defendants of Government Code §12940(h).  Government Code §12940(h) expressly provides that

> it is unlawful to retaliate against a person because the person has opposed any practices forbidden under Government Code §§12900 through 12966 or because the person has filed a complaint, testified, or assisted in any proceeding under the FEHA.
> It is also unlawful to retaliate or otherwise discriminate against a person for requesting an accommodation for disability, regardless of whether the request was granted pursuant to Government Code §12940(m)(2).

59.     Plaintiff was directly harmed by the unlawful retaliation defendants' violation of the Government Code, including but not limited to Government Code §12940(h) as alleged herein, and defendants' retaliatory misconduct was a substantial factor in causing the herein alleged harm to Plaintiff.

60.     As a direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff was caused to suffer, and continues to suffer severe emotional distress, embarrassment, shame, emotional pain and suffering, equal work conditions,

-13-

equal employment privileges and/or job advancement, thereby causing Plaintiff to sustain general damage in an amount as yet unascertained but subject to proof.

61.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff suffered loss of earnings and earning capacity, all in an amount as yet unascertained but subject to proof.

62.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has become emotionally distressed and physically ill, all to Plaintiff's damage in an amount as yet unascertained but subject to proof.

63.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has been denied interest on the principal amounts of earnings to which Plaintiff is due.

64.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has incurred and will incur reasonable attorney fees in prosecuting this action.  Plaintiff is entitled to recovery of all said attorney fees pursuant to Sections 12940 and 12965 of the California Government Code.

65.    Plaintiff is informed and believes, and thereupon alleges, that defendants acted against Plaintiff with intent to harm Plaintiff.  Plaintiff is further informed and believes, and thereupon alleges, that the misconduct of defendants was approved and ratified by defendants and their corporate officers/managing agents.  The unlawful and discriminatory acts and omissions undertaken by the defendants, and each of them, as alleged hereinabove, were done willfully, oppressively and maliciously and with the intent to injure and oppress Plaintiff and, by reason thereof, Plaintiff is entitled to punitive and

-14-

*Complaint For Damages*

Exhibit 2
Page 75

exemplary damages in an amount as yet unascertained but sufficient to punish and make an example of defendants, and each of them.

## THIRD CAUSE OF ACTION

### (RETALIATION IN VIOLATION OF LABOR CODE SECTION 1102.5, ET SEQ.)

(Alleged Against All Defendants)

66.  Plaintiff restates and incorporates by reference each and every allegation contained in Paragraphs 1 through 65, inclusive, as though fully set forth herein.

66.     Plaintiff is informed and believes, and thereupon alleges, that at all times herein, Plaintiff's employment was wrongfully by defendants terminated in violation of the protections of California Labor Code §§1102.5.  Section 1102.5(b)-(f) expressly states:

(b)     An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c)     An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d)     An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

-15-

(e)    A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

(f)    In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

67.    Plaintiff specifically alleges that Plaintiff was terminated by Defendants because Plaintiff refused to participate in unlawful misconduct related to defendants' discriminatory practices, complaints about illegal and/or unethical misconduct, and in retaliation for Plaintiff's complaints of unlawful pay practices.

68.    Plaintiff is informed and believes, and thereupon alleges, that because Plaintiff disclosed information to defendants that Plaintiff had reasonable cause to believe defendants were engaging in unlawful misconduct that constituted a violation of State or Federal law and that defendants were required to report to a governmental agency, that Plaintiff did report such misconduct by defendants to governmental agencies and/or that defendants feared Plaintiff would report to a governmental agency, and/or because Plaintiff refused to participate in activities that would result in a violation of State or Federal law. In so doing, Defendants violated Labor Code Section 1102.5 and California Government Code §12940(h) by retaliating against Plaintiff.

69.    As a direct and foreseeable result of the aforesaid acts of said defendants, Plaintiff has lost and will continue to lose income and benefits in an amount to be proven at the time of trial. Plaintiff claims such amount as damages together with pre-judgment interest pursuant to Civil Code §3287 and/or any other provision of law providing for pre-judgment interest.

70.    As a result of the aforesaid acts of defendants, Plaintiff claims damages for emotional distress, general anxiety, grief, shame, humiliation, embarrassment, anger, disappointment and worry, all to Plaintiff's general damage, at a minimum, in excess of the maximum jurisdiction of the municipal court.

-16-

*Complaint For Damages*

Exhibit 2
Page 77

71.    As a further direct and proximate result of the wrongful conduct of defendants, Plaintiff has suffered general damages, losses in earnings, bonuses, deferred compensation, employment benefits, earning capacity, opportunities for advancement, work experience, and out-of-pocket expenses and consequential damages, with all of Plaintiff's damages in excess of the minimum subject matter jurisdiction of this Court and according to proof.

72.    The acts of defendants and each of them were performed with the knowledge and threat of an employer's economic power over its employee.  The above described acts of defendants, by and through their managing agents, officers or directors, were engaged in with a deliberate, cold, callous, fraudulent and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff and Plaintiff's rights.  The acts and omissions to act by Plaintiff's supervisors, were approved, tolerated, ratified and condoned by defendants.  Such acts were despicable, and constitute malice, fraud and/or oppression within the meaning of Civil Code §3294.  Plaintiff requests an assessment of punitive damages against defendants, in an amount to be proven at time of trial.

73.    Plaintiff is entitled to recover statutory penalties under Labor Code §1102.5. Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the private attorney general doctrine (Civil Code §1021.5) as well as Government Code § 12965(b).

## FOURTH CAUSE OF ACTION

**(Harassment in Violation of California Government Code § 12940(k) et seq.)**

(Alleged By Plaintiff As Against All Defendants)

74.    The allegations set forth in Paragraphs 1 through 73 are re-alleged and incorporated herein by reference.

75.    Plaintiff is racially identified as an African American female, age 54, and defendants were aware at all relevant times that Plaintiff racially identifies as an African American female. As an African American female, Plaintiff was entitled to protection from harassment and discrimination in the workplace at all relevant times.

-17-

76.     Plaintiff is currently age 54, and at all relevant times alleged herein, Plaintiff was entitled to protections against harassment and discrimination based upon Plaintiff's age.

77.     As alleged herein, between August, 2020 and November 24, 2021 the Plaintiff was subjected to repeated, offensive and pervasive discrimination and harassment, from managers and supervisors employed by defendants, based upon Plaintiff's racial identity, gender and age.

78.     Furthermore, as alleged herein, between August, 2020 and November 24, 2021, the Plaintiff was further subjected to repeated and offensive harassment, from managers and supervisors employed by defendants, based upon Plaintiff's complaints concerning unlawful and/or unethical misconduct by defendants.

79.     Plaintiff repeatedly complained to defendants' executive officers and managing agents about the pervasive harassment, and requested that the misconduct cease and desist.  Defendants ignored all of Plaintiff's complaints and permitted the misconduct to persist in spite of Plaintiff's repeated complaints.

80.     Plaintiff is informed and believes that Plaintiff was ultimately wrongfully terminated on November 24, 2021, in part, due to discrimination by defendants based upon Plaintiff's race and/or race related characteristics, gender and age, and for complaining about discrimination and harassment in the workplace.

81.     Plaintiff is informed and believes and based thereon alleges that at all times mentioned in this Complaint the defendants, and each of them, regularly employed 5 or more persons, bringing defendants within the provisions of the Government Code Sections 12900 et. seq., which prohibits employers or their agents from various forms of discrimination.

82.     In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated public policy and the guarantees and provisions of law embodied in California Government Code, §§12940, 12945 et seq.; California Labor Code

-18-

§233; California Constitution, Article I, §8; relevant provisions of the California Fair Employment and Housing Act; and relevant provisions of the California Family Rights Act in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's ethnicity, race and/or race related characteristics.

83.    The actions of defendants in discriminating against Plaintiff based upon Plaintiff's gender, age, race and/or race related characteristics were ratified and approved by defendants at all times.  Furthermore, Plaintiff was ultimately wrongfully and unlawfully terminated based, in part, upon such complaints concerning defendants' misconduct. The acts and omissions of the defendants, and each of them, in engaging in harassment and wrongful termination of Plaintiff were not based upon any legitimate employment reason or rationale.

84.    In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated California public policy and the guarantees and provisions of law embodied in California Government Code, §12940 et seq., and other relevant law, in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's age, race, ethnicity, age, national origin, gender, sexual orientation and/or physical disability.

85.    As a direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff was caused to suffer, and continues to suffer severe emotional distress, embarrassment, shame, emotional pain and suffering, equal work conditions, equal employment privileges and/or job advancement, thereby causing Plaintiff to sustain general damage in an amount as yet unascertained but subject to proof.

86.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff suffered loss of earnings and earning capacity, all in an amount as yet unascertained but subject to proof.

-19-

*Complaint For Damages*

Exhibit 2
Page 80

87.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has become emotionally distressed and physically ill, all to Plaintiff's damage in an amount as yet unascertained but subject to proof.

88.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has been denied interest on the principal amounts of earnings to which Plaintiff is due.

89.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has incurred and will incur reasonable attorney fees in prosecuting this action.  Plaintiff is entitled to recovery of all said attorney fees pursuant to Sections 12940 and 12965 of the California Government Code.

90.    Plaintiff is informed and believes, and thereupon alleges, that defendants acted against Plaintiff with intent to harm Plaintiff.  Plaintiff is further informed and believes, and thereupon alleges, that the misconduct of defendants was approved and ratified by defendants and their executive officers/managing agents.  The unlawful and discriminatory acts and omissions undertaken by the defendants, and each of them, as alleged hereinabove, were done willfully, oppressively and maliciously and with the intent to injure and oppress Plaintiff and, by reason thereof, Plaintiff is entitled to punitive and exemplary damages in an amount as yet unascertained but sufficient to punish and make an example of defendants, and each of them.

-20-

*Complaint For Damages*

Exhibit 2
Page 81

## FIFTH CAUSE OF ACTION

**(Failure to Take All Reasonable Steps Necessary to Prevent Discrimination and Harassment from Occurring in Violation of California Government Code § 12940(k) et seq.)**

(Alleged By Plaintiff As Against All Defendants)

91.     The allegations set forth in Paragraphs 1 through 90 are re-alleged and incorporated herein by reference.

92.     At all times herein mentioned, the FEHA, Government Code §12940(k), was in full force and effect and binding on defendants.  These statutes required defendants to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

93.     At all relevant times defendants failed to take all reasonable steps necessary to prevent discrimination and harassment from occurring.  As a result, defendants have violated its policies and practices, and committed unlawful discriminatory acts including but not limited to the following:

(a)     A pattern, policy and practice of racial, age, ethnic, age, and gender discrimination.

(b)     A policy, practice and procedure of unfair and discriminatory selection, transfer and reassignment for persons based upon their age, race, ethnicity, national origin and/or gender.

(c)     The total ineffectiveness, insensitivity, bias, futility, unreasonableness of defendants' human resources department and their management, administrators, directors, officers and staff, as well as the quality of any meaningful, internal complaint or grievance procedures or reviews.

(d)     Defendants' outright failure to take all reasonable steps necessary to prevent discrimination from occurring and to take measures that were reasonably calculated to end the discrimination against Plaintiff.

-21-

(e)    Defendants' failure to adequately train, discipline or monitor its managers, employees or agents after it had knowledge and notice of their discriminatory conduct toward Plaintiff;

(f)    Such other further unlawful misconduct as may not presently be known, but subject to discovery.

94.    By the use of such policies, practices and tactics against Plaintiff, defendants and each of them, have violated the intent and goal of such equal employment opportunities program to eliminate discrimination and harassment against employees. Plaintiff was further deprived of Plaintiff's employment and any promotional opportunities to advance within defendants' organization.

95.    Within the time provided by law, Plaintiff has filed Plaintiff's Complaints with the DFEH in full compliance with the administrative requirements and received a Right-to-Sue letter relating to defendants' unlawful and discriminatory misconduct.

96.    As a proximate result of defendants' willful, knowing and intentional failure to prevent discrimination and harassment Plaintiff has sustained and continues to sustain substantial losses in earnings and other employment benefits.

97.    As a proximate result of defendants' willful, knowing, and intentional harassment, Plaintiff has suffered and continues to suffer general damages in a sum according to proof.

98.    Plaintiff will also seek and is entitled to recover attorney's fees in connection with this cause of action under the private attorney general doctrine (Civil Code § 1021.5) as well as Government Code § 12965(b).

99.    The acts of defendants and each of them were performed with the knowledge and threat of an employer's economic power over its employee.  The above described acts of defendants, by and through their managing agents, officers or directors, were engaged in with a deliberate, cold, callous, fraudulent and intentional manner in order to injure and damage Plaintiff and/or with a conscious disregard of Plaintiff and

-22-

*Complaint For Damages*

Exhibit 2
Page 83

Plaintiff's rights.  The acts and omissions to act by Plaintiff's supervisors, were approved, tolerated, ratified and condoned by defendants.  Such acts were despicable, and constitute malice, fraud and/or oppression within the meaning of Civil Code §3294.  Plaintiff requests an assessment of punitive damages against defendants, in an amount to be proven at time of trial.

## SIXTH CAUSE OF ACTION

## (WRONGFUL TERMINATION IN VIOLATION OF FEHA AND PUBLIC POLICY)

(Alleged Against All Defendants)

100.    Plaintiff restates and incorporates by reference each and every allegation contained in Paragraphs 1 through 99, inclusive, as though fully set forth herein.

101.    Plaintiff is informed and believes, and thereupon alleges, Plaintiff's race, ethnicity, gender, and age were used by defendants as a  substantial factor in wrongfully terminating Plaintiff's employment on November 24, 2021.

102.    Plaintiff is further  informed and believes, and thereupon alleges that Plaintiff's complaints about harassment, discrimination and unlawful misconduct by defendants were further substantial factors in the decision by defendants to wrongfully terminate Plaintiff's employment on November 24, 2021.

103.    Plaintiff's employment was terminated in violation of fundamental public policies of the State of California, including, without limitation, the right to be free from harassment and discrimination in the workplace, the right to oppose, complain about or object to fraud, efforts to cheat and deprive the public, efforts to defraud the State of California; efforts to defraud the United States government, unsafe and dangerous activities that threatened to cause harm and did cause harm to the public, activities designed to cause physical and financial harm to defendants' employees, as well as the right to object to and oppose retaliation for having reported, objected to and/or opposed defendants' misconduct.

-23-

*Complaint For Damages*

Exhibit 2
Page 84

These fundamental public policies inure to the benefit of the public, and not just the private interests of the employer and employee.

104.    The above acts by defendants, and each of them, were wrongful and in violation of the fundamental principles of the public policy of the State of California as reflected in its laws, objectives and policies.  Said laws, which establish these fundamental public policies include, without limitation: Government Code §12940 et seq.; Labor Code sections 201, 203, 204, 206.5, 218.5, 218.6, 226, 227.3, 510, 1102.5 and 6310; Business and Professions Code §2220 and related provisions of the Business and Professions Code concerning operation of a charitable organization.

105.    Plaintiff was terminated by defendants in retaliation for complaints about their discrimination and harassment, and for reporting to them what Plaintiff reasonably believed in good faith and suspected was illegal conduct that harmed the public as well as defendants's employees.  Plaintiff was terminated shortly after Plaintiff reported to higher management Plaintiff's complaints concerning defendants' illegal activity and misconduct, and shortly after Plaintiff refused to participate in or facilitate such unlawful misconduct by defendants.

106.    In violating California's Labor Code's prohibitions against terminating and discriminating against an employee based upon that employee's age, race, ethnicity, physical disability or complaints by Plaintiff to Plaintiff's employer concerning the employer's illegal business practices, defendants' termination of Plaintiff was in violation of fundamental public policies for the benefit of the public.  Specifically, the public policy behind those statutes was the prevention of retaliation against and termination of an employee who has complained to Plaintiff's employer about its illegal business practices.

107.    Plaintiff's complaints to defendants concerning its illegal business practices, and Plaintiff's refusal to participate in defendants' illegal schemes was a substantial motivating and substantial factor in defendants' retaliation against Plaintiff and termination of Plaintiff's employment.

108.    Plaintiff further alleges that Plaintiff's sex, gender, race and/or racial

-24-

*Complaint For Damages*

Exhibit 2
Page 85

characteristics, ethnicity, age, and/or physical disability was a substantial motivating and substantial factor in defendants' retaliation against Plaintiff and wrongful termination of Plaintiff's employment.

109.    As a direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff was caused to suffer, and continues to suffer severe emotional distress, embarrassment, shame, emotional pain and suffering, equal work conditions, equal employment privileges and/or job advancement, thereby causing Plaintiff to sustain general damage in an amount as yet unascertained but subject to proof.

110.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff suffered loss of earnings and earning capacity, all in an amount as yet unascertained but subject to proof.

111.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has become emotionally distressed and physically ill, all to Plaintiff's damage in an amount as yet unascertained but subject to proof.

112.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has been denied interest on the principal amounts of earnings to which Plaintiff is due.

113.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has incurred and will incur reasonable attorney fees in prosecuting this action.  Plaintiff is entitled to recovery of all said attorney fees pursuant to Sections 12940 and 12965 of the California Government Code.

114.    Plaintiff is informed and believes, and thereupon alleges, that defendants acted

-25-

against Plaintiff with intent to harm Plaintiff.  Plaintiff is further informed and believes, and thereupon alleges, that the misconduct of defendants was approved and ratified by defendant and their corporate officers/managing agents.  The unlawful and discriminatory acts and omissions undertaken by the defendants, and each of them, as alleged hereinabove, were done willfully, oppressively and maliciously and with the intent to injure and oppress Plaintiff and, by reason thereof, Plaintiff is entitled to punitive and exemplary damages in an amount as yet unascertained but sufficient to punish and make an example of defendants, and each of them.

### SEVENTH CAUSE OF ACTION

### (AGE DISCRIMINATION)

(Alleged Against All Defendants)

115.    Plaintiff restates and incorporates by reference each and every allegation contained in Paragraphs 1 through 114, inclusive, as though fully set forth herein.

116.    Plaintiff is currently age 54.  At time of termination by defendants, Plaintiff was age 52.  Plaintiff is informed and believes that Plaintiff was wrongfully terminated, in part, due to discrimination by defendants based upon Plaintiff's age, and that Plaintiff's age was unlawfully used as an unlawful substantial motivating factor in the defendants' wrongful termination of Plaintiff on November 24, 2021.

117.    Plaintiff is informed and believes and based thereon alleges that at all times mentioned in this Complaint the defendants, and each of them, regularly employed 5 or more persons, bringing defendants within the provisions of the Government Code Sections 12900 et. seq., which prohibits employers or their agents from various forms of discrimination.

118.    In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated public policy and the guarantees and provisions of law embodied in California Government Code, §§12940, 12945 et seq.; California Labor Code

-26-

§233; California Constitution, Article I, §8; relevant provisions of the California Fair Employment and Housing Act; and relevant provisions of the California Family Rights Act in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's ethnicity, race and/or race related characteristics.

110.    The actions of defendants in discriminating against Plaintiff based upon Plaintiff's age and/or age related characteristics were ratified and approved by defendants at all times.  Furthermore, Plaintiff was ultimately wrongfully and unlawfully terminated based, in part, upon such complaints concerning defendants' misconduct. The acts and omissions of the defendants, and each of them, in engaging in wrongful termination of Plaintiff were not based upon any legitimate employment reason or rationale.

120.    In performing the acts and omissions alleged hereinabove, the defendants, and each of them, have violated California public policy and the guarantees and provisions of law embodied in California Government Code, §12940 et seq., and other relevant law, in that defendants, and each of them, have discriminated against and harassed Plaintiff on the basis of Plaintiff's  race, ethnicity, age, national origin, gender, sexual orientation and/or physical disability.

121.    As a direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff was caused to suffer, and continues to suffer severe emotional distress, embarrassment, shame, emotional pain and suffering, equal work conditions, equal employment privileges and/or job advancement, thereby causing Plaintiff to sustain general damage in an amount as yet unascertained but subject to proof.

122.    As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff suffered loss of earnings and earning capacity, all in an amount as yet unascertained but subject to proof.

123.    As a further direct and proximate result of the unlawful and discriminatory

-27-

actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has become emotionally distressed and physically ill, all to Plaintiff's damage in an amount as yet unascertained but subject to proof.

124.   As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has been denied interest on the principal amounts of earnings to which Plaintiff is due.

125.   As a further direct and proximate result of the unlawful and discriminatory actions undertaken and performed by the defendants, and each of them, as set forth hereinabove, Plaintiff has incurred and will incur reasonable attorney fees in prosecuting this action.

126.   Plaintiff is entitled to recovery of all said attorney fees pursuant to Sections 12940 and 12965 of the California Government Code.

127.   Plaintiff is informed and believes, and thereupon alleges, that defendants acted against Plaintiff with intent to harm Plaintiff.  Plaintiff is further informed and believes, and thereupon alleges, that the misconduct of defendants was approved and ratified by defendants and their executive officers/managing agents.  The unlawful and discriminatory acts and omissions undertaken by the defendants, and each of them, as alleged hereinabove, were done willfully, oppressively and maliciously and with the intent to injure and oppress Plaintiff and, by reason thereof, Plaintiff is entitled to punitive and exemplary damages in an amount as yet unascertained but sufficient to punish and make an example of defendants, and each of them.

-28-

## EIGHTH CAUSE OF ACTION

### (UNLAWFUL BUSINESS PRACTICES PROHIBITED BY BUSINESS & PROFESSIONS CODE §17200)

(Alleged Against All Defendants)

128.    Plaintiff restates and incorporates by reference each and every allegation contained in Paragraphs 1 through 127, inclusive, as though fully set forth herein.

129.    Defendants' violations of the law, consumer fraud, and violations of the Labor Code, including wage statute and orders, outlined in the preceding causes of action, were unfair and/or unlawful and/or fraudulent and thus constitute unlawful business practices prohibited by Business & Professional Code §§17200 et seq.  By means of these practices, defendants gained an unfair competitive advantage with respect to other competing companies in California which adhered to lawful norms of business conduct.

130.    An employer which practices shady practices has an unfair competitive advantage over employers who comply with the laws.  Further, the UCL's remedies are cumulative to other remedies available to Plaintiff.  (Bus. & Prof. Code, §17205.)  Therefore, injunctive relief under the UCL is an appropriate remedy where a business has engaged in an unlawful practice of firing employees who tried to follow ethical rules of conduct.

131.    The victims of these unfair, fraudulent and/or illegal business practices, include, but are not limited to Plaintiff and other employees, citizens, consumers in the State of California, competing foundations in the State of California, and the general public. Plaintiff is informed and believes and thereon alleges that defendants, and each of them, performed the above-mentioned acts with the intent of gaining an unfair competitive advantage and thereby injuring Plaintiff directly, employees, other competitors, foundations, and the general public.

132.    The acts constitute continuing and ongoing unlawful activities prohibited by Business and Professions Code sections 17000 et.seq. and 17200 et.seq., and justify the issuance of an injunction, and all remedies and injunction pursuant to Business and Professions Code Section 17205.

-29-

133.    Pursuant to section 17203, Plaintiff is entitled to issuance of an order enjoining defendants from this prohibited conduct.  Moreover, under the same section, Plaintiff is entitled to an order of restitution, commanding Defendants to disgorge to Plaintiff all money and property acquired by means of these practices.

**WHEREFORE**, Plaintiff prays judgment against the defendants, and each of them, as follows:

1.    For general and special damages according to proof;

2.    For penalties and interest pursuant to applicable law;

3.    For loss of earnings and earning capacity, according to proof;

4.    For pre-judgment interest to the extent allowed by law;

5.    For costs of suit incurred herein;

6.    For punitive and/or exemplary damages in an amount to punish Defendants;

7.    For attorney's fees and costs in prosecuting this action;

8.    For statutory penalties;

9.    For such other and further relief as the Court deems just and proper.

## PLAINTIFF DEMANDS TRIAL BY JURY.

Plaintiff hereby demands trial by jury on all issues so triable in the Complaint pursuant to California law and the United States Constitution.

Dated: June 28, 2023                         THE NOVAK LAW FIRM, P.C.

_____
SEAN M. NOVAK
Attorney For Plaintiff
GINA DURHAM

-30-

*Complaint For Damages*

Exhibit 2
Page 91

# EXHIBIT 3

Exhibit 3
Page 92

 

Sent by email only to: mjimenez@Calendow.org

May 25, 2022

Martha Jimenez
The California Endowment
1000 N. Alameda St.
Los Angeles, CA 90012

Re:     Claimant:              Gina Durham
        Claim Number:          0-14610
        Date Received:         5/11/2022
        Insured:               The California Endowment
        Policy Number:         DPS5000364C
        Policy Effective Dates: 9/1/2021 to 9/1/2022
        Issuing Company:       Radnor Specialty Insurance Company

Dear Martha:

Radnor Specialty Insurance Company ("the Company") is in receipt of a draft lawsuit to be filed in Los Angeles Superior Court captioned Gina Durham vs. The California Endowment, Martha Jimenez and Does 1 through 50. The complaint asserts causes of action for race discrimination, retaliation, wrongful termination and intentional infliction of emotional distress.

We acknowledge that Policy No. DPS5000364C ("The Policy") provides Employment Practices Coverage for policy period 9/1/2021 to 9/1/2022 with limits of $5,000,000 each claim, $5,000,000 in the aggregate, and subject to retention of $25,000 each claim.  The Employment Practices Liability Coverage of this Claims Made Policy has a Prior and Pending Date of 9/1/2013.

The $25,000 Retention provides that the Insured has a responsibility to participate financially in the defense of this matter. That means the Insured is responsible for the first $25,000 expended in the defense of this matter whether it be for Defense Costs or Loss. The defense Attorney shall submit all legal bills within the $25,000 Retention directly to the Insured with a copy to the Company for its records. The Insured will then timely remit all Defense Costs within the $25,000 Retention to the Defense Firm. Once the $25,000 Retention has been exhausted, the Defense Attorney will submit its billings to this Company for direct reimbursement for covered claims.

Because a *Wrongful Employment Act* has been alleged, and a *Claim* as defined under the Policy has been made, a defense has been triggered for The California Endowment and you, as *Insureds* under the Policy.

Please refer to the Policy EVP102 EPL (11/19), Executive ViewPoint– EVP– Employment Practices Liability Coverage Part, which in part reads:

BERKSHIRE HATHAWAY COMPANIES

1190 DEVON PARK DRIVE • P.O. BOX 6700 • WAYNE, PA 19087 • 610-688-2535 • 888-523-5545 • FAX 610-688-4391

United States Liability Insurance Company • Mount Vernon Fire Insurance Company • U.S. Underwriters Insurance Company
Mount Vernon Specialty Insurance Co. • Radnor Specialty Insurance Co.

USLI.COM • DEVONPARKSPECIALTY.COM

Exhibit 3
Page 93

## I. INSURING AGREEMENT

The **Insurer** shall, pay on behalf of an **Insured**, **Loss** on account of a **Claim** first made against an **Insured** during the **Policy Period**, or the Extended Reporting Period if applicable, by or on behalf of:

Employment Practices Liability

A.  an **Employee** or an applicant for employment for a **Wrongful Employment Act…**

## II. DEFINITIONS

M. **Wrongful Employment Act** means any actual or alleged:

1.  violation of any federal, state or local laws (whether statutory or common) Prohibiting discrimination in employment based on a person's race, color, religion, creed, genetic information, age, gender or gender identity, disability, marital status, national origin, pregnancy, HIV status, sexual orientation or preference, Vietnam Era Veteran status or other protected military status, or any other status that is protected pursuant to any such laws;

2.  sexual harassment or other harassment including workplace bullying;

3.  wrongful retaliation against an **Employee** for: the exercise of any legally protected right or for engaging in any legally protected activity; refusing to violate any law or opposing any unlawful practice; having cooperated in a proceeding or investigation (including an internal investigation by an **Organization's** human resources department or legal department) into alleged unlawful activity by an **Insured;** disclosing or threatening to disclose o a superior or any governmental agency anyalleged violations of law by an **Insured** and/or the **Organization**; or filing any claim against the **Organization** under any federal, state or local whistleblower law including Federal False Claims Act, or Sarbanes-Oxley;

4.  wrongful: termination; dismissal or discharge of employment, whether actual or constructive;

5.  wrongful: demotion; denial of tenure; failure or refusal to hire or promote; failure to grant partnership or other equity status; denial of seniority; failure to employ; or wrongful or negligent employee reference;

6.  wrongful employment-related: misrepresentation; defamation, libel or slander; negligent evaluation; wrongful discipline; wrongful deprivation of career opportunity; negligent retention, supervision, hiring or training; or false imprisonment;

7.  employment-related wrongful infliction of: emotional distress, mental anguish or humiliation;

8.  employment-related invasion of privacy, including the unauthorized use or disclosure of **Confidential Employee Information**;

9.  wrongful failure to adopt or enforce consistent employment-related corporate

Exhibit 3
Page 94

*workplace policies and procedures;*

*10. hostile workplace or working environment caused by any of the above **Wrongful Employment Acts** in paragraphs 1. through 9. above; or*

*11. breach of any oral, written or implied contract, including any contract arising out of any personnelmanual, employee handbook, policy statement or other representation; committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such by any means including the internet, social media or email.*

### A. Claim

*1. means any:*

*a. written demand for monetary or non-monetary relief, including injunctive relief;*

*b. civil proceeding commenced by the service of a complaint or similar pleading;*

*c. an arbitration or mediation proceeding commenced by receipt of a demand for arbitration,demand for mediation or similar document;*

*d. formal civil administrative or regulatory proceeding or formal, civil, administrative or regulatory investigation, including any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any similar federal, state or local agency with jurisdiction over an **Organization's** employment practices; or*

*e. Notice of Violation or Order to Show Cause or written demand for monetary relief or injunctive relief, commenced by the receipt by an **Insured** of such Notice, Order or written demand, issued by the Office of Federal Contract Compliance Programs;*

*brought against an **Insured**, alleging a **Wrongful Employment Act**, including any appeal therefrom. Such **Claim** shall be deemed made on the earliest of the date of service upon, or other receipt by, any **Insured** of a written demand, complaint, formal order of investigation, target letter, Notice of Violation or Order to Show Cause or similar document in such proceeding, arbitration or investigation..*

*I. **Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:*

*1. **Defense Costs**;*

*2. settlements, judgments (including pre-judgment and post-judgment interest); Compensatory damages;*

*3. punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the **Insurer**, or the **Wrongful Act** giving rise to such damages;*

*4. liquidated damages awarded pursuant to the Age Discrimination in*

Exhibit 3
Page 95

*Employment Act, Family and Medical Leave Act, or Equal Pay Act;*

5. *back pay and front pay; and*
6. *attorney's fees awarded by a court against an **Insured** to a person or entity bringing a **Claim** oragreed to by the **Insurer,** in writing, in connection with a settlement*

*However, **Loss** does not include:*

1. *the cost of compliance with any order for, grant of, or agreement to provide non-monetary or injunctive relief;*
2. *costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state or local statutory or common law, including but not limited to the Americans with Disabilities Act, the Civil Rights Act of 1964, or any amendments to or rules or regulations promulgated thereunder;*
3. *any amounts uninsurable under the law pursuant to which this **Coverage Part** is construed;*
4. *civil or criminal fines, penalties, taxes, sanctions or forfeitures imposed on an **Insured** whether pursuant to law, statute, regulation or court rule;*
5. *future salary, wages, commissions or **Employee Benefits** of a person bringing a **Claim** who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order, or other resolution of a **Claim**;*
6. *compensation (other than back pay or front pay) earned by a claimant in the course of employment but unpaid by an **Organization** including salary, wages, commissions, severance, bonus or incentive compensation, or **Employee Benefits**;*
7. ***Employee Benefits** due or to become due or the equivalent value of such **Employee** Benefits, except with respect to any Claim for wrongful termination; or*
8. *any amount for which an **Insured Person** is absolved from payment by reason of any covenant, agreement or court order.*

**H**. **Insured Person** *means any Executive or **Employee** of an **Organization***

**D. Employee** *means any past, present or future, natural person whose labor or service was, is or will be engaged and directed by an **Organization,** including full-time, part-time, temporary, seasonal, leased or loaned employees, interns or volunteers. **Employee** also includes an independent contractor working for an **Organization**, but only while acting in his or her capacity as such and only if the **Organization** has agreed to indemnify such independent contractor in writing and in the same manner as provided to the **Organization's** other **Employees** for liability arising out of a **Claim.***

If at some point a settlement is reached and payment is made via W2 to the claimant for lost wages, please be advised the employer's tax withholdings would be the Insured's responsibility as taxes do not meet the definition of **Loss** above.

Exhibit 3
Page 96

We have referred the defense of this case to Christopher Wesierski of the law offices of
Wesierski & Zurek. He may be reached at 949-975-1000 or cwesierski@wzllp.com. Please
extend this counsel your full cooperation.

The Company's position with respect to this claim is based upon presently known facts and
circumstances and is subject to further evaluation as additional information becomes available.
The Company reserves it rights to assert additional terms and provisions under the policy and at
law, which may become applicable.

The contents of this letter should not be construed as a waiver of any rights or defenses, which
this Company may have under this Policy with respect to this matter.

Please feel free to contact the undersigned if you have any questions.


Yours truly,

Linda Carney, CPCU
Claims Examiner
888-523-5545, ext. 2813
lindac@usli.com

Copy:   kathleen.kennedy@amwins.com

        File

Exhibit 3
Page 97

# EXHIBIT 4

Exhibit 4
Page 98



Sent by email only to: mjimenez@Calendow.org

September 1, 2023

Martha Jimenez
The California Endowment
1000 N. Alameda St.
Los Angeles, CA 90012

Re:    Claimant:           Gina Durham
          Claim Number:      0-14610
          Date Received:      5/11/2022
          Insured:            The California Endowment
          Policy Number:      DPS5000364C
          Policy Effective Dates:  9/1/2021 to 9/1/2022
          Issuing Company:    Radnor Specialty Insurance Company

Dear Martha:

Please allow this letter to serve as a follow-up to our prior correspondence of 5/25/2023 relative to the above captioned claim. We incorporate the contents of that letter herein.

Radnor Specialty Insurance Company ("the Company") recently received a lawsuit filed in Los Angeles Superior Court captioned Gina Durham vs. The California Endowment, Does 1 through 20, and Roes 1 to 20. The complaint asserts causes of action for race/gender/age discrimination, retaliation, harassment, failure to take reasonable steps necessary to prevent discrimination, wrongful termination, and violation of Business & Professions Code. The claimant seeks special damages, loss of earnings, punitive damages and attorney fees and costs.

We again acknowledge that Policy No. DPS5000364C ("The Policy") provides Employment Practices Coverage for policy period 9/1/2021 to 9/1/2022 with limits of $5,000,000 each claim, $5,000,000 in the aggregate, and subject to retention of $25,000 each claim.  The Employment Practices Liability Coverage of this Claims Made Policy has a Prior and Pending Date of 9/1/2013.

Because ***Wrongful Employment Acts*** have been alleged, and a ***Claim*** as defined under the Policy has been made, a defense has been triggered under the Policy.

We again refer you to the Policy EVP102 EPL (11/19), Executive ViewPoint– EVP– Employment Practices Liability Coverage Part, which in part reads:

### *I. INSURING AGREEMENT*

*The **Insurer** shall, pay on behalf of an **Insured**, **Loss** on account of a **Claim** first*

BERKSHIRE HATHAWAY COMPANIES

1190 DEVON PARK DRIVE • P.O. BOX 6700 • WAYNE, PA 19087 • 610-688-2535 • 888-523-5545 • FAX 610-688-4391

United States Liability Insurance Company • Mount Vernon Fire Insurance Company • U.S. Underwriters Insurance Company
Mount Vernon Specialty Insurance Co. • Radnor Specialty Insurance Co.

USLI.COM • DEVONPARKSPECIALTY.COM

Exhibit 4
Page 99

made against an **Insured** during the **Policy Period**, or the Extended Reporting
Period if applicable, by or on behalf of:
Employment Practices Liability
 A.  an **Employee** or an applicant for employment for a **Wrongful Employment
    Act…**

## II. DEFINITIONS

**M**. **Wrongful Employment Act** means any actual or alleged:
1.  violation of any federal, state or local laws (whether statutory or common)
    Prohibiting discrimination in employment based on a person's race, color,
    religion, creed, genetic information, age, gender or gender identity, disability,
    marital status, national origin, pregnancy, HIV status, sexual orientation or
    preference, Vietnam Era Veteran status or other protected military status, or
    any other status that is protected pursuant to any such laws;
2.  sexual harassment or other harassment including workplace bullying;
3.  wrongful retaliation against an **Employee** for: the exercise of any legally
    protected right or for engaging in any legally protected activity; refusing to
    violate any law or opposing any unlawful practice; having cooperated in a
    proceeding or investigation (including an internal investigation by
    an **Organization's** human resources department or legal department) into
    alleged unlawful activity by an **Insured;** disclosing or threatening to disclose o
    a superior or any governmental agency anyalleged violations of law by an
    **Insured** and/or the **Organization**; or filing any claim against the
    **Organization** under any federal, state or local whistleblower law including
    Federal False Claims Act, or Sarbanes-Oxley;
4.  wrongful: termination; dismissal or discharge of employment, whether actual
    or constructive;
5.  wrongful: demotion; denial of tenure; failure or refusal to hire or promote;
    failure to grant partnership or other equity status; denial of seniority; failure
    to employ; or wrongful or negligent employee reference;
6.  wrongful employment-related: misrepresentation; defamation, libel or slander;
    negligent evaluation; wrongful discipline; wrongful deprivation of career
    opportunity; negligent retention, supervision, hiring or training; or false
    imprisonment;
7.  employment-related wrongful infliction of: emotional distress, mental anguish
    or humiliation;
8.   employment-related invasion of privacy, including the unauthorized use or
    disclosure of **Confidential Employee Information**;
9.   wrongful failure to adopt or enforce consistent employment-related corporate
    workplace policies and procedures;
10. hostile workplace or working environment caused by any of the above
    **Wrongful Employment Acts** in paragraphs 1. through 9. above; or
11. breach of any oral, written or implied contract, including any contract arising

Exhibit 4
Page 100

*out of any personnelmanual, employee handbook, policy statement or other representation; committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such by any means including the internet, social media or email.*

**A. Claim**

*1. means any:*

   *a. written demand for monetary or non-monetary relief, including injunctive relief;*

   *b. civil proceeding commenced by the service of a complaint or similar pleading;*

   *c. an arbitration or mediation proceeding commenced by receipt of a demand for arbitration,demand for mediation or similar document;*

   *d. formal civil administrative or regulatory proceeding or formal, civil, administrative or regulatory investigation, including any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any similar federal, state or local agency with jurisdiction over an **Organization's** employment practices; or*

   *e. Notice of Violation or Order to Show Cause or written demand for monetary relief or injunctive relief, commenced by the receipt by an **Insured** of such Notice, Order or written demand, issued by the Office of Federal Contract Compliance Programs;*

   *brought against an **Insured**, alleging a **Wrongful Employment Act**, including any appeal therefrom. Such **Claim** shall be deemed made on the earliest of the date of service upon, or other receipt by, any **Insured** of a written demand, complaint, formal order of investigation, target letter, Notice of Violation or Order to Show Cause or similar document in such proceeding, arbitration or investigation..*

*I. **Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including:*

   *1. **Defense Costs**;*

   *2. settlements, judgments (including pre-judgment and post-judgment interest); Compensatory damages;*

   *3. punitive, exemplary, or multiplied damages, if and to the extent such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages, provided such jurisdiction has a substantial relationship to the **Insured**, the **Insurer**, or the **Wrongful Act** giving rise to such damages;*

   *4. liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family and Medical Leave Act, or Equal Pay Act;*

   *5. back pay and front pay; and*

   *6. attorney's fees awarded by a court against an **Insured** to a person or entity bringing a **Claim** oragreed to by the **Insurer,** in writing, in connection with a*

Exhibit 4
Page 101

*settlement*

However, **Loss** *does not include:*

1.  *the cost of compliance with any order for, grant of, or agreement to provide non-monetary or injunctive relief;*
2.  *costs associated with providing any accommodation for persons with disabilities or any other status which is protected under any applicable federal, state or local statutory or common law, including but not limited to the Americans with Disabilities Act, the Civil Rights Act of 1964, or any amendments to or rules or regulations promulgated thereunder;*
3.  *any amounts uninsurable under the law pursuant to which this* **Coverage Part** *is construed;*
4.  *civil or criminal fines, penalties, taxes, sanctions or forfeitures imposed on an* **Insured** *whether pursuant to law, statute, regulation or court rule;*
5.  *future salary, wages, commissions or* **Employee Benefits** *of a person bringing a* **Claim** *who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order, or other resolution of a* **Claim***;*
6.  *compensation (other than back pay or front pay) earned by a claimant in the course of employment but unpaid by an* **Organization** *including salary, wages, commissions, severance, bonus or incentive compensation, or* **Employee Benefits***;*
7.  **Employee Benefits** *due or to become due or the equivalent value of such* **Employee** *Benefits, except with respect to any Claim for wrongful termination; or*
8.  *any amount for which an* **Insured Person** *is absolved from payment by reason of any covenant, agreement or court order.*

**H**. **Insured Person** *means any Executive or* **Employee** *of an* **Organization**

**D. Employee** *means any past, present or future, natural person whose labor or service was, is or will be engaged and directed by an* **Organization,** *including full-time, part-time, temporary, seasonal, leased or loaned employees, interns or volunteers.* **Employee** *also includes an independent contractor working for an* **Organization***, but only while acting in his or her capacity as such and only if the* **Organization** *has agreed to indemnify such independent contractor in writing and in the same manner as provided to the* **Organization's** *other* **Employees** *for liability arising out of a* **Claim.**

To the extent that punitive damages are not insurable under the laws of the State of California, the Policy would not provide coverage for punitive damages.

If at some point a settlement is reached and payment is made via W2 to the claimant for lost wages, please be advised the employer's tax withholdings would be the Insured's responsibility as taxes do not meet the definition of **Loss** above.

Exhibit 4
Page 102

As you are aware, the defense of this case has been referred to the law offices of Wesierski & Zurek. Please continue to extend this counsel your full cooperation.

The Company's position with respect to this claim is based upon presently known facts and circumstances and is subject to further evaluation as additional information becomes available. The Company reserves it rights to assert additional terms and provisions under the policy and at law, which may become applicable.

The contents of this letter should not be construed as a waiver of any rights or defenses, which this Company may have under this Policy with respect to this matter.

Please feel free to contact the undersigned if you have any questions.

If you believe that all or part of this claim has been wrongfully denied or rejected, you may have the matter reviewed by the California Department of Insurance at the following address:

California Department of Insurance
Claims Services Bureau
300 South Spring Street, South Tower
Los Angeles, CA 90013
(800) 927-4357
(213) 897-8921
www.insurance.ca.gov

Yours truly,

Linda Carney, CPCU
Claims Examiner
888-523-5545, ext. 2813
lindac@usli.com

Copy:   kathleen.kennedy@amwins.com

File

Exhibit 4
Page 103

# EXHIBIT 5

Exhibit 5
Page 104

CHRISTOPHER P. WESIERSKI†
RONALD ZUREK†
TERENCE P. CARNEY†
THOMAS G. WIANECKI†
PAUL J. LIPMAN
MICHELLE R. PRESCOTT
DAVID M. FERRANTE-ALAN
MARY H. KIM*
JENNIFER W. NAPLES
CHRISTIAN C.H. COUNTS
KATHRYN J. HARVEY
STEPHANIE H. HSIEH
ABE G. SALEN
EILEEN SPADONI
LAURA J. BARNS
ARPINEH YEREMIAN

THOMAS B. CUMMINGS†
LYNNE RASMUSSEN
BRETT A. SMITH
ABRAHAM S. ODABACHIAN
LAYNE M. BUKOVSKIS
CHRISTOPHER A. RICHARDSON
SCARLET R. RUSH
GREGORY S. MILLER
ERIC J. STENBERG
JOSHUA A. NUZZO
DIANE R. DOUGLAS
SIMON L. TRUONG
ZACHARY E. GOROKHOVSKY
WILLIAM S. MCINTOSH
ADAM M. O'SHEA

# WESIERSKI & ZUREK LLP

LAWYERS
29 ORCHARD ROAD
LAKE FOREST, CALIFORNIA 92630
TELEPHONE (949) 975-1000
FACSIMILE (949) 756-0517

100 CORSON STREET, SUITE 300
PASADENA, CALIFORNIA 91103
TELEPHONE (213) 627-2300
FACSIMILE (213) 629-2725

SENDER'S E-MAIL:
CCOUNTS@WZLLP.COM

† AMERICAN BOARD OF TRIAL
ADVOCATES (ABOTA)

ALSO ADMITTED IN
*CONNECTICUT

June 11, 2024

**VIA EMAIL**
James Shrimp, J.D., AIC, PCIOD
Claims Examiner, Professional Claims
USLI
1190 Devon Park Drive
Wayne, PA  19087

Re:     **Durham v CA Endowment**
        Insured:          The California Endowment
        Claim No.:        0-14610
        Our File No.:     USL-0060

Dear Mr. Shrimp:

The discovery in this matter involves the review and potential production of a substantial number of documents and emails, which number in the hundreds of thousands of pages. There are subtle and significant issues of attorney-client privilege because the communications we're from a plaintiff who was in house counsel to the insured. Accordingly, careful attention must be given to the review of any documents before they are produced or considered for production. In order to tackle this time consuming and laborious task, the client has retained the services of an E-discovery vendor, Integreon.  This appears to be reasonable and necessary given the volume of documents involved and the sensitivity of the privilege issues in this context.  However, those services come at a significant cost as is reflected and the SOW attached to this letter. The client has asked that you consider contributing toward this cost since it is necessary and has been incurred in the defense of plaintiff's legal action.

12141770-1 USL-0060

Exhibit 5
Page 105

James Shrimp, J.D., AIC, PCIOD
June 11, 2024
Page 2

Please let me know if you have any questions or comments.

Very truly yours,

WESIERSKI & ZUREK LLP

Christian C.H. Counts
Senior Partner

CCH:jp
Attachment

12141770-1 USL-0060

Exhibit 5
Page 106

DocuSign Envelope ID: 762CEB50-2439-4D14-9F32-FCDCF12ABC8D

# integreon

## Statement of Work

This Statement of Work ("**SOW**") is entered into as of June 7, 2024 (the "**SOW Effective Date**") by and between The California Endowment ("**Client**") and Integreon Intermediate LLC ("**Integreon**"). The Parties agree that this SOW shall be governed by the terms of the Services Agreement dated May 14, 2024 by and between Client and Integreon ("**Agreement**"). Capitalized terms not defined herein shall have the meanings set forth in the Agreement.

### TERM

The Services will commence on or shortly after the SOW Effective Date and continue until the project is completed. Subject to the assumptions set forth in this SOW, the anticipated completion time for the Services is approximately 8 weeks from the commencement of the Services.

### SERVICES

Data processing, hosting, project management, and document review services for the purpose of assisting with eDiscovery review and production. Data processing and hosting services will be provided by PLUSnxt LLC and Integreon will remain responsible in all respects to The California Endowment for the performance of such services.

### FEES, INVOICING AND PAYMENT, EXPENSES

The pricing assumptions and fees for the Services set forth in this SOW shall be as follows:

**Estimated Fees**

| | |
|---|---|
| Data Volume (GB) | 264 |
| Documents per GB | 1,500 |
| Raw Documents (#) | 396,000 |

| Phase 1: Data Mining | | | |
|---|---|---|---|
| **Tech / Hosting** | **Rate** | **Volume** | **Fee ($)** |
| Data ingestion Costs (Per GB) - one time | $25.00 | 264 | $6,600 |
| Hosting (Per GB/Per Month)* | $9.00 | 264 | $2,376 |
| User Licenses (Per User Per Month) | $0.00 | 3 | $0 |
| **Total Tech/Hosting** | | | **$8,976** |

| Data Mining | $ per hour | Hours | Fee ($) |
|---|---|---|---|
| Data Mining | $200.00 | 5 | $1,000 |

| **Phase 1 Total: Tech + Data Mining** | **$9,976** |
|---|---|

**Phase 2 Review Fees**

Client has indicated that it would like Integreon to provide review services, and has requested that Integreon provide project management and document review services. The review cost will be determined after the number of documents for review is determined. Integreon is able to provide the Services for a per document or flat fee rate, which the Parties can mutually agree upon once the size of the review population is determined. The following hourly rate card would apply for onshore review Services.

| Phase 2: Manual Review | |
|---|---|
| **ONSHORE/US Review** | **Rates ($)** |
| Project Management | $200 |
| Reviewer | $45 |
| Data Analytics | $200 |

*Integreon SOW*

Exhibit 5
Page 107

DocuSign Envelope ID: 762CEB50-2439-4D14-9F32-FCDCF12ABC8D

integreon

**Fees/Pricing Assumptions**

Any estimated fees set forth in this SOW are for planning purposes only. Actual cost and billing for Services will be based on actual units (# hours, as applicable) at the rates specified in the table above.

Volume – 264 GB

Documents per GB – 1,500

Raw Documents – 396,000

Rework – Rework for documents caused by changes in protocol or approach after a portion of work has been completed, will be charged at 50% of per doc rate above. Rework or redevelopment of CEL format will be at a price mutually agreed in writing.

Custom/Non-Standard Workflows, SME Work or Advanced Analytics - any custom/non-standard workflows, additional data analytics or SME work (subject matter expertise) will be charged at $200 per hour if needed.

Foreign language documents and AV files - if applicable to be priced at an hourly rate which will be determined based on the matter at hand.

Data Storage - No data for any of Integreon CIR operations are saved on servers outside the United States. Integreon has a 60-day data destruction policy for review Services data unless instructed by The California Endowment otherwise.

**Privileges**

Because Integreon may be acting at the direction of Client's internal or external counsel ("**Counsel**") to provide the Services, the communications between and among the Parties and Counsel, and the Services performed by Integreon hereunder, will be made primarily to enable Counsel to render legal advice to Client in anticipation of litigation and regulatory inquiries that may arise regarding the data. Accordingly, Integreon's communications with Counsel and Client, Integreon's deliverables, notes, and other work product, and all information and data received from Counsel or Client, excluding Integreon IP ("**Communications**") are intended by Counsel to be covered by attorney-client privilege, work product doctrine, and all other applicable legal privileges. Accordingly, Integreon agrees to treat and regard all Communications arising out of or relating to the Services in a manner consistent with the maintenance of any such privilege or protection, and as Confidential Information and subject to the confidentiality requirements of Section 6 of the Agreement. Integreon agrees to work under the direct supervision, instruction, and direction of Counsel, including by protecting all Communications in accordance with the instructions from Counsel that may be provided separately to Integreon.

**Invoicing and Payment**

Client will be invoiced monthly in arrears for the Services. Payment will be made in accordance with Section 2 of the Agreement.

**Expenses**

Client shall pay or reimburse Integreon for the reasonable out-of-pocket expenses in accordance with Client's Travel and Expense Policy for Contractors incurred by Integreon in connection with Integreon's performance of its obligations under this SOW, provided Integreon has obtained the prior written approval of Client before incurring any expenses. Integreon shall separately identify all such reimbursable expenses in the applicable invoice for Services.

Client shall be responsible at its own expense for obtaining all necessary licenses and subscriptions so that the Integreon team will access the client applications and/or databases in a compliant manner.

[Signature Page Follows]

*Integreon SOW*

Exhibit 5
Page 108

DocuSign Envelope ID: 762CEB50-2439-4D14-9F32-FCDCF12ABC8D



## SIGNATURE PAGE TO STATEMENT OF WORK

The terms of this SOW are agreed to by the Parties as of the SOW Effective Date.  This SOW may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

The California Endowment                    Integreon Intermediate LLC

By: _Martha Jimenez_____         By: _Michael Zuercher_____

Name: __Martha Jimenez_____         Name: __Michael Zuercher_____

Title: _EVP/General Counsel/Secretary_      Title: __General Counsel_____

*Integreon SOW*

Exhibit 5
Page 109

# EXHIBIT 6

Exhibit 6
Page 110

CHRISTOPHER P. WESIERSKI†
RONALD ZIJREK†
TERENCE P. CARNEY†
THOMAS G. WIANECKI†
PAUL J. LIPMAN
MICHELLE R. PRESCOTT
DAVID M. FERRANTE-ALAN
MARY H. KIM*
JENNIFER W. NAPLES
CHRISTIAN C.H. COUNTS
KATHRYN J. HARVEY
STEPHANIE H. HSIEH
ABE G. SALEN
EILEEN SPADONI
LAURA J. BARNS
ARPINEH YEREMIAN

THOMAS B. CUMMINGS†
LYNNE RASMUSSEN
BRETT A. SMITH
ABRAHAM S. ODABACHIAN
LAYNE M. BUKOVSKIS
CHRISTOPHER A. RICHARDSON
SCARLET R. RUSH
GREGORY S. MILLER
ERIC J. STENBERG
JOSHUA A. NUZZO
DIANE R. DOUGLAS
SIMON L. TRUONG
ZACHARY E. GOROKHOVSKY
WILLIAM S. MCINTOSH
ADAM M. O'SHEA

† AMERICAN BOARD OF TRIAL
ADVOCATES (ABOTA)

ALSO ADMITTED IN
*CONNECTICUT

# WESIERSKI & ZUREK LLP

LAWYERS
29 ORCHARD ROAD
LAKE FOREST, CALIFORNIA 92630
TELEPHONE (949) 975-1000
FACSIMILE (949) 756-0517

100 CORSON STREET, SUITE 300
PASADENA, CALIFORNIA 91103
TELEPHONE (213) 627-2300
FACSIMILE (213) 629-2725

SENDER'S E-MAIL:
CCOUNTS@WZLLP.COM

July 12, 2024

**VIA EMAIL**
James Shrimp, J.D., AIC, PCIOD
Claims Examiner, Professional Claims
USLI
1190 Devon Park Drive
Wayne, PA  19087

Re:     Durham v CA Endowment
        Insured:        The California Endowment
        Claim No.:      0-14610
        Our File No.:   USL-0060

Dear Mr. Shrimp:

As you know, the discovery in this matter involves the review and potential production of a substantial number of documents and emails.  The client has engaged Integreon (an E-Discovery vendor) to assist in the production of documents and creation of a privilege log.  Integreon's latest status report reflects the review of 442,991 documents.  Integreon has identified 199,821 responsive documents and potential privilege issues on 285,289 documents.  I believe Integreon's assistance is reasonable and necessary given the volume of documents involved and the sensitivity of the privilege issues in this context.

Enclosed, please find Integreon's July 8, 2024 invoice.  The client has asked that USLI contribute toward this cost since it is necessary and has been incurred in the defense of plaintiff's legal action.  Please let me know if you have any questions or if you need further information.

12160044-1 USL-0060

Exhibit 6
Page 111

James Shrimp, J.D., AIC, PCIOD
July 12, 2024
Page 2

Very truly yours,

WESIERSKI & ZUREK LLP

Christian C.H. Counts
Senior Partner

CCH:CCC
Enclosure

I2160044-1 USL-0060

Exhibit 6
Page 112

| Invoice | |
|---|---|
| **integreon**<br><br>Integreon Intermediate LLC.<br>3247 47th Street SouthFargo,North Dakota,US58104 | **Invoice Details**<br>Invoice No     : 111137369<br>Invoice Date   : 08-JUL-2024<br>Payment Term : 30 NET<br>Due Date       : 07-AUG-2024<br>PO No          :<br>Project Name  : California Endowment - Durham v TCE |

**Customer Details**

| Client Code: | 20246800 | | Ship To: | The California Endowment |
|---|---|---|---|---|
| Bill To: | The California Endowment<br>1000 Alameda Street,<br>Los Angele<br>CA,US,90012 | | | 1000 Alameda Street,<br>Los Angele<br>CA, US,90012 |
| Attention : | Lynell D. Davis | | | |

| SR No. | Description | Quantity | Rate | Amount(USD) |
|---|---|---|---|---|
| 1 | Data Ingestion | 204.61 | 25.00 | 5,115.25 |
| 2 | Hosting | 314.6 | 9.00 | 2,831.40 |
| | | Item Total: | | 7,946.65 |
| | | Tax: | | |
| | | Grand Total: | | 7,946.65 |

**REMITTANCE INSTRUCTIONS**
Please use below bank details for Wire & ACH transfer.

**Bank Details**

| Bank Name : | HSBC Bank | |
|---|---|---|
| Beneficiary Name: | INTEGREON INTERMEDIATE LLC | |
| Address : | 2911 Walden Ave, Depew, NY 14043 | |
| Account No: | ███████ | |
| ABA for ACH transfer: | | |
| ABA for Wire Transfer: | | |
| SWIFT CODE: | MRMDUS33 | |

| While making payments please mention Ref as per below :<br>Payment for Invoice No. **111137369** Dated: **08-JUL-2024** | PS : If you have any query with regards to above invoice,<br>please send email to ARInvoiceDesk@integreon.com |
|---|---|

Exhibit 6<br>Page 113

# EXHIBIT 7

Exhibit 7
Page 114

## Christian C.H. Counts

| | |
|---|---|
| **From:** | Christian C.H. Counts |
| **Sent:** | Wednesday, July 31, 2024 6:00 PM |
| **To:** | James Shrimp; Jennifer Purcell |
| **Cc:** | Steven Griego; Claims Imaging |
| **Subject:** | RE: Durham v CA Endowment - Claim Number    0-14610 -  USL-0060 |

Thank you, James.

The client engaged the e-discovery vendor themselves without my input.  I have forwarded your request for the W9 form.

Sincerely,


Christian C.H. Counts, Esq.
**Wesierski & Zurek LLP**
29 Orchard Road, Lake Forest, CA 92630
Tel. No. (949) 975-1000
Fax. No. (949) 756-0517
Email ccounts@wzllp.com



Follow us on:
Confidential Communication: Emails from this firm normally contain confidential and privileged material and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. This communication and all attachments are confidential, in anticipation of litigation or in furtherance of litigation. The attorney client privilege, work product doctrine and privacy rights of the sender, recipients and third parties are specifically asserted as to this communication and all attachments, in addition to all other protections afforded by law, including without limitation, HIPAA, physician/patient privilege, trade secret, tax privacy, copyright and trademark laws. If you believe that you received this email in error, please do not read this email or any attached items. Please delete the email and all attachments, including any copies thereof, and inform the sender that you have deleted the email, all attachments and any copies thereof. Thank you.


**From:** James Shrimp <james.shrimp@USLI.com>
**Sent:** Wednesday, July 31, 2024 12:30 PM
**To:** Jennifer Purcell <JPurcell@WZLLP.COM>
**Cc:** Christian C.H. Counts <ccounts@WZLLP.COM>; Steven Griego <SGriego@WZLLP.COM>; Claims Imaging <claimsimaging@USLI.com>
**Subject:** RE: Durham v CA Endowment - Claim Number 0-14610 - USL-0060


**\*\*CAUTION: This email originated from outside of the organization.\*\***


Christian,

Regarding this invoice, I believe you know that we have our own e-discovery vendors that we utilize.

Did the Insured hire this vendor without consulting you?  Did you advise them we have our own vendors?

Exhibit 7
Page 115

We are reviewing the invoice.

If we are going to contribute, I cannot do so without a W9.

Thank you,


**James B. Shrimp, J.D., AIC**
**Claims Examiner, Professional Claims**
888-523-5545 ext. 2898 | james.shrimp@usli.com | Alternate Contact Kevin Buffington ext. 2499
1190 Devon Park Drive, Wayne, PA 19087



*SPEED, ACCESSIBILITY and*
*EASE OF USE*$^{TM}$

*Learn more or quote over the phone 888-773-8754,*
*online or via email submission. You can even reply to this email,*
*and I'll make sure your submission gets to the right team!*

**Watch Video >>**


**From:** Jennifer Purcell <JPurcell@WZLLP.COM>
**Sent:** Friday, July 12, 2024 12:02 PM
**To:** James Shrimp <james.shrimp@USLI.com>
**Cc:** Christian C.H. Counts <ccounts@WZLLP.COM>; Steven Griego <SGriego@WZLLP.COM>
**Subject:** (EXTERNAL) Durham v CA Endowment - Claim Number 0-14610 - USL-0060

CAUTION EXTERNAL EMAIL. This email originated outside of USLI.

Please see the attached letter for your review, thank you.


Jennifer A. Purcell, assistant to
Thomas B. Cummings, Esq.
Christian C.H. Counts, Esq.
Eileen Spadoni, Esq.
**Wesierski & Zurek LLP**
29 Orchard Road, Lake Forest, CA 92630
Tel. No. (949) 975-1000
Fax. No. (949) 756-0517
Email jpurcell@wzllp.com



**WESIERSKI & ZUREK LLP**
**Experience Excellence** [wzllp.com]

Follow us on: [facebook.com] [twitter.com] [linkedin.com] [wzllp.com]

Confidential Communication: Emails from this firm normally contain confidential and privileged material and are for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. This communication and all attachments are confidential, in anticipation of litigation or in furtherance of

2

Exhibit 7
Page 116

litigation. The attorney client privilege, work product doctrine and privacy rights of the sender, recipients and third parties are specifically asserted as to this communication and all attachments, in addition to all other protections afforded by law, including without limitation, HIPAA, physician/patient privilege, trade secret, tax privacy, copyright and trademark laws. If you believe that you received this email in error, please do not read this email or any attached items. Please delete the email and all attachments, including any copies thereof, and inform the sender that you have deleted the email, all attachments and any copies thereof. Thank you.

3

Exhibit 7
Page 117

# EXHIBIT 8

Exhibit 8
Page 118



October 28, 2024

Ms. Lynell Davis, Esq.
The California Endowment
1000 N. Alameda St.
Los Angeles, CA 90012

**VIA E-MAIL AT:** ldavis@calendow.org

| RE: | Claimant: | Gina Durham |
|---|---|---|
| | Claim Number: | 0-14610 |
| | Reported Date of Loss: | 5/11/2022 |
| | Date Received: | 5/11/2022 |
| | Named Insured: | The California Endowment |
| | Policy Number: | DPS5000364C |
| | Policy Effective Dates: | 9/1/2021 to 9/1/2022 |
| | Issuing Company: | Radnor Specialty Insurance Company |

Dear Ms. Davis,

Radnor Specialty Insurance Company ("the Company") writes this letter to address the amount that Integreon, an e-discovery vendor, billed The California Endowment in connection with work performed related to discovery in the lawsuit filed by the Claimant Gina Durham.

On June 11, 2024, defense counsel Christian Counts advised the Company that The California Endowment had retained Integreon to assist with document production and provided a Statement of Work ("SOW") which noted the Phase I cost was estimated at $9,976. The Company never agreed to have Integreon assist with discovery but on August 14, 2024, paid one invoice from Integreon in the amount of $7,946.65. The Company never received any estimates regarding the Phase 2 work contemplated under the SOW. The Company subsequently received additional invoices from Integreon dated August 16, 2024, totaling $412,618.94, which apparently are related to Phase 2 work.

Please refer also policy form EVP 100 GTC (11-19) **General Terms and Conditions**, which provides in relevant part:

V. DEFENSE AND SETTLEMENT

A. Defense

The **Insurer** shall have the right and duty to defend any **Claim** covered by this **Policy** even if the allegations are groundless, false or fraudulent. The **Insurer** shall have the right to appoint counsel of its choice with respect to such **Claim**. The **Insurer's** obligation to defend any **Claim** or pay any **Loss**, including **Defense Costs**, shall be completely fulfilled and extinguished if the applicable Limit of Liability has been exhausted by payment of **Loss**.

A BERKSHIRE HATHAWAY COMPANY

1190 DEVON PARK DRIVE • P.O. BOX 6700 • WAYNE, PA 19087 • 610-688-2535 • 888-523-5545 • FAX 610-688-4391

United States Liability Insurance Company • Mount Vernon Fire Insurance Company • U.S. Underwriters Insurance Company

 USLI.COM

Exhibit 8
Page 119

Lynell Davis, Esq.
0-14610
October 28, 2024

* * *

2. No **Insured** shall settle any **Claim**, incur any **Defense Costs**, or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Defense Costs**, assumed obligation or admission to which it has not consented.

The above cited provision states that the Company shall not be liable for any **Defense Costs** or assumed obligation to which it has not consented. Because the expenses reflected in the August 16, 2024, were incurred by The California Endowment without the knowledge or consent of the Company, these expenses are not covered under the Policy.

If you have additional information or legal authority that you believe may affect the Company's position regarding this issue, or you obtain such information or authority in the future, please send me such information or documentation for review. The Company reserves all its rights under the Policy and at law.

If you have questions or disagree with the decision communicated in this letter, please contact me via e-mail at kevin.brown@usli.com or by phone at (888) 523-5545, ext. 7673.

Sincerely,

Kevin M. Brown
Coverage Specialist

2

Exhibit 8
Page 120

# EXHIBIT 9

Exhibit 9
Page 121

## Invoice

# integreon

Integreon Intermediate LLC.
4150 19th Avenue South, Suite 202, Fargo, North Dakota, US58103

**Invoice Details**

| | | |
|---|---|---|
| Invoice No | : | 111137717 |
| Invoice Date | : | 16-AUG-2024 |
| Payment Term | : | 30 NET |
| Due Date | : | 15-SEP-2024 |
| PO No | : | |
| Project Name | : | California Endowment - Durham v TCE |
| Billing Period | : | June & July 2024 |

### Customer Details

**Client Code:** 20246800

**Bill To:** The California Endowment
1000 Alameda Street,
Los Angele
CA, US, 90012

**Attention :** Lynell D. Davis

**Ship To:** The California Endowment
1000 Alameda Street,
Los Angele
CA, US, 90012

| SR No. | Description | Quantity | Rate | Amount(USD) |
|---|---|---|---|---|
| 1 | Hosting | 318.01 | 9.00 | 2,862.09 |
| 2 | Project Management | 264.88 | 200.00 | 52,976.00 |
| 3 | Reviewer | 7856.93 | 45.00 | 353,561.85 |
| | Item Total: | | | 409,399.94 |
| | Tax: | | | |
| | Grand Total: | | | 409,399.94 |

**REMITTANCE INSTRUCTIONS**

A) If you are paying by check, issue in the name of Integreon Intermediate LLC.: **Integreon Intermediate LLC, 4150 19th Avenue South, Suite 202, Fargo, North Dakota 58103**
B) Please use below bank details for Wire & ACH transfer.

### Bank Details

| | |
|---|---|
| **Bank Name :** | HSBC Bank |
| **Beneficiary Name:** | INTEGREON INTERMEDIATE LLC |
| **Address :** | 2911 Walden Ave, Depew, NY 14043 |
| **Account No:** | ■■■■■ |
| **ABA for ACH transfer:** | |
| **ABA for Wire Transfer:** | |
| **SWIFT CODE:** | MRMDUS33 |

While making payments please mention Ref as per below :
Payment for Invoice No. **111137717** Dated: **16-AUG-2024**

PS : If you have any query with regards to above invoice, please send email to ARInvoiceDesk@integreon.com

Exhibit 9
Page 122

# EXHIBIT 10

Exhibit 10
Page 123

## Invoice

**integreon**

Integreon Intermediate LLC.
4150 19th Avenue South, Suite 202, Fargo, North Dakota, US58103

### Invoice Details

| | | |
|---|---|---|
| Invoice No | : | 111137718 |
| Invoice Date | : | 16-AUG-2024 |
| Payment Term | : | 30 NET |
| Due Date | : | 15-SEP-2024 |
| PO No | : | |
| Project Name | : | California Endowment |
| Billing Period | : | June & July 2024 |

### Customer Details

| | |
|---|---|
| **Client Code:** | 20246800 |
| **Bill To:** | The California Endowment<br>1000 Alameda Street,<br>Los Angele<br>CA,US,90012 |
| **Attention :** | Lynell D. Davis |

**Ship To:** The California Endowment
1000 Alameda Street,
Los Angele
CA, US,90012

| SR No. | Description | Quantity | Rate | Amount(USD) |
|---|---|---|---|---|
| 1 | Project Management | 6.5 | 100.00 | 650.00 |
| 2 | Reviewer | 51.38 | 50.00 | 2,569.00 |
| | Item Total: | | | 3,219.00 |
| | Tax: | | | |
| | Grand Total: | | | 3,219.00 |

**REMITTANCE INSTRUCTIONS**

A) If you are paying by check, issue in the name of Integreon Intermediate LLC.:**Integreon Intermediate LLC, 4150 19th Avenue South, Suite 202, Fargo, North Dakota 58103**
B) Please use below bank details for Wire & ACH transfer.

### Bank Details

| | |
|---|---|
| **Bank Name :** | HSBC Bank |
| **Beneficiary Name:** | INTEGREON INTERMEDIATE LLC |
| **Address :** | 2911 Walden Ave, Depew, NY 14043 |
| **Account No:** | |
| **ABA for ACH transfer:** | |
| **ABA for Wire Transfer:** | |
| **SWIFT CODE:** | MRMDUS33 |

While making payments please mention Ref as per below :
Payment for Invoice No. **111137718** Dated: **16-AUG-2024**

PS : If you have any query with regards to above invoice, please send email to ARInvoiceDesk@integreon.com

Exhibit 10
Page 124

Declaration of Ilya A. Kosten

Jennifer Yu Sacro, SBN: 208988
E-Mail: jsacro@sacrowalker.com
Ilya A. Kosten, SBN: 173663
E-Mail: ikosten@sacrowalker.com
Lisa M. Burnett, SBN: 324293
E-Mail: lburnett@sacrowalker.com
SACRO & WALKER LLP
700 North Brand Boulevard, Suite 610
Glendale, California 91203
Tel.: (818) 721-9597; Fax: (818) 721-9670

Attorneys for Defendant
RADNOR SPECIALTY
INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA ENDOWMENT, | ) Case No. 2:25-cv-06891 ODW (MARx) |
| Plaintiff, | ) Hon. Otis D. Wright, II |
| v. | ) **DECLARATION OF ILYA A.** |
| | ) **KOSTEN IN SUPPORT OF** |
| RADNOR SPECIALTY | ) **DEFENDANT RADNOR SPECIALTY** |
| INSURANCE COMPANY, | ) **INSURANCE COMPANY'S MOTION** |
| | ) **FOR SUMMARY JUDGMENT** |
| Defendant. | ) |
| | ) DATE:             December 29, 2025 |
| | ) TIME:             1:30 P.M. |
| | ) COURTROOM:   10C |
| | ) |
| | ) Complaint filed: July 28, 2025 |
| | ) Pre-Trial Conference: February 22, 2027 |
| | ) Trial: March 9, 2027 |
| | ) |
| | ) |
| | ) |

-126 -

DECLARATION OF ILYA A. KOSTEN IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

I, Ilya A. Kosten, declare as follows:

1.     I am over the age of 18, a licensed California attorney, and admitted to practice in the United States District Court for the Central District of California. I am a partner with the law firm of Sacro & Walker, LLP, attorneys of record for Radnor Specialty Insurance Company ("Radnor") in the instant action.  I am the attorney primarily responsible for the handling of this action, and I submit the instant declaration in support of Radnor's motion for summary judgment concurrently filed herewith. The following facts are within my personal knowledge.  If called upon as a witness, I could and would testify competently to those facts, under oath.

2.     On September 19, 2025, and then again on October 3, 2025, in compliance with Central District local rule 7-3, I met and conferred via video conference with Plaintiff's counsel Steven Brower regarding the substance of Radnor's motion for summary judgment, the grounds therefor, and potential resolution. I discussed with Mr. Brower that, as also previously set forth in various correspondence sent by Radnor to Plaintiff, it is Radnor's position that the alleged e-discovery costs in the amount of $412,618.94 sought by Plaintiff in this action are not covered under various provisions of the applicable insurance policy, which provisions I discussed with Mr. Brower, that they were not authorized or consented to by Radnor, and that, accordingly, Plaintiff is not entitled to reimbursement for such unauthorized and uncovered costs. Mr. Brower informed me that it remains Plaintiff's position that such

/ / /

/ / /

/ / /

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

- 127 -

DECLARATION OF ILYA A. KOSTEN IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

costs are covered under the policy. As a result, a resolution could not be reached short of filing the motion for summary judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true correct.  This declaration was signed on November 19, 2025, in Glendale, California.

_____
Ilya A. Kosten

SACRO & WALKER LLP
700 N. Brand Boulevard, Suite 610
Glendale, California 91203

- 128 -

DECLARATION OF ILYA A. KOSTEN IN SUPPORT OF DEFENDANT RADNOR SPECIALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT